# Exhibit 7 –
# Order Granting Defendants'
# Motion for Summary Judgment

# Exhibit 7

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MICHAEL ERWINE,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )        3:18-cv-00461-RCJ-WGC
                                         )
CHURCHILL COUNTY, a political            )        **ORDER**
subdivision of the State of Nevada, *et al.* )
                                         )
            Defendants.                  )
_____ )

Defendants move for summary judgment in this case on Plaintiff's sole remaining federal-law claim that Defendants violated Plaintiff's right to due process by terminating his employment and allegedly issuing a stigmatizing statement that hampered his ability to work in his chosen profession[1] and to dismiss the pendent state-law claims under 28 U.S.C. § 1367(c)(3). The Court grants this motion in its entirety and closes the case.[2]

---

[1] While the Court treats this claim as one, Plaintiff breaks it down into two: an individual claim against Defendant Trotter and a *Monell* claim against Defendant Churchill County based upon Defendant Trotter's actions as an alleged final policy-maker. As the Court finds that the underlying merits are subject to summary judgment, it declines to address the additional requirements of *Monell.*

[2] There are two further motions that can be handled summarily. Plaintiff moves to allow for testimony at trial via tele-video. (ECF No. 174.) This motion is denied as moot. Plaintiff also moves to seal an exhibit. (ECF No. 177.) This Court has previously allowed for this specific exhibit to be sealed. (ECF No. 126.) This Court grants this request for the same reasons.

## FACTUAL BACKGROUND

From December 9, 2015 until October 10, 2016, Plaintiff was employed as a Deputy Sheriff for the Churchill County Sheriff's Office (CCSO). This employment came after Plaintiff had previously, and unsuccessfully, applied with several law enforcement agencies for work. Plaintiff applied for positions with the Washoe Tribal Police in 2011, Washoe County Sheriff's Office in October of 2015, Sparks Police Department in June of 2015, Lyon County Sheriff's Office in April of 2015, and Fallon Tribal Police in April of 2015. (ECF No. 120 Ex. 1 at 72, 75–80, 87.) All of these applications were denied. (*Id.*) As one of Plaintiff's letters of recommendation states and Plaintiff acknowledges, this difficulty in securing employment may have been due to a prior arrest for driving under the influence in 2011. (*Id.* at 86–87, 106–07; ECF No. 120 Ex. 2.) At the time of this arrest, Plaintiff was a part-time volunteer deputy with the Carson City Sheriff's Office. (ECF No. 120 Ex. 1 at 86–87.) He resigned shortly after the arrest, while the criminal case was proceeding. (*Id.*)

When the CCSO hires deputy sheriffs, they are hired on a probationary status for one year, wherein employees are at-will. (ECF No. 98 Ex. 12 at 9.) As Plaintiff's employment ended approximately ten months after its start, he never completed his probationary period.

During his employment with the CCSO, Plaintiff acknowledges that his supervisors had noted that he had issues with accountability and taking responsibility. (ECF No. 120 Ex. 1 at 118.) A former captain of the CCSO (Michael Matheson) stated in a memo dated August 11, 2016, that "[Plaintiff] needs to focus on and master his duties and functions in the detention center before being distracted by other opportunities," and "I told [Plaintiff] that to this time he had earned a reputation with his coworkers as an unmotivated and underperforming deputy. I strongly encouraged him to refocus and motivate himself to perform at a higher level . . . ." (ECF No. 93 Ex. 3.)

In July 2016, Plaintiff claims that he and another police officer, Officer Jessica Zamora, witnessed inmate Samuel Davis being mistreated by Sergeant Summers. Plaintiff states the following: Officer Zamora transported Mr. Davis to the jail. Plaintiff and Sergeant Summers went outside to assist her in bringing Mr. Davis into the jail. While Mr. Davis was in the patrol car, he began to yell obscenities to the three officers standing by the car. At which point, Sergeant Summers grabbed Mr. Davis by the throat and slammed him against the side of the car. Later, after booking Mr. Davis into the jail, Sergeant Summers told Plaintiff to write his use of force report for him and be sure to include that it was because of the inmate's "physically aggressive nature" that he used the force he did. A few days later, Sergeant Summers called Plaintiff into his office to discuss Mr. Davis's booking. He also told Plaintiff to "watch out for that bitch" (referencing Officer Zamora) because she reported him for excessive force. Just a few days later, Captain Matheson talked to Plaintiff about Sergeant Summers in relation to Mr. Davis's booking. Shortly after talking to Captain Matheson, Sergeant Summers yelled, "Did you rat me out?" while walking past Plaintiff in the hallway.

In October of 2016, two events occurred that culminated in the termination of the Plaintiff's employment with the CCSO. First, on October 8, Plaintiff went into work for the day shift. When he came in there was an inmate, Mr. Andrew Beaulieu, who was complaining about not receiving water. He was in a security cell and waiting to be booked into the jail.

Regarding this incident, Plaintiff claims the following: When Plaintiff arrived at Mr. Beaulieu's security cell, he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Plaintiff that Mr. Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. After investigating the circumstances, Plaintiff discovered Mr. Beaulieu had been requesting water for about two hours. Mr. Beaulieu informed Plaintiff that every time he had requested water, the grave shift deputy would flush the

drain in Mr. Beaulieu's cell making Mr. Beaulieu's request inaudible over the flushing noise. This was later confirmed during review of surveillance footage. Plaintiff provided Mr. Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Mr. Beaulieu what the rest of the booking process would look like. During this time, Mr. Beaulieu expressed to Plaintiff that the grave shift deputies were "assholes," and he would be filing a lawsuit against them. Plaintiff continued to conduct his rounds in the jail. While Plaintiff was conducting his rounds, other inmates asked Plaintiff what had happened to the "guy in the security cell" the previous night and opined that what the grave shift did "was messed up." Another inmate filed a grievance request to Captain Matheson regarding the treatment of Mr. Beaulieu. Plaintiff reviewed surveillance footage of the grave shift's interaction with Mr. Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Mr. Beaulieu before removing him from the security cell. Plaintiff did not note any alarming actions by Mr. Beaulieu wherein Plaintiff would need to be concerned. However, he did note acts of the grave shift deputy that he considered inappropriate and concerning and that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Plaintiff chose to log the events on his computer (ECF No. 115 Ex. 1 Attachment A) so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

Another deputy that was working during this incident, Deputy Thompson, drafted a memorandum that he sent to Defendant Benjamin Trotter, who was the sheriff at the time. In this memorandum, he largely agrees with Plaintiff's version of events with a few key differences. He adds that the deputies had not given Mr. Beaulieu water for the two-hour period because he was drunk and being verbally aggressive. Whenever a deputy approached him, he would tell him, "Go fuck yourself." He claims that he heard Mr. Beaulieu whisper to Plaintiff that he would like to

speak with him privately, and Plaintiff then took him to the kitchen alone to speak with him for several moments.

Second, on October 9, 2016, there was an incident with Plaintiff involving an inmate, Mr. Michael Maes, and another deputy, Deputy Jolie Jabines. Regarding this incident, Plaintiff avers to the following: During Plaintiff's dayshift, Deputy Jabines dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her. Plaintiff did not feel it was appropriate for Deputy Jabines to have Mr. Maes come into the booking cage to pick up items which could be used as weapons. Plaintiff questioned Deputy Jabines about this but her only response was "Senior Deputy," which Plaintiff understood as meaning that he did not have a say in the matter. Mr. Maes then came into the cage in response to Deputy Jabines' order. Plaintiff positioned himself between Mr. Maes and the control panel of the facility. Plaintiff was in an uncomfortable position with Mr. Maes being only a few feet away from Plaintiff and backed into a corner. Plaintiff removed his taser from its holster and held it in his hand with the taser pointed to the ground. Plaintiff removed the cartridge from the taser due to the close proximity of Mr. Maes to both Plaintiff and Deputy Jabines. Mr. Maes cleaned up the items and left the cage without incident.

Deputy Jabines also drafted a memorandum addressed to Defendant Trotter regarding the Maes incident. In it, she expressed concerns over how Plaintiff handled himself in this situation. She contends there was never a need for the taser, and his use of it distracted her from attending to Mr. Maes as well as endangered her and Mr. Maes from being accidently tased. She says that Mr. Maes never showed any signs that he would pose a threat to them, and he crouched on the ground while Plaintiff was aiming the taser near him. Further, she says that Plaintiff "snickered," when he had his taser out. She lastly claims Plaintiff "turned off the [taser], removed the cartridge,

reactivated the [taser], and pulled the trigger making a loud noise while sparking all while still aiming the [taser] at Inmate Maes."

On October 10, 2016, Defendant Trotter met with Plaintiff and gave him the choice to resign or the CCSO would terminate his employment effective immediately. Plaintiff chose to resign. On that same day, Defendant Trotter placed a memorandum in Plaintiff's personnel file (the Trotter Memo). (ECF No. 115 Ex. 3.) This memorandum summarizes the information Defendant Trotter had been presented through the memoranda from other deputies and concludes there are a number of "items of concern." (*Id.*) These items led him to conclude that it would be best to "terminate[ Plaintiff's employment] today for failing to satisfactorily complete his probation." (*Id.*)

The memo contains a number of statements, which Plaintiff claims are defamatory and stigmatizing: Plaintiff "fail[ed] to follow proper chain of command;" Plaintiff engaged in "conduct unbecoming a deputy and unjustifiable use of force;" Plaintiff created "liability" for the agency; Plaintiff was "unprofessional;" and Plaintiff violated the "taser and use of force" policy as well as "behavioral standards."

After his resignation, Plaintiff again attempted to find employment as a police officer. (ECF No. 115 Ex. 12.) On January 17, 2017, Plaintiff received a letter from the Washoe County Sheriff's Office informing him that "the Sheriff's Office has determined that you do not meet the established standards for a position as Deputy Sheriff and therefore you have not been selected at this time." On February 7, 2017, Plaintiff received an email from the Las Vegas Metropolitan Police Department (LVMPD) in response to his application for employment informing him that "based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet the LVMPD hiring standards based on Employment History" and "You

are not eligible to apply with the LVMPD for any position indefinitely." On September 8, 2017, Plaintiff received a letter from the Carson City Department of Alternative Sentencing informing him that he is "no longer being considered in the current recruitment due to failing on one or more portions of the selection process" which included the Background Investigation and Chief's Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future." On September 12, 2017, Plaintiff received from Douglas County Sheriff's Office a letter informing him that he "did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment." On November 14, 2017, Plaintiff received a letter from North Las Vegas Police Department informing him he was "ineligible to continue in the employment process for the position of Police Officer . . . for character issues and his employment history," and "You are disqualified indefinitely." On March 1, 2018, Plaintiff received a letter from Reno Police Department informing him that his "application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your preemployment background investigation."

The parties stipulate to the fact the CCSO provided the Washoe County Sheriff's Office a copy of the Trotter Memo. Defendants, however, contend they did not provide the memo to any other agency. Plaintiff disputes this fact by pointing to Nevada statutes that dictate that a public safety agency may compel the disclosure of personnel files for their applicants for prior service as a peace officer. Nev. Rev. Stat. 239B.020. Plaintiff also hired an expert witness, Mr. Ron Dreher. He opines that the Nevada departments likely saw this memo through that procedure due to the fact that they uniformly denied his applications and the fact that the some of the law enforcement agencies denied his applications indefinitely. (ECF No. 115 Ex. 13.) He avers to the following:

> Detective Olson [of the LVMPD] most likely obtained or had already obtained
> Sheriff's Trotter's October 10, 2016 memorandum stating his reasons for
> terminating Mr. Erwine. Sheriff Trotter's memorandum tainted Mr. Erwine's

background by labeling him a "liability". It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment. In today's law enforcement world being labeled a "liability" and being terminated for that reason is a law enforcement career killer in my opinion.

(*Id.* at 13.)

In addition, Plaintiff produces the report generated by LVPMD, which details Detective Olson spoke with Defendant Trotter in a phone interview but does not mention the Trotter Memo. (ECF No. 116 Ex. 9.) As noted in the exhibit, Defendant Trotter spoke about the Beaulieu incident, as why Plaintiff was forced to resign. (*Id.*) This led Detective Olson to conclude Plaintiff would be "unsuitable for employment with LVMPD." (*Id.*)

Reno Police Department and North Las Vegas Police Department were issued subpoenas duces tecum each asking for the following: "The complete employment history file of Michael Erwine as it was provided to your office by Churchill County Sheriff's Office. This includes any and all information and documentation regarding preemployment background investigations, employment information and any information regarding reprimands." (ECF No. 171 Exs. 1, 2.) Reno Police Department and North Las Vegas Police Department both responded that they had no responsive records to these requests. (*Id.*)

In his deposition, Plaintiff admitted that he told each of these agencies to which he applied that he was previously arrested for driving under the influence in 2011. (ECF No. 120 Ex. 1 at 77.) He also admitted that he "told every . . . background person . . . I resigned [from the CCSO] in lieu of termination because I witnessed some unethical things taking place in which . . . the sheriff told me I was not part of the team or a good team player." (*Id.* at 33–34.)

///

///

///

On January 8, 2018, a little over a year after resigning from the CCSO, Plaintiff secured employment as a police officer with the Pyramid Lake Paiute Tribe.[3] (ECF No. 120 Ex. 1 at 53.) This department terminated Plaintiff's employment on April 4, 2018. Plaintiff claims that the reason given for this termination was vague but included failing to "complete the training process successfully" and "not [being] at the level that they expected [Plaintiff] to be at." (*Id.*)

Now, Plaintiff is gainfully employed by the Washoe Tribe of Nevada and California as a full-time police officer. (*Id.* at 18.) He was offered this position on July 10, 2019.[4] He has successfully completed this department's one-year probationary period. (*Id.*) Plaintiff was able to secure this position despite having been forced to resign from CCSO. He states, "I basically provided them with my story of the events that took place during my employment [with the CCSO], what I was accused of in the memorandum and then the affidavits and the story of the people involved in that." (*Id.* at 21–22.)

## LEGAL STANDARD

A court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only facts that affect the outcome are material. *Id.*

To determine when summary judgment is appropriate, courts use a burden-shifting analysis. On the one hand, if the party seeking summary judgment would bear the burden of proof

---

[3] Unlike Nevada state and local law enforcement agencies, the tribal police departments are not able to acquire Plaintiff's personnel files under Nev. Rev. Stat. § 239B.020 as they are not a Nevada "public safety agency" under the statute.

[4] During each stint of unemployment as a police officer, after being forced to resign from CCSO, Plaintiff was gainfully employed as a security guard or officer. (ECF No. 171 Ex. 1 at 65; ECF No. 142 at 3.)

at trial, then he can only satisfy his burden by presenting evidence that proves every element of his claim such that no reasonable juror could find otherwise assuming the evidence went uncontroverted. *Id.* at 252. On the other hand, when the party seeking summary judgment would not bear the burden of proof at trial, he satisfies his burden by demonstrating that the other party failed to establish an essential element of the claim or by presenting evidence that negates such an element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (Brennan J., concurring). A court should deny summary judgement if either the moving party fails to meet his initial burden or, if after he meets that burden, the other party establishes a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

## ANALYSIS

Under the uncontested facts of this case, summary judgment is proper on Plaintiff's federal due process claim. As this is the sole remaining federal-law claim, the Court dismisses the remaining state-law claims without prejudice under 28 U.S.C. § 1367(c).

## I. Plaintiff fails to establish a prima facie stigma-plus claim.

For this claim, Plaintiff needs to prove Defendant Trotter deprived Plaintiff of a constitutionally protected property or liberty interest without adequate process. Plaintiff relies only upon a claimed liberty interest. (*See* ECF No. 113.) In the public employment context, a plaintiff may prove a deprivation of a liberty interest by showing that he was terminated from his employment in conjunction with a stigmatizing statement. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). One without the other is insufficient. *Id.*

There is some discord in caselaw regarding the required criteria that constitute a sufficiently stigmatizing statement. There is a line of cases in which statements that "impair[] a reputation for honesty or morality" are found to be sufficient in themselves. *E.g.*, *Tibbetts v. Kulongoski*, 567 F.3d 529, 535–36 (9th Cir. 2009) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1552

(9th Cir. 1988)). However, in *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013), the Circuit stated:

> [T]he liberty interests protected by the Fourteenth Amendment are implicated *only* when the government's stigmatizing statements effectively exclude the employee completely from her chosen profession. Stigmatizing statements that merely cause "reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession" do not constitute a deprivation of liberty.

(emphasis added) (quoting *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976)). In *Blantz*, the Ninth Circuit was considering an appeal from the dismissal of a complaint for failure to state a claim. *Id.* at 920. It noted that the plaintiff alleged statements from the employer that included "'unwarranted and false information concerning her reputation for honesty and/or morality,' which [the Circuit] accept[ed] as true." *Id.* at 925 n.6. The Circuit nonetheless affirmed dismissal because the plaintiff did not allege facts sufficient to show that she was unable to work in her chosen profession. *Id.* at 926. Following this case, both the element that a stigmatizing statement regards one's honesty or morality and the element that the statement effectively excludes one from his chosen profession are mandatory.

The Court adopts the legal standard as stated in *Blantz* and finds that Plaintiff needs to show that he was effectively excluded from his chosen profession, even if he shows the statement impugned his character for honesty or morality. The Court does so because of the stark similarities between this case and *Blantz*. Both cases involve government employment and public safety employment. The Court also holds this standard to be appropriate, in part, because of the great powers that the government places upon police officers. Law enforcement agencies must ensure that they employ only qualified and morally upstanding citizens, which is undoubtedly why Nevada has put into law the mandatory disclosure requirements for personnel files of police officer applicants. Nev. Rev. Stat. § 239B.020.

Additionally, a plaintiff must show four more elements to satisfy his burden. If a plaintiff can prove a sufficiently stigmatizing statement, he must also show (1) that the accuracy of the charge is contested, (2) that there is some public disclosure of the false, stigmatizing charge, (3) that the charge is made in connection with termination of employment, and (4) that the employer failed to allow him an opportunity to refute the veracity of the charges. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998).

Initially, the Court notes Plaintiff argues his employment with the police officer positions with the Indian Tribes should not be considered employment in his chosen profession. In his deposition, he admitted that his duties are that of a regular police officer. (ECF. No. 120 Ex. 1 at 18.)[5] Plaintiff's expert witness, Mr. Ron Dreher, nonetheless posits the following as grounds for his contention this is not the same profession:

> If [Plaintiff] was hired by a state or local law enforcement agency he would be entitled to the compensation and benefits each sheriff's office or police agency has in [Nevada Revised Statutes] or in their collective bargaining agreement or both. He would be entitled to our [Public Employees' Retirement System of Nevada]. His ability to learn the many facets of policing is enhanced. His ability to promote is enhanced. His ability to transfer from one agency to the next through lateral transfers is enhanced. Tribal police agencies do not offer these benefits.

(ECF No. 115 Ex. 13 as 14.) However, assuming the accuracy of the expert's assertions, the Court concludes Plaintiff has shown, at most, that being a police officer for a tribal police agency causes only "reduced economic returns," which the Ninth Circuit has said is insufficient to constitute a liberty interest. *Blantz*, 727 F.3d at 925. While this Court is unaware of a specific case where a police officer was allegedly relegated to working for a tribal police agency as opposed to a county sheriff's office, even large steps down within the same profession are commonly found to be

---

[5] The Court notes that Plaintiff applied to two tribal police agencies before working for the CCSO, evincing that working for tribal police is part of his chosen profession. The Court further notes that Plaintiff is actually making more money now than he was with the CCSO. As of December 2020, Plaintiff was making $25.85 hourly with the Washoe Tribe of Nevada and California, where he is still working; with the CCSO, he was only making $21.44 hourly. (ECF No. 171 Ex. 1 at 19, 112.)

insufficient to survive summary judgment for a stigma-plus claim. For example, the Ninth Circuit affirmed the conclusion at summary judgment that a judge who lost a judicial appointment and had to return to private practice, was still able to work in his chosen profession of attorney. *Santana v. Cty. of Yuba*, No. 2:15-CV-00794-KJM-EFB, 2019 WL 4734928, at *28 (E.D. Cal. Sept. 27, 2019), *aff'd*, 856 F. App'x 65 (9th Cir. 2021). As such, this effectively narrows Plaintiff's claim to the roughly sixteen-month period between his employment with the CCSO and the Pyramid Lake Paiute Tribe and the roughly fifteen-month period between his employment with the Pyramid Lake Paiute Tribe and the Washoe Tribe of Nevada and California.[6]

Even though these may be "protracted interruptions" of employment in Plaintiff's chosen profession, *Blantz*, 727 F.3d at 925, Plaintiff failed to meet his burden of proffering evidence raising a triable issue of fact that the interruptions were caused by statements from Defendants. Plaintiff and his expert merely speculate that other agencies reviewed the Trotter Memo because Plaintiff was denied employment by six agencies (Washoe County Sheriff's Office, LVMPD, Carson City Department of Alternative Sentencing, Douglas County Sherriff's Office, North Las Vegas Police Department, and Reno Police Department) before acquiring the position with the Pyramid Lake Paiute Tribe.[7] While the parties stipulate that Defendants provided Washoe County

---

[6] He testifies that his application to the Pyramid Lake Paiute Tribe occurred six to eight months before he was finally hired and that this was the general rule for law enforcement applications. (ECF No. 171 Ex. 1 at 31–32.) As such, roughly half of the time he spent outside of a law enforcement agency was while a successful employment application was pending.

[7] Plaintiff speculates that the CCSO disclosed the Trotter Memo to all of the law enforcement agencies of Nevada for which he applied because such disclosure would be mandatory under Nev. Rev. Stat. § 239B.020 if requested. This statute dictates that "[u]pon the request of a public safety agency, an employer shall provide to the public safety agency information" of a "former employee of the employer who is an applicant for the position of . . . peace officer," which may include "[a] record of disciplinary action taken against the applicant." As the disclosure is required by law, it is not the disclosure itself that is potentially actionable but rather the creation of the allegedly defamatory statement without adequate due process for which disclosure is mandatory. Nonetheless, whether they disclosed the Trotter Memo to the other law enforcement agencies is essential to the element of causation, and just because they could request this information does not mean that they did.

Sheriff's Office with a copy of the Trotter Memo, there is no evidence that any other agency for which Plaintiff applied reviewed the memorandum. Additionally, the parties agree that Defendant Trotter relayed some facts regarding the Beaulieu Incident to the LVMPD. (ECF No. 116 Ex. 1.) There is no evidence that the remaining four agencies received any statement from Defendants. Reno Police Department and North Las Vegas Police Department affirmatively stated they had no documents regarding any discipline Plaintiff received from the CCSO. (ECF No. 171 Exs. 2–3.) Because of this lack of causation, Plaintiff cannot show that he was denied employment at these other four agencies because of any stigmatizing statement from Defendants.

Even more, Plaintiff needs to show that it was the alleged stigmatizing statements from Defendants that caused his difficulties in acquiring other employment in his chosen profession—not being forced to resign from the CCSO, not his criminal record, not lack of experience, or any other aspect that potential employers would consider. He experienced a similar period of underemployment before he was hired by CCSO. Plaintiff was job searching for at least eight months before his employment with the CCSO (he applied for Lyon County Sheriff's Office in April of 2015 and was not hired by the CCSO until December of that year). Plaintiff and the author of a letter of recommendation that he submitted to law enforcement agencies note that Plaintiff had struggles with finding a police officer position, possibly related to his prior arrest for driving under the influence. (ECF No. 120 Ex. 2.) Plaintiff's argument that all of the six agencies that denied his applications because of Defendants' statements ignores the fact that five agencies denied his application before the CCSO took him: Washoe Tribal Police, Washoe County Sheriff's Office, Sparks Police Department, Lyon County Sheriff's Office, and Fallon Tribal Police.

Most critically, Plaintiff failed to provide any evidence that shows he could not have applied for the police officer jobs that he acquired with the Pyramid Lake Paiute Tribe and the Washoe Tribe of Nevada and California shortly after being terminated from the CCSO and the

Pyramid Lake Paiute Tribe respectively. While Plaintiff did wait approximately a half-year to apply for each position and waited approximately another half-year for the application process to complete, (ECF No. 171 Ex. 1 at 31–32), nothing in the record indicates that either part of the delay was caused by Defendants' statements. For this reason, no juror could reasonably find that the Trotter Memo or any other statement from defendants caused the "protracted interruptions" to employment in Plaintiff's chosen profession. *Blantz*, 727 F.3d at 925.

In light of the facts that Plaintiff had similar struggles before working with the CCSO and that he was able to file successful applications with two tribal police agencies, the Court concludes that no reasonable juror could find that Defendants deprived Plaintiff of a protected liberty interest by effectively excluding him from his chosen profession. Plaintiff's evidence that two agencies received a statement from Defendants that allegedly stigmatized Plaintiff fails to create a triable issue of fact that would depart from this conclusion. For this reason, Defendants are entitled to summary judgment for Plaintiff's federal stigma-plus due process claim.

Plaintiff seeks to rebut this holding of the Court by relying upon expert testimony from Mr. Dreher for the opinion that the state agencies more likely than not reviewed the Trotter Memo, which caused Plaintiff's employment troubles. The Court finds this testimony is unreliable for these conclusions and therefore does not rely upon it. Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

///

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 tasks district judges with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).[8] To evaluate reliability, the district court "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). These factors are nonexclusive, and "the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case." *Id.*

In his report, Mr. Dreher opines to the following: "If Washoe County [Sheriff's Office] had the memorandum(s) from Sheriff Trotter there is no doubt in my mind that the other law enforcement agencies that Mr. Erwine applied for either had the same copies of those memorandums or had been verbally advised of those memorandums by Sheriff Trotter or his representatives." (ECF No. 176 Ex. 16 at 10.) Plaintiff "has been labeled as a liability by Sheriff Trotter. Accordingly, the chances of him being employed by a state or local government Nevada peace officer agency is almost zero." (*Id.*) "Given the fact that Mr. Erwine was rejected by the local and state law enforcement agencies in Nevada where he applied, there is evidence that Churchill County [Sheriff's Office] and Churchill County released any and all documents

---

[8] The Court is inclined to agree with legal experts that caselaw has strayed from the Supreme Court precedents of *Daubert* and its progeny by relaxing the district courts' gatekeeping function under Rule 702. *See, e.g.*, David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rule of Evidence 702*, 57 Wm. & Mary L. Rev. 1, 26–29 (2015).

regarding Mr. Erwine's employment to the requesting agencies either verbally or in writing." (*Id.* at 12.) "The comments by Las Vegas Metro Police Department (LVMPD) and North Law Vegas Police Department (NLVPD), stating in writing that Mr. Erwine can never again (indefinitely) apply for those departments, substantiate the fact that Mr. Erwine has been branded and labeled as being unfit to be a peace officer in Nevada." (*Id.*) "Mr. Erwine's background prior to his constructive discharge from Churchill County [Sheriff's Office], he would have passed the background investigation and been hired by LVMPD contingent on his passing the polygraph examination." (*Id.* at 13.) "It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment. In today's law enforcement world being labeled a 'liability' and being terminated for that reason is a law enforcement career killer in my opinion." (*Id.*)

Mr. Dreher summarily derives these grand conclusions from his "extensive experience in law enforcement and in representing police unions in negotiations and before the Nevada Legislature." (ECF No. 176 at 12.) Mr. Dreher fails to provide any specific methodology from which he was able to reach these judgments. As such, the Court finds that these conclusions in regard to whether the other law enforcement agencies reviewed the Trotter Memo or other statements from Defendants and whether these such statements caused Plaintiff's troubles in finding employment are not reliable and therefore not helpful.

The Court further concludes that even if it were to adopt Plaintiff's proposed standard— i.e., Plaintiff need not show effective exclusion from his chosen profession if he can show the published statement impaired his character for honesty or morality. According to the standard advocated by Plaintiff, a statement falls into one of three tiers: (1) the statement impugns the employee's character for honesty or morality in which case it is always sufficiently stigmatizing; (2) the statement merely impugns the employee's competence and ability in which case it is never sufficiently stigmatizing; and (3) the statement impugns the employee not for his character for

honesty and morality but also more than mere incompetence in which case the statement is only sufficiently stigmatizing if it causes effective exclusion from his chosen profession.

Plaintiff argues that both his character for honesty and morality were attacked in the Trotter Memo. The Court disagrees.[9] As discussed above, the Trotter Memo summarizes Defendants' position about two incidents that occurred, which resulted in Defendants forcing Plaintiff to resign. The first of these two incidents involved Plaintiff allegedly helping Mr. Beaulieu to investigate the CCSO for misconduct perpetrated against him and encouraged him to sue the CCSO. At best, this amounts to a breach of fiduciary duty as it is never alleged that Plaintiff lied but merely put the interests of a potentially adverse party above those of his employer. The Ninth Circuit recently reversed the denial of qualified immunity under identical grounds, finding there was no example of law finding that alleging a breach of a fiduciary duty amounts to alleging dishonesty or immorality. *Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018). As such, the allegations regarding this incident are insufficient.

The Trotter Memo also discusses the incident in which Defendants allege that Plaintiff inappropriately pointed a taser at an inmate, Mr. Maes. It further alleges that he removed the cartridge from the taser and pulled the trigger to make a loud noise and spark. The memo indicates that this was inappropriate "play" as Plaintiff "snickered." Defendant Trotter called it "conduct unbecoming of an officer" and "perceived use of excessive force." These allegations speak nothing of dishonesty and do not impugn Plaintiff's character for morality. Rather, these allegations merely question Plaintiff's professionalism and maturity by engaging in a reckless prank as opposed to

---

[9] In its prior order, the Court operated under the premise there were only two categories, those that impugned one's character for honesty or morality and those that merely claimed incompetence or inability. (ECF No. 115.) When presented with these limited categories, the Court held that the Trotter Memo rose above mere statements of incompetence and inability and was forced to hold the memorandum impugned Plaintiff's character for morality. If Plaintiff is correct that there is a middle ground, the Court holds the Trotter Memo's statements most squarely falls into it.

moral turpitude. *See, e.g.*, *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401, 1411 (9th Cir. 1988) (allegations of difficulty getting along with others and poor management were not stigmatizing); *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976) (statements of unsatisfactory work and unwillingness and inability to deal with coworkers were not stigmatizing); *Gray v. Union County Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975) (statements of deliberate undermining of social agencies, insubordination, incompetence, hostility toward authority and aggressive behavior were not stigmatizing).

If it adopted Plaintiff's three-tiered analysis, the Court would hold that the Trotter Memo falls into the middle ground whereby a statement is only sufficiently stigmatizing if it were to effectively exclude one from his chosen profession. Plaintiff cannot prove the required exclusion as discussed above. Summary judgment would still be proper therefore even if Plaintiff is correct regarding the legal standard.

In sum, the Court holds that *Blantz* is the appropriate standard for this case and that no reasonable juror could find that Plaintiff was effectively excluded from employment in his chosen profession. Thus, summary judgment is proper. And, even if this Court were to adopt Plaintiff's more lenient standard, the Court still holds summary judgment proper because no reasonable juror could conclude that the statements of Defendants impugned Plaintiff's character for honesty and morality.

## II.     The Court dismisses the pendent state-law claims under 28 U.S.C. § 1367(c)(3).

In cases where, as here, " the district court has dismissed all claims over which it has original jurisdiction" before resolving pendent state-law claims, the court "may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(3). Before dismissing such claims, the court should consider four factors: (1) judicial economy, (2) convenience to the parties, (3) fairness to the plaintiff, and (4) comity. *O'Connor v. State of Nev.*, 27 F.3d 357, 363 (9th Cir. 1994), *as*

*amended* (July 1, 1994), *as amended* (July 12, 1994). "[I]n the usual case in which federal-law claims are eliminated before trial, the balance of [the factors of economy, convenience, fairness, and comity] will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992)); *see also Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court . . . ."). Dismissal under 28 U.S.C. § 1367(c) is without prejudice. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 348 (1988).

Applying these factors here, the Court finds this case fails to stray from the usual one. The economy and convenience factors favor keeping the case in this Court instead of having Plaintiff refile in state court and causing another judge to take up this case. These factors are only slight as there are no great hurdles to either party from litigating this case in state court, where the litigants can pick up where this Court leaves off. Fairness does not favor either way as the parties can reach a fair verdict in state court. Lastly, comity greatly favors dismissal as the remaining claims are state-law ones alleged against a political subdivision and its agent.

///

///

///

///

///

///

///

///

///

## CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 171) is GRANTED. Summary judgment is GRANTED in favor of Defendants for Plaintiff's federal-law causes of action. The pendent state-law claims are dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

IT IS FURTHER ORDERED that Plaintiff's Motion to Allow for Tele-video Testimony at Trial is DENIED AS MOOT.

IT IS FURTHER ORDERED that Plaintiff's Motion to Seal (ECF No. 177) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment and close the case.

IT IS SO ORDERED.

Dated March 9, 2022.

_____
ROBERT C. JONES
United States District Judge