# Exhibit 8 – Amended Complaint

# Exhibit 8

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

MICHAEL ERWINE,

                        Plaintiff,

vs.

CHURCHILL COUNTY, a political
subdivision of the State of Nevada;
CHURCHILL COUNTY SHERIFF
BENJAMIN TROTTER; and DOES 1
through 10 inclusive;

                      Defendants.

_____/

Case No.: 3:18-cv-00461-RCJ WGC

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

COMES NOW, MICHAEL ERWINE, ("Erwine" or "Plaintiff"), by and through

the undersigned counsel, and files the following Amended Complaint seeking

redress for the violation by of Erwine's rights to be free from violation of his rights

under the First and Fourteenth Amendments of the United States Constitution

and for various pendent state law claims against CHURCHILL COUNTY, a

political subdivision of the State of Nevada;  and SHERIFF BENJAMIN TROTTER

("Sheriff Trotter") (collectively "the Defendants"); and JOHN DOES I through X,

inclusive.

This Amended Complaint is filed according to the leave granted by the Court at the Status Conference held on August 3, 2020 (See Doc. # 62).

**Jurisdiction**

1.    This action arises primarily under 42 U.S.C. Section 1983.

2.    This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 1367, 2201 and 42 U.S.C. Sections 1983 and 1988, as the Plaintiff's claim arises under Federal Law.

3.    The Court has personal jurisdiction over the Defendants because the alleged incident described below occurred within this District.

**Venue**

4.    Venue is proper pursuant to 28 U.S.C. Section 1391 in the Northern District of Nevada because the acts giving rise to the Plaintiff's claims occurred in this District.

**Parties**

5.    Mr. Erwine is a former Deputy Sheriff for Churchill County.  Erwine currently resides in Carson City, Nevada.

6.    Churchill County is a political subdivision of the State of Nevada.

7.    Sheriff Trotter was employed by the Churchill County as Sheriff at the times relevant to this Complaint.  Trotter was at all times relevant herein acting under color of state law as described below. Sheriff Trotter is sued in his individual capacity.

8.   Trotter, as Sheriff of Churchill County, was the officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office.

**Statement of Facts**

9.   Between December 9, 2015 and October 10, 2016, Defendant employed Plaintiff in the capacity of Detention Deputy.

10.   On December 9, 2015, Plaintiff took an Official Oath to among other things, faithfully perform all the duties of the office of the Deputy Sheriff and to support, protect and defend the Constitution and Government of the United States, and the Constitution and Government of the State of Nevada.

11.   On December 9, 2015, the first day Plaintiff was employed by Defendant, Plaintiff reviewed and signed various acknowledgements certifying his receipt and review of new hire documents including but not limited to Safety Rules and Regulations, Workplace Safety, Harassment Policy, General Safety, Fraud Prevention, and even acknowledgement of the Job Description of a Detention Deputy Sheriff. In the Job Description, Essential Functions of a Detention Deputy Sheriff included the following:

a. Accountability for inmates-Conducts daily headcounts, periodic cell and pod checks; moves inmates to and from locations for court appearances, medical care, visits, etc.
b. Intake and release of inmates- Brings inmates into the jail by conducting searches, booking questionnaires, fingerprints, photography, access to money and phone.
c. Ensures Safety of Inmates and Staff- Conduct facility and person searches for weapons/drugs/contraband; conduct surveillance, investigations, and reports of crimes committed

within the detention facility; monitor activity of inmates; handle inmates with mental health issues- Carry out processes to ensure that inmates are provided with adequate food, clothing, medicine, and clean living arrangements; Conduct inspections of living conditions to ensure compliance with departmental policy and federal law.

d. Customer Service- Receives and screens visitors and telephone calls and directs the caller to the proper person or personally handles the call; provide information which requires the use of judgment and interpretation of policies, rules and procedures.

e. Court Appearances- Transports inmates to and from court; provides security for court staff and inmates during proceedings; updates legal paperwork to ensure timely compliance with court orders; responds to emergencies in the court house.

f. Medical Treatment- Provide first aid for inmates as required; triage inmates for physician visits and needs for emergency medical treatment and transport; sets up medications and distribute to inmates daily as required; complete documentation for medical issues; provide security for medical staff.

g. Extraditions- Transport inmates to other agency jails, courts, and other facilities; send notices to other agencies of arrests, process warrants, and set-up extraditions with outside companies who transport inmates.

h. Represents the County with dignity, integrity, and a spirit of cooperation in all relationships with staff and the public.

12.     From the commencement of Erwine's employment with Defendant Erwine witnessed the Defendant's officials blatantly disregard basic Constitutional rules, and further disregard the essential duties of a Detention Deputy.

13.     During one instance, almost immediately after beginning his tenure with the County, Erwine witnessed that an Inmate in the detention facility's security cell, Jimmy Thomas, had urinated inside of the security cell. Erwine witnessed Sergeant Summers open the door to the Mr. Thomas' cell and swiftly

push the urine with a squeegee so as it became airborne and splashed all over

Mr. Thomas who was sleeping. Sergeant Summers laughed about this as if it

was entertaining to him. Deputy Davis was also present during this incident.

When Erwine spoke to Deputy Davis after the fact, Deputy Davis informed

Erwine "it is just the way things are." and "It would be best to look the other

way."

14.    Erwine witnessed Sergeant Summers treat other inmates the same

way when they had urinated in the security cell.

15.    On or about April 16, 2016, female inmate Lacy Habberstead

approached Erwine saying she wanted to talk to a sergeant about something

took place while she was at the hospital with Deputy Keller. Ms. Habberstead

informed Erwine that Deputy Keller had her drop her pants in front of him and

watched her as she used the bathroom. Ms. Habberstead asked Erwine if

Deputy Keller's actions were appropriate, and Erwine informed Ms. Habberstead

that he would talk to the Sergeant about it. Erwine told Sergeant Summers about

Habberstead's complaint and that she wanted to talk to Summers about it;

however, Sergeant Summer's response was "Oh Jesus Christ Erwine, why don't

you just hug them all" ... "They are inmates for Christ's sake."

16.    A few days later Captain Matheson went to Erwine and asked him

about the event. Erwine repeated to Captain Matheson the information he

previously provided to Deputy Keller. Shortly after Captain Matheson's

discussion with Erwine, Deputy Keller stopped Erwine in the hallway and

attempted to talk to Erwine about Habberstead's complaint. Deputy Keller told

Erwine, "we don't report that kind of stuff around here."

17.    During a separate occasion, an inmate, Samuel Davis, was

transported to the jail by Officer Zamora of the Fallon Police Department.

Sergeant Summers and Erwine met with Officer Zamora outside of her patrol

car. When Sergeant Summers opened the door to the patrol car Mr. Davis

began to shout obscenities at Summers. Sergeant Summers dragged the Mr.

Davis out of the patrol car, grabbed him by his throat, and slammed him against

the side of the car. Sergeant Summers held Mr. Davis by his throat and asked

him about the comments he made. After booking Mr. Davis into jail Sergeant

Summers told Erwine to write his use of force report for him and be sure to

include that it was because of the inmate's "physically aggressive nature" that he

used the force he did. A few days later, Sergeant Summers called Erwine into

his office to discuss the Mr. Davis' booking. He also told Erwine to "watch out for

that bitch" (referencing Officer Zamora of the Fallon Police Department) because

she reported him for excessive force against the inmate.  Just a few days later,

Captain Matheson talked to Erwine about Sergeant Summers in relation to Mr.

Davis' booking.  Shortly after talking to Captain Matheson, Sergeant Summers

yelled, "Did you rat me out?" while walking past Erwine in the hallway.

18.    On numerous occasions Erwine witnessed both Deputies and

Sergeants go through female inmate's phones while being booked to seek out

and view private pornographic photos. Two specific inmates that Erwine can recall this took place with were Jillian Whickem and Ashley Gokey.

19.     On or about August 17, 2016, while walking through the parking lot to Erwine's vehicle after his shift was over, he was stopped by Deputy Hardin, Luesing, and Maynez. While Erwine stood in the parking lot engaging in after work conversation with his fellow co-workers, Sergeant Summers walked out into the parking lot and shouted, "Erwine what the fuck are you still doing here? Go home." Erwine thought Summers was bantering with him, however Sergeant Summers continued to say, "I'm serious, get the fuck out of my parking lot." The next day Erwine reported the incident to Captain Matheson and explained how Erwine felt the comments Summers made were very unprofessional. Captain Matheson responded by saying, "You know how Sergeant Summers is ... " and offered no resolution to Erwine' s concern.

20.     On October 8, 2016, while Erwine was completing his essential job functions, he went onto day shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When Erwine arrived at Beaulieu' s security cell he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell.

21.     After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and

later confirmed during review of surveillance footage that every time Beaulieu ·would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise.

22.    Erwine provided Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like. During this time, Beaulieu expressed to Erwine that the grave shift deputies were "assholes" and he would be filing a lawsuit against them.

23.    In accordance with Erwine's essential job functions, Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu.  As previously stated, Erwine did go back and review surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. Erwine did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Erwine chose to log the events on his computer, so he could

follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

24. On Sunday, October 9, 2016, during Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself so she asked an inmate to come into the booking cage and pick them up for her. Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved. Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as weapons. Erwine questioned Deputy Jabines about this but her only response was "Senior Deputy" which Erwine understood as to mean he did not have a say in the matter.

25. When the Matthew Maes ("Maes") came into the cage, Erwine positioned himself between Maes and the control panel of the facility. Erwine was in an uncomfortable position with Maes being only a few feet away from Erwine and backed into a corner. Erwine removed his taser from its holster and held it in his hand with the taser pointed to the ground. Erwine chose to remove the cartridge from the taser due to the close proximity of inmate Maes to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without incident.

26.     On Saturday, October 8, 2016, Erwine tried to bring the concerns of the mistreatment during the Beaulieu Incident to the attention of Sgt. Summers. Summers, however, did not show concern and stated "He's [Beaulieu] an inmate, Fuck him."

27.     Near the end of Erwine's shift on October 10, 2016, Erwine was called into the office of Nuckolls where Erwine was confronted by Captain Mathenson and Sheriff Trotter. Sheriff Trotter informed Erwine that he was aware of the booking that took place over the weekend with Beaulieu and that Erwine's concerns were intentional to harm the Department. Erwine began to speak about the Beaulieu Incident as he had originally intended to do from the beginning of his shift that day, however, Erwine was not afforded any opportunity to explain what he had witnessed or discovered.  Instead, Trotter stated Erwine had two choices: 1) he could resign, or 2) the Department would terminate his employment effective immediately.  Either way, Erwine was informed his employment was not continuing after the current meeting he was present in. Erwine signed a Letter of Separation on October 10, 2016.

28.     Erwine was escorted out of the Detention Center after he executed the Letter of Separation and was not able to retrieve any of his paperwork from the Detention Center.

29.     Before Sheriff Trotter's constructive discharge of Erwine, Erwine was provide with no notice that he had been accused on misconduct.  He was not afforded a hearing, and he had no meaningful opportunity to be heard.

30.     On October 11, 2016, Erwine met with Captain Mathenson at his office to return some of Erwine's gear that he had at his residence. Erwine tried to speak to Captain Mathenson to find out why he was given the ultimatum to resign or be terminated. Captain Mathenson's response was "You know what Mike, I think you were just trying too hard to be a cop."

31.     Until the instances that occurred on October 9 and October 10 the only other document that appeared in Erwine's employee file was an Employee Evaluation Report which ranked overall at a "Fair" rating. Under the "Professionalism" rating it was noted that "Erwine has made mistakes and made excuses for them rather than holding himself accountable … When Deputy Erwine made a mistake, Deputy Erwine's reason was Deputy Davis did not show him that way or did not show him at all." The note explaining Deputy Erwine's overall "Fair" rating stating, "Deputy Erwine would be rated a lot higher and further along in his training program if it was not for his issues with accountability. Accountability has effected [sic] every area in his training program."

32.     Immediately following the instances that occurred on October 9 and October 10 a memorandum appeared in Erwine's file with statements and documentation from individuals compiled by Sheriff Trotter ("Trotter's Memorandum"). Trotter's Memorandum contains several false and defamatory statements about Erwine and his performance.

33.     Trotter's Memorandum and the allegations regarding his performance were never shared with Erwine before he was terminated.

34.     Trotter's Memorandum was inserted into Erwine's employee file without Erwine's knowledge.

35.     Trotter's Memorandum specifically alleges and asserts facts and items of concern that would make it difficult if not impossible to obtain gainful employment as a police officer, specifically the items of concern related to the alleged facts contained in the report are:

> [Erwine's conduct] is unprofessional behavior. [Erwine] creates a liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action. [Erwine] discredits our agency and our profession. In a time when scrutiny is high on all of us in law enforcement, this type of play [Erwine's alleged actions] is inexcusable. Deputy Erwine clearly violated our policies on Taser and Use of Force, as well as, behavior standards.

36.     Contrary to the Evaluation Report, Erwine did not have accountability issues, rather he was retaliated against for trying to hold the other personnel accountable to the standards he acknowledged upon the commencement of his employment.  Thus, Sheriff Trotter made plain in Trotter's Memorandum that it was the policy of his department that officers who observe and even contemplate reporting the misconduct of other officers will be summarily fired without recourse to and due process or the disciplinary protections provided under Nevada Law in Chapter 289.

37.     NRS 289.040 provides a procedure for the placing of unfavorable comments or documents in administrative file of peace officer and associated

rights of a peace officer to contest the comments or documents. Trotter did not follow the procedure in NRS 289.040 before placing the unfavorable comments at issue in this case in Erwine's file.

38.    NRS 289.057 provides procedures for investigation into allegations of misconduct of a peace officer, none of which were followed by Trotter in Erwine's case.

39.    NRS 289.060 provides that a law enforcement agency shall, not later than 48 hours before any interrogation or hearing is held relating to an investigation conducted pursuant to NRS 289.057, provide a written notice to the peace officer who is the subject of the investigation and associated rights, none of which were followed by Trotter in Erwine's case.

40.     It is also notable, that none of Erwine's concerns or complaints made to the Detention Facility were placed in his employment file, and though a formal internal affairs investigation was not conducted regarding any of the Incidents, the reports of Erwine's fellow co-workers were placed in his file without any supporting documentation or even without taking a statement from Erwine.

41.    Approximately two weeks after the Maes incident, Maes was informed by Deputy Jabines that Deputy Erwine was terminated from his employment with Churchill County Sheriff's Office because "he was a rat."

42.     Succeeding the release of Maes, Maes reached out to Erwine to inform him of the conversation he had with Deputy Jabine regarding his improper termination.

43.     During the conversation, Maes informed Erwine that during the Maes Incident his recollection of events reinforced Erwine' s story and were contrary to the falsified report placed in Erwine's employment file. Maes confirmed the taser was never pointed at him, and the taser was never discharged. Maes did not recall a sound or spark being produced from the Maes Incident, also contrary to the biased report placed in Erwine's employment file.  Maes affirmed during the Maes incident, Maes did not at any point feel threatened in any way.

44.     During the course of Erwine' s employment, whenever Erwine approached his seniority regarding concerns of misconduct he was merely brushed off and informed the misconduct was "just the way things were."

45.     Erwine was not given a notice of misconduct regarding the Beaulieu Incident, he never received a warning regarding any alleged misconduct, and further he was never reprimanded. Erwine was not given an opportunity to improve upon his alleged misconduct.

46.     With the October Incidents being the first incidents in his file, Erwine had a right to receive further guidance from the Department before being forced to resign. Erwine did not commit any professional misconduct; however, to date, in his employment file sits biased reports from seniority in retaliation against Erwine for trying to follow Nevada Law and Department policy.

47.     Subsequent to Erwine' s "resignation," Erwine sought employment elsewhere with numerous agencies that had posted job openings across the entire State of Nevada.

48.     On December 6, 2016, Washoe County Sheriff's Office contacted Churchill County Detention Center and requested any information regarding any pre-employment background investigations, employment information, and any information regarding reprimands and his resignation.

49.     On January 17, 2017, Erwine received a letter from the Washoe County Sheriff informing him that, "…the Sheriff's Office has determined that you do not meet the established standards for a position as Deputy Sheriff and therefore you have not been selected at this time."

50.     On February 7, 2017, Erwine received an email from Las Vegas Metropolitan Police in response to his application for employment informing him, "…based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History" and "You are not eligible to apply with LVMPD for any position indefinitely."

51.     On September 8, 2017, Erwine received a letter from the Carson City Department of Alternative Sentencing informing him that he is, "…no longer being considered in the current recruitment due to failing on or more portions of the selection process" which included the Background Investigation and Chiefs

Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future."

52.     On September 12, 2017, Erwine received from Douglas County Sheriff a letter informing him that he, "…did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment.… "

53.     On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "…ineligible to continue in the employment process for the position of Police Officer … " for character Issues and his employment history," and "You are disqualified indefinitely."

54.     On January 4, 2017, Erwine received a letter from the Nevada Department of Safety informing him, "We have carefully reviewed your qualification for the above referenced position and considered your background information. We regret to inform you that you are no longer being considered for a DPS Officer position with the Nevada Department of Public Safety."

55.     On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his, " … application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation."

56.     After reviving the rejection letters listed above, Erwine requested his employee file from the Churchill County Sheriff's Office on several occasions but

was refused his file until Erwine received via email a complete copy of his employee file on April 13, 2018.

57.     Trotter's Memorandum was provided to the law enforcement agencies mentioned above.

58.     Trotter's Memorandum is the reason why Erwine was not hired by the law enforcement agencies mentioned above.

59.     Trotter's Memorandum and the reports in Erwine's file from his fellow co-workers in October of 2016, should not have been placed in his permanent file, and should not be public information provided to potential future job candidates for reasons stated above, however, it is clear that the reports which have no merit and were intentionally placed in his file remain in Erwine's permanent employment file to harm Erwine's employment prospects, and are/or were distributed to each prospective law enforcement agency that inquiries about Erwine's employment history, thereby interfering and preventing Erwine from obtaining prospective employment.

60.     By the above-described malicious acts, and as a direct result, Defendant caused Erwine to lose the benefit of gainful employment at his chosen occupation for a period of almost three years.

61.     The Plaintiff has suffered damages as a result of the disregard for his Constitutional rights by the Defendants, including but not limited to emotional distress, anguish, and humiliation caused by Erwin's unlawful discharge from employment and violation of his Constitutional rights described above.

**CLAIMS FOR RELIEF**

**42 U.S.C. 1983 - VIOLATION OF DUE PROCESS**

**(PROTECTED PROPERTY INTEREST)**

**(Against Defendant Trotter)**

62.     Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

63.     Predeprivation notice, a hearing, and an opportunity to be fairly heard must occur before employees are finally deprived of their property interest by the government. *Mathews v. Eldridge*, 424 U.S. 319, 347, 96 S. Ct. 893, 909 (1976); *Brewster v. Bd. of Educ*., 149 F.3d 971, 984 (9th Cir. 1998).

64.     By their conduct, as described herein, Defendant is liable to the Plaintiff under 42 U.S.C. § 1983 for the violation, under color of state law, of the constitutional right to be free from any deprivation of property without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

65.     Trotter violated numerous provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060 governing the rights of peace officers in the State of Nevada, including the Plaintiff, which rules secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff.

66.     The provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060 create a protected property interest that is protected by the Due

18

Process Clause of the 5th and 14th Amendments to the Constitution and the

Nevada Constitution the violation of which caused damages to the Plaintiff.

67.    The acts of the Defendants described above were dishonest,

intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award

of punitive damages.

68.    In addition to the relief requested above, the Plaintiff requests relief

as described in the prayer for relief below.

## 42 U.S.C. 1983 - VIOLATION OF DUE PROCESS

## (PROTECTED LIBERTY INTEREST)

## (Against Defendant Trotter)

69.    Plaintiff repeats and realleges the allegations set forth in the

foregoing Paragraphs as though fully set forth herein.

70.    By their conduct, as described herein, Defendant Trotter is liable to

the Plaintiff under 42 U.S.C. § 1983 for the violation, under color of state law, of

the constitutional right to be free from any deprivation of liberty without due

process of law under the Fifth and Fourteenth Amendments to the United States

Constitution.

71.    Trotter made false and stigmatizing comments about Erwine.

72.    Trotter's false and stigmatizing comments were disclosed to the

Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department,

the Carson City Department of Alternative Sentencing, the Douglas County

Sheriff's Office, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department.

73.    Erwine has suffered a tangible loss of employment as a result of the public disclosure.

74.    Trotter's false and stigmatizing comments about Erwine violate Erwine's Due Process Clause of the 5th and 14th Amendments to the Constitution, the violation of which caused damages to the Plaintiff.

75.    The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Plaintiff to an award of punitive damages.

76.    In addition to the relief requested above, the Plaintiff requests relief as described in the prayer for relief below.

### 42 USC 1983 - MONELL CLAIM

### (Against Churchill County)

77.    Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

78.    At all relevant times herein, Defendant Churchill County acting through its Sheriff's Office, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to the Plaintiffs' constitutional rights which caused the violation of such rights as described herein.

79.     All actions described herein by Trotter are a policy or custom of Churchill County.   See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Trotter was the municipal officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office.

80.     Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive the Plaintiff of his Constitutional Rights under the Fifth and Fourteenth Amendments to the U.S. Constitution without due process of law.

81.     The constitutional abuses and violations by Defendant Churchill County through the actions of its Sheriff's Office and all named Defendants, were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by Defendant Churchill County, including its practice and policy of unlawfully terminating the employment of law enforcement officers who monitor and document police activities and/or misconduct by other officers in the Churchill County Sheriff's Office and failing to follow the requirements of  the provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060.

82.     Upon information and belief, Defendant Churchill County has, acting through its Sheriff's Office, developed, implemented, enforced, encouraged and

sanctioned a de facto policy, practice, and/or custom of unlawfully terminating the employment of law enforcement officers who monitor and document police activities and/or misconduct by other officers in the Churchill County Sheriff's Office and failing to follow the requirements of the provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060.

83.   Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiff of his constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

84.   Defendants have acted with deliberate indifference to the constitutional rights of the Plaintiff.

85.   As a direct and proximate result of the acts as stated herein by each of the Defendants the Plaintiff's constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

## VIOLATION OF DUE PROCESS – NEVADA CONSTITUTION

### (Against All Defendants)

86.   Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

87.   Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice.  *Summers v. Warden of Nev. State Prison*, 84 Nev.

326, 329, 440 P.2d 388, 390 (1968).  Nevada law very clearly requires that a state agency must follow procedures required by statute governing employee discipline.  *McCracken v. Elko County Sch. Dist*., 103 Nev. 655, 747 P.2d 1373 (1987).  Because Erwine had a constitutionally protected property interest in his job, he was entitled to due process before being deprived of that interest under Nevada law.  *Pressler v. City of Reno*, 118 Nev. 506, 511, 50 P.3d 1096, 1098 (2002).

88.    Trotter violated numerous provisions of NRS Chapter 289 governing the due process rights of Peace Officers in the State of Nevada, including the Plaintiff, which rules secure certain benefits that support a claim of entitlement to those benefits by the Plaintiff, including but not limited violation of NRS 289.040, which provides the opportunity to either review or sign disciplinary documents before they are placed into a peace officer's file; NRS 289.057, which provides a peace officer the opportunity to review their file after an investigation; NRS 289.060, which requires that a peace office be given notice of investigation; NRS 289.080, which provides that a peace officer be given opportunity to have representatives at an investigatory or disciplinary hearing.

89.    Trotter's conduct was also fundamentally unfair and shocking to the universal sense of justice, as Erwine was fired by Trotter for trying to protect the Constitutional rights of inmates at Churchill County.  Trotter then inserted and sheared with other police departments the defamatory and false statements

about Erwine, such that no other law enforcement agency would strongly

consider hiring him.

90.     The provisions of Nevada Revised Statutes ("NRS") Chapter 289

create a property interest that is protected by the Due Process Clause of the

Nevada Constitution, the violation of which by the Defendants caused damages

to the Plaintiff.

## TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY

### (Against All Defendants)

91.     Plaintiff repeats and realleges the allegations set forth in the

foregoing Paragraphs as though fully set forth herein.

92.     Plaintiff, acting in good faith, refused to engage in conduct that

would violate the United States Constitution and the laws of the State of Nevada.

93.     Defendants created working conditions so intolerable and

aggravated based on the fact that a reasonable person in Plaintiff's position

would have felt compelled to resign.

94.     Due to such working conditions, Plaintiff resigned from his

employment with Defendant.

95.     Defendants had actual or constructive knowledge of the intolerable

actions and conditions of employment and their impact upon Plaintiff, despite

alternate or available remedies.

96.     The Defendant's decision to discharge the Plaintiff was in bad faith

and was proximately caused by the Plaintiff's actions and was in derogation of

the public policy of the State of Nevada, preventing the firing of employees for

opposing the unlawful practices of an employer.

97.    As a direct and proximate result of Defendant's tortious constructive

discharge Plaintiff suffered damages.

**DEFAMATION**

**(Against All Defendants)**

98.    Plaintiff repeats and realleges the allegations set forth in the

foregoing Paragraphs as though fully set forth herein.

99.    Defendant knowingly made false and defamatory statements about

the Plaintiffs employment history described above, which was published to the

Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department,

the Carson City Department of Alternative Sentencing, the Douglas County

Sheriff's Office, the Nevada Department of Public Safety Letter, and the North

Las Vegas Police Department.  Specifically, Trotter made the false statement of

fact that Erwine "clearly violated" Churchill County Sheriff's Office policies, "on

Taser and Use of Force, as well as, behavior standards."

100.   The aforementioned false statements made by Defendant would

normally tend to lower the reputation of the Plaintiff in- the community, and in the

profession and business or industry in which Plaintiff worked and would excite

derogatory opinions about the Plaintiff and hold the Plaintiff up to contempt.

101.   As a direct and proximate cause of Defendant's conduct, as described above, Plaintiff was prevented from securing future employment and has been damaged in an amount to be proven at trial.

102.   Defendant's false and defamatory statements were made in reckless disregard of the rights of Plaintiff, and in reckless disregard of the truth of the matter, and constitute actual or implied malice giving rise of a claim for punitive and exemplary damages.

**DEFAMATION PER SE**

**(Against All Defendants)**

103.   Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

104.   Defendant knowingly made false and defamatory statements about the Plaintiff's employment history, which was published to the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City Department of Alternative. Sentencing, the Douglas County Sheriff's Office, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department. Specifically, Trotter made the false statement of fact that Erwine "clearly violated" Churchill County Sheriff's Office policies, "on Taser and Use of Force, as well as, behavior standards."

105.   Defendant's statements constitute defamation per se in that they tend to injure the Plaintiff in his trade, business and profession.

106.   As a direct and proximate cause of Defendant's conduct, as described above, Plaintiff was prevented from securing future employment and has been damaged in an amount in an amount to be proved at trial.

107.   Defendant's false and defamatory statements were made in reckless disregard of the rights of Plaintiff, and in reckless disregard of the truth of the matter and constitute actual or implied malice giving rise of a claim for punitive and exemplary damages in an amount to be proved at trial.

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE EMPLOYMENT**

**(Against All Defendants)**

108.   Plaintiff repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

109.   Defendant sent intentionally adverse and false statements regarding Plaintiffs employment history to numerous potential employers of Plaintiff.

110.   Defendant knew that prospective business relationships existed and acted intentionally to interfere with those prospective business relationships, specifically the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City Department of Alternative Sentencing, the Douglas County Sheriff's Office, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department, pursuant to its transmission of false statements concerning Plaintiff's previous employment with Plaintiff.

111.   The Defendant intended to harm Plaintiff by wrongfully preventing Plaintiff from obtaining new employment.

112.   Defendant had no privilege or justification for its wrongful actions.

113.   As a direct and proximate cause of Defendant's conduct, as described above, the Plaintiff was prevented from securing future employment and has been damaged in an amount to be proved at trial.

WHEREFORE, the Plaintiff requests that this Court:

a. Enter a declaratory judgment that the actions complained of herein are unlawful and violate the United States Constitution and Nevada law.

b. Order Defendants to pay the compensation denied or lost to Plaintiff to date by reason of Defendants' unlawful actions, in amounts to be proven at trial;

c. Order Defendants to pay compensatory damages for the Plaintiff's lost property and emotional pain and suffering, in an amount to be proven at trial;

d. Order Defendants to pay exemplary and punitive damages;

e. Order Defendants to pay attorneys' fees and costs of the action pursuant to 42 U.S.C. 1988.

f. Order Defendants to pay interest at the legal rate on such damages as appropriate; and

g. Grant any further relief that the Court deems just and proper.

**DATED** this Thursday, August 6, 2020

By:_____

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE.
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM

28

1

## **CERTIFICATE OF SERVICE**

2

3

      Pursuant to FRCP 5, I certify that on the date shown below, I caused service to

4

be completed of a true and correct copy of the foregoing pleading by:

5

6 _____        personally delivering;

7

_____        delivery via Reno/Carson Messenger Service;

8

_____        sending via Federal Express (or other overnight delivery service);

9

10 _____        depositing for mailing in the U.S. mail, with sufficient postage affixed
                thereto; or,

11

12   X\_\_\_\_        delivery via electronic means (fax, eflex, NEF, etc.) to:

13                Katherine F. Parks, Esq.
               Thorndal Armstrong

14                6590 S. McCarran Blvd. Suite B.

15                Reno, NV 89509
               Attorney for the Defendant

16

17         **DATED** this Thursday, August 6, 2020

18                      By:_____

19                      LUKE BUSBY, ESQ.

20                      NEVADA STATE BAR NO. 10319
                     316 CALIFORNIA AVE.

21                      RENO, NV 89509

22                      775-453-0112
                     LUKE@LUKEANDREWBUSBYLTD.COM

23                      *ATTORNEY FOR PLAINTIFF*

24

25

26

27

28

29