LUKE A. BUSBY
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

***

|  |  |
|---|---|
| MICHAEL ERWINE,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br>CHURCHILL COUNTY, a political subdivision<br>of the State of Nevada; CHURCHILL<br>COUNTY SHERIFF BENJAMIN TROTTER;<br>UNITED STATES OF AMERICA, ZACHARY<br>WESTBROOK, JON LEONARD, MICHEL<br>HALL, GENE BURK; and DOES I through X<br>inclusive;<br><br>        Defendants, | Case No.: 3:24-cv-00045-MMD-CSD<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**LR 16-6 ENE REQUESTED** |

COMES NOW, MICHAEL ERWINE, ("Erwine" or "Plaintiff"), by and through the undersigned

counsel, and hereby files the following Complaint seeking redress for the violation of Erwine's rights to

be free from violation of his rights under the Fourth, Fifth, and Fourteenth Amendments of the United

States Constitution and for state law claims against CHURCHILL COUNTY, a political subdivision of

the State of Nevada; SHERIFF BENJAMIN TROTTER ("Sheriff Trotter"); THE UNITED STATES OF

1

AMERICA ("USA"); ZACHARY WESTBROOK ("Westbrook"); JOHN LEONARD ("Leonard"); MICHEL HALL ("Hall"); GENE BURK ("Burk"); and JOHN DOES I through X inclusive; (collectively "Defendants").

## **PRELIMINARY STATEMENT**

1.      This is a civil action for monetary relief from injuries Erwine sustained as a result of Defendants' conduct during Erwine's employment with both the Churchill County Sheriff's Office and the Washoe Tribe of Nevada and California that have had a devastating impact on his reputation and career prospects.

2.      Erwine's employment with the Churchill County Sheriff's Office was supposed to be the start of Erwine's law enforcement career, however it ultimately led to a total career and professional ruin for Erwine.

3.      Erwine came to the Churchill County Sheriff's office well qualified for his position as Deputy Sheriff.  Out of all the candidates that were hired by Churchill County at the time, Erwine was the only one who held a current Nevada law enforcement certificate having previously graduated from one of Nevada's Law Enforcement Academies as well as earning a Criminal Justice Degree from Western Nevada College.

4.      Almost immediately after the commencement of Erwine's employment with the Churchill County Sheriff's Office he witnessed numerous problematic acts by fellow deputies and supervisors. Whenever Erwine brought this to a supervisor's attention he was told "That's just the way things are here".

5.      At just under a year of employment with Churchill County, Erwine was fired in October of 2016 subsequent to attempting to make a complaint about the unethical treatment of an inmate in the custody of the Churchill County Sheriff's office.

6.      Unbeknownst to Erwine, at the time Sheriff Trotter fired Erwine he placed a false and career destroying Memorandum into Erwine's employee file that was hidden from Erwine for almost

two years. Erwine was labeled as a "Rat" by his former coworkers and would soon suffer the consequences of questioning the conduct of fellow officers.

7.      Over the next few years Erwine tried numerous times to regain employment in his career field, however was unaware that Churchill County was distributing Trotters memorandum to other law enforcement agencies that Erwine sought employment with. Erwine was also unaware that Sheriff Trotter was communicating to potential employers of Erwine the contents of his memorandum and further telling them that Erwine was a "Piece of shit" and that he would sabotage their agency if they were to hire him.

8.      After numerous attempts Erwine was able to obtain employment with a tribal law enforcement agency only, the Pyramid Lake Paiute Tribe, because at that time, the tribe was not aware of Trotter's Memorandum nor the reasons Erwine was terminated from Churchill County. This employment however was short lived for Erwine, because once members of the department began asking questions about Erwine's employment with Churchill County, he quickly found himself again unemployed.

9.      After a few more years Erwine was again able to obtain employment with another tribal law enforcement agency, the Washoe Tribe of Nevada and California, but the same issue emerged when Trotter's Memorandum became known to Erwine's supervisors at the Washoe Tribe.

10.     Though Erwine worked for the Washoe Tribe for over two years acting as an instructor and trainer for the department coupled with "Very Good" and "Outstanding" performance reviews, Erwine again found himself terminated and unemployed after his employer became aware the circumstances surrounding his termination from Churchill County- Only this time Erwine is now falsely faced with being labeled as law enforcement officer who was terminated for violating an individual's civil rights and lying during an investigation – irrevocable damming his ability to get a job in any field.

11.     Erwine has subsequently been denied from applying, had job offers revoked, and in some instances been fired after employers become aware of the false and defamatory statements published in his employee files.

12.     Erwine now finds himself struggling to find any gainful employment, in any field, - all because Erwine dared to record the misconduct of his fellow Deputies at the Churchill County Sheriff's Office.

## JURISDICTION

13.     This action arises under 42 U.S.C. 1981, 1983, 1985, as well as the Federal Tort Claims Act, Sections 2671 through 2680 of Title 28 of the U.S.C.

14.     This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 1346(b), 1367, 2201, and 42 U.S.C. Sections 1983, 1985, 1986, and 1988, as the Plaintiff's claim arises under Federal Law.

15.     The Court has supplemental jurisdiction over Plaintiff's pendent state law claims under 28 U.S.C. 1367.

16.     The Court has personal jurisdiction over the Defendants because the alleged incidents described below occurred within this District.

## VENUE

17.     Venue is proper pursuant to 28 U.S.C. Section 1391 in the Northern District of Nevada because of the acts giving rise to the Plaintiff's claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.     On April 23, 2023, Erwine filed a Standard Form 95 Federal Tort Claims Act claim seeking compensation for Wrongful Termination against the Tribe and the Department of the Interior.

19.     On October 26, 2023, Erwine's FTCA claim was denied by the Department of the Interior.  *See* Exhibit 1.

20.     Erwine's federal tort claim satisfied the requirement under 28 U.S.C. 2675(a) that a claim must be presented to the appropriate Federal Agency and must be finally denied in writing before instituting an action against the United States for money damages.

### PARTIES

21.     Erwine is a citizen of the United States and a resident of the State of Nevada.  At all times relevant to this action Erwine resided in Washoe County or Churchill County, Nevada.

22.     Churchill County is a political subdivision of the State of Nevada.

23.     Sheriff Trotter was employed by Churchill County as Sheriff at the times relevant to this complaint.  Trotter was as all times relevant herein acting under the color of state.  Trotter is sued in his individual capacity.

24.     The Bureau of Indian Affairs in the Department of Inferior ("BIA") is the interested agency of the Defendant United States of America.

25.     Westbrook was employed by The Washoe Tribe of Nevada and California as Sergeant and then Chief of Police at the times relevant to this complaint.  Westbrook is sued in his individual capacity.  Westbrook was a Federal Official under the Indian Self-Determination and Education Assistance Act.

26.     Leonard was employed by The Washoe Tribe of Nevada and California as Deputy Chief of Police at the times relevant to this complaint.  Leonard is sued in his individual capacity. Leonmard was a Federal Official under the Indian Self-Determination and Education Assistance Act.

27.     Hall was employed by The Washoe Tribe of Nevada and California as an officer and then a Sergeant at the times relevant to this complaint.  Hall is sued in his individual capacity.  Hall was a Federal Official under the Indian Self-Determination and Education Assistance Act.

28.     Burk was employed by The Washoe Tribe of Nevada and California as General Counsel at the times relevant to this complaint.  Burk is sued in his individual capacity.

29.     Defendants DOES 1-X are/ were employed by Churchill County or the Washoe Tribe of Nevada and California and are sued in their individual capacity.

30.     The true names and titles of Defendants DOES 1 through X, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is negligently or otherwise legally responsible in some manner for the events and happenings herein alleged.  Erwine will ask leave to amend this Complaint to show their names and capacities when they have been ascertained.

## ALLEGATIONS OF FACT

## ERWINE'S EMPLOYMENT WITH CHURCHILL COUNTY

31.     Erwine applied for the position of Deputy Sheriff with Churchill County in September of 2015.

32.     In his application for employment Erwine listed his previous misdemeanor arrest for DUI from over four years prior in 2011.

33.     In his application Erwine also listed his training and experience in the law enforcement field, which at that time consisted of a category one Peace Officers Standards and Training certificate from a Nevada Law Enforcement Academy as well as an Associates degree in Criminal Justice.

34.     Erwines graduation from an Nevada law enforcement academy as well as his degree in criminal justice far exceeded the training and experience requirements of the position which were nothing more than a high school diploma.

35.     With knowledge of his training and experience as well as his prior arrest for DUI, Churchill County hired Erwine for the position of Deputy Sheriff in December of 2015.

36.     Erwine was selected for the position over numerous other candidates that participated in the hiring process.

37.     Between December 9, 2015 and October 10, 2016, Churchill County employed Erwine in the capacity of Detention Deputy.

38.     On December 9, 2015, the first day Erwine was employed by Churchill County, Erwine reviewed and signed various acknowledgements certifying his receipt and review of new hire documents including but not limited to Safety Rules and Regulations, Workplace Safety, Harassment Policy, General Safety, Fraud Prevention, and even acknowledgement of the Job Description of a Detention Deputy Sheriff.

39.     From the commencement of Erwine's employment with Churchill County, Erwine witnessed his fellow coworkers at Churchill County blatantly disregard basic Constitutional rules, and further disregard the essential duties of a law enforcement officer including throwing facies on inmates, excessive use of force, and inappropriate behavior with inmates of the opposite sex.

### The Beaulieu Incident

40.     On October 8, 2016, while Erwine was completing his essential job functions, he went onto shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to finish being booked into the detention center.

41.     When Erwine arrived at Beaulieu's cell he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell.

42.     After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu ·would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise.

43.     Erwine provided Beaulieu with water and explained to Beaulieu what the rest of the booking process would look like.

44.     During this time, Beaulieu expressed to Erwine that the grave shift deputies were "Assholes" and he would be filing a lawsuit against them.

45.     Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and stated what the grave shift deputies did "was messed up."

46.     Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu.

47.     Erwine reviewed surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell and did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, Erwine did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention.

48.     Since the concerns regarding the treatment of Mr. Beaulieu were not an immediate threat, and Erwine's sergeant did not work on weekends, Erwine chose to log the events on his computer, so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

49.     On Saturday, October 8, 2016, Erwine tried to bring the concerns of the mistreatment during the Beaulieu Incident to the attention of Sgt. Summers. Summers, however, did not show concern and stated "He's [Beaulieu] an inmate, Fuck him."

**The Maes Incident**

50.     On Sunday, October 9, 2016, during Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage - included in these items were screwdrivers and other sharp instruments.

51.     Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her.

52.     Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved.

8

53.     Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as weapons.

54.     Erwine questioned Deputy Jabines about this but her only response was "Senior Deputy" which Erwine understood as to mean he did not have a say in the matter.

55.     When Matthew Maes ("Maes") came into the cage, Erwine positioned himself between Maes and the control panel of the facility.

56.     Erwine was in an uncomfortable position with Maes being only a few feet away from Erwine and backed into a corner.

57.     Erwine removed his taser from its holster and held it in his hand with the taser pointed to the ground.

58.     Erwine chose to remove the cartridge from the taser due to the close proximity of inmate Maes to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without incident.

**Trotter's Termination of Erwine**

59.     Near the end of Erwine's shift on October 10, 2016, Erwine was called into the office of Sergeant Nuckolls where Erwine was confronted by Captain Mathenson and Sheriff Trotter. Sheriff Trotter informed Erwine that he was aware of the booking that took place over the weekend with Beaulieu and stated that Erwine's concerns were intentional to harm the Department.

60.     Erwine began to speak about the Beaulieu Incident as he had originally intended to do from the beginning of his shift that day, however, Erwine was not afforded any opportunity to explain what he had witnessed or discovered.

61.     Instead, Trotter stated Erwine had two choices: 1) he could resign, or 2) the Department would terminate his employment effective immediately - Either way, Erwine was informed his employment was not continuing after the current meeting he was present in.  Erwine signed a Letter of Separation on October 10, 2016.

62.     Erwine was escorted out of the Detention Center after he executed the Letter of Separation and was not able to retrieve any of his paperwork from the Detention Center.

63.     After Erwine was escorted out of the detention center Trotter sent out an email to the entire Sheriff's Department notifying everyone that he was changing the key code to the facility as Erwine was no longer employed with the department and he did "not have a good gauge on his [Erwine's] current state of mind."

64.     At this time the only reason Erwine was given for his separation from the department was not successfully completing his probationary period.

65.     On October 11, 2016, Erwine met with Captain Matheson at his office to return some of Erwine's equipment that he had at his residence.

66.     Erwine tried to speak to Captain Matheson to find out why he was given the ultimatum to resign or be terminated. Captain Matheson's response was "You know what Mike, I think you were just trying too hard to be a cop."

67.     Approximately two weeks after the Maes incident, Maes was informed by Deputy Jabines that Deputy Erwine was terminated from his employment with Churchill County Sheriff's Office because "He was a rat."

**ERWINE'S JOB SEARCH AFTER HIS**

**TERMINATION FROM CHURCHILL COUNTY**

68.     Subsequent to Erwine's termination from Churchill County, Erwine sought employment elsewhere with numerous law enforcement agencies as well as private security jobs that had posted job openings across the entire State of Nevada.

69.     On December 6, 2016, Washoe County Sheriff's Office contacted Churchill County Detention Center and requested any information regarding any pre-employment background investigations, employment information, and any information regarding reprimands and his resignation.

70.     Churchill County provided the Washoe County Sheriff's office with a Memorandum from Erwine's personnel file.

71.     On January 17, 2017, Erwine received a letter from the Washoe County Sheriff informing him that "the Sheriff's Office has determined that you do not meet the established standards for a position as Deputy Sheriff and therefore you have not been selected at this time. In accordance with the Washoe County Code 5.18 5, you are unable to be considered for any position at the Sheriff's Office for one year from the date of this letter."

72.     On February 7, 2017, Erwine received an email from Las Vegas Metropolitan Police in response to his application for employment informing him "based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History."  "You are not eligible to apply with LVMPD for any position indefinitely, and your name will be removed from all eligibility list(s) and processes."

73.     This letter came after a background investigator from the Las Vegas Metro Police Department spoke with Sheriff Trotter about Erwine's termination from Churchill County.

74.     On September 8, 2017, Erwine received a letter from the Carson City Department of Alternative Sentencing informing him that he is "no longer being considered in the current recruitment due to failing on or more portions of the selection process" which included the Background Investigation and Chiefs Review.  This letter came after a phone call from the Chief where he asked Erwine why he left Churchill County and stated, "You know Trotter and I used to be partners".  Like Erwine's response from Las Vegas Metro he was again precluded forever reapplying with the agency again.

75.     On September 12, 2017, Erwine received a letter from Douglas County Sheriff's office informing him that he "did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment... "

76.     On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "..ineligible to continue in the employment process for the position of Police Officer ... " for "Character Issues" and his "Employment History."

77.     On January 4, 2017, Erwine received a letter from the Nevada Department of Safety informing him "We have carefully reviewed your qualification for the above referenced position and considered your background information. We regret to inform you that you are no longer being considered for a DPS Officer position with the Nevada Department of Public Safety."

78.     On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his "… application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation.

79.     In April of 2018 Erwine was offered a position with Allied Universal Security Services to work as a security guard in the Washoe County Courthouse.  As a condition of his employment Erwine was required to undergo a law enforcement background check through the Washoe County Sheriff's Office.  Erwine was notified by Allied Universal that he did not pass the background check and his job offer was rescinded.

## ERWINE'S EMPLOYMENT WITH THE
## PYRAMID LAKE POLICE DEPARTMENT

80.     In May of 2017 Erwine applied for a Police Officer position with the Pyramid Lake Police department.

81.     As with his application with Churchill County, Erwine also disclosed in his application with Pyramid Lake his prior arrest for DUI as well as listed all of his training and experience in the law enforcement field.

82.     After a rigorous testing process, Erwine was ultimately chosen out of a list of other candidates and offered a position contingent upon successfully passing a pre-employment background check.

83.     Erwine attended an interview with a background investigator from the Pyramid Lake Police Department where he was given a lengthy background packet that he was instructed to complete and return.

84.     Upon completing and returning the background packet the background investigator from the Pyramid Lake Police Department had resigned and Erwine was told that the remainder of his background process would take some time as he would have to wait for a new background investigator to be hired in order to complete the background investigation process.

85.     Over the next few months Erwine called the Pyramid Lake human resources department numerous times to check on the status of his background investigation.

86.     In late 2017 Erwine was informed by the head of human resources that they had not yet hired a background investigator however she had conducted his background and gave Erwine a "Favorable suitability determination".

87.     Erwine began working as a Police Officer for the Pyramid Lake Police Department in January 2018.

88.     Erwine's employment with the department consisted of a three-month training program of which he would be observed and given scores daily of his performance.

89.     During Erwine's first two months of employment, he routinely received "Acceptable" and "Above Acceptable" scores in numerous performance categories.

90.     When Erwine entered into his third and final month of training, he was assigned to a different training officer than he had had previously.

91.     This training officer, "Officer Fay" had immediately began to ask Erwine questions about his employment with the Churchill County Sheriff's Office and told Erwine that he had friends that worked there.

92.     Officer Fay gave Erwine the nickname "Weasel" and began calling him this in front of other members of the department.

13

93.     Officer Fay went on to tell Erwine directly that he did not like Erwine and did not think he should be a cop.

94.     During Erwines final phase of training he was notified that the Police Department had hired a new background investigator and that he would need to attend an interview with him.

95.     In March of 2018 Erwine was brought in front of the Chief of Police where he was sent home for the day and told to think about if police work was the right job for him.

96.     Erwine returned to work a few days later where he was ultimately terminated for not successfully completing the field training program.

97.     Around the time of his termination Erwine was able to view his employee evaluation reports where he discovered that many of his scores from over the past month had been changed and made lower than they originally were.  Erwine noticed that many of his daily reviews were electronically signed even though he had never seen them prior.

98.     After his termination Erwine had submitted a complaint to the tribal chairman in regard to his dismissal and fraudulent alteration of his training records however received no response.

### CHURCHILL COUNTY'S CONTINUING

### IMPACT ON ERWINE'S JOB SEARCH

99.     After the circumstances surrounding his dismissal from the Pyramid Lake Police department Erwine became increasingly concerned of the impact of his previous employment with Churchill County and its impact on his job opportunities.

100.     Erwine had tried numerous times since his termination from Churchill County to obtain a copy of his personal file; however was denied access.

101.     Finally in April of 2018 Erwine was able to obtain a copy of his employment file from Churchill County and it immediately became clear why he was having issues obtaining employment after a background check.

102.   Erwine's personal file contained Trotter's Memorandum and other documents dated the day of and a few days prior to his termination.

103.   Trotter's Memorandum and associated documents contain several false and defamatory statements about Erwine and his performance.

104.   Trotter's Memorandum and the allegations regarding his performance were never previously made known or shared with Erwine.

105.   Trotter's Memorandum and associated documents specifically alleges and asserts facts and items of concern that would make it impossible to obtain gainful employment in Erwine's career field by anyone who was made aware or viewed them.

106.   Specifically, Erwine disputes the following facts and conclusions contained Trotter's Memorandum:

> [Erwine's conduct] is unprofessional behavior.  [Erwine] creates a liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action. [Erwine] is siding with the inmate against his own agency or, possibly, encouraging civil action against his own agency.  [Erwine] discredits our agency and our profession. In a time when scrutiny is high on all of us in law enforcement, this type of play [Erwine's alleged action] is inexcusable. Deputy Erwine clearly violated our policies on Taser and Use of Force, as well as, behavior standards.

107.   In September of 2018 Erwine brought suit against Churchill County and Sheriff Trotter for numerous federal and state law claims including his right to be free from interference from pursuing the occupation of his choosing.  (For the purposes of this complaint this shall be referred to as Erwine's "Previous Lawsuit").

## ERWINE'S EMPLOYMENT WITH THE WASHOE TRIBE

108.   Between October 18, 2019, and March 4, 2022, Erwine was employed in the capacity of Police Officer with the Washoe Tribe of Nevada and California ("Washoe Tribe").

109.   In January of 2019 Erwine applied and completed an application for the position of Police Officer with the Washoe Tribe.

110.    As Erwine did with all of his previous law enforcement applications, Erwine disclosed his prior arrest for DUI in 2011 as well as listed his training and experience in the law enforcement field during his application process.

111.    Also during his application process, Erwine notified the then Tribe's Chief of Police David Blackeye ("Chief Blackeye") of his previous employment issues and his pending lawsuit.

112.    On or about July 2, 2019 Erwine interviewed with Chief Blackeye and other members of the Tribal administrative staff.

113.    On or about July 11, 2019 Erwine was offered a position as a Police Officer with the Washoe Tribe of Nevada and California by Chief Blackeye contingent upon successful completion of a pre-employment screening and comprehensive background investigation.

114.    Prior to the beginning of Erwine's employment, Chief Blackeye resigned from the department.

115.    Erwine completed the hiring process and began his employment on October 18, 2019, to include a one-year probationary period.

116.    Upon being hired at the Washoe Tribe,  Erwine received various documents outlining his job description as well as employment policies and procedures regarding employment status and disciplinary procedures.

117.    In November of 2019 Erwine began the field training program which lasted approximately three months of which he successfully completed.

118.    In one instance during Erwines training program he was given the highest possible score achievable by a trainee from his sergeant.  The sergeant went on to tell Erwine that that was the first time in his career as a training officer that he gave a trainee such a high score during an extremely stressful incident.

119.    In February of 2020 Erwine was asked by his supervisor to attend a two week long training course which certified Erwine as a defensive tactics instructor so he could train other members of the department.

120.    In early 2020 Sergeant Zachary Westbrook assumed the position of Chief of Police at the Washoe Tribe.

121.    Before Westbrook became aware of the details of Erwine's previous lawsuit, Erwine was a rising star in the department.

122.    Even though still within his probationary period, Erwine had been asked to take on the additional instructor rolls in order to instruct and certify other members of the department.  In addition to being a defensive tactics instructor, Erwine was sent to various other instructor schools including Radar Instructor, Baton Instructor, and Physical Fitness Administrator.

123.    Erwine was also asked to take on additional responsibilities such as coordinating vehicle maintenance and ordering of department gear.

124.    On October 18 of 2020 Erwine successfully completed his one-year probationary period giving him permanent employee status.

125.    On November 25, 2020 Erwine received his first annual employee evaluation.  Erwine scored "85" out of 100 and received "Outstanding" remarks in many of the evaluation categories. Erwine was ranked "Very Good" overall which entitled him to a 2.5% pay raise.

126.    In early 2021 the Tribe had hired Officer Brad Harris as a Police Officer with the department.  Officer Harris had previously known Erwine as he worked for another tribal law enforcement agency in Churchill County during the time Erwine was employed as a Deputy with Churchill County.

127.    On January 22, 2021 Erwine was physically threatened by Officer Harris.

128.    Officer Harris threatened to physically harm Erwine if he was questioned about an incident and his story did not line up with that of the other officers.  Erwine subsequently drafted a memo about the incident and submitted it to Sergeant Hall, which was his supervisor at the time.

129.    Sergeant Hall urged Erwine not to officially file the report because the department would be forced to investigate the incident and it would not look good for Officer Harris.  Erwine told his Sergeant Hall that he wanted the incident documented and gave him the report but was never subsequently asked about the incident.

130.    On January 29, 2021 Chief Westbrook held a department meeting requiring the attendance of all police department members.  During the meeting Chief Westbrook singled out the Erwine and stated "I hired you after nobody else would," and  "You owe me".

131.    At the end of the January 29, 2021 meeting Deputy Chief Leonard stated "If we don't want you here you won't be," and "We will find a way to fire you," and "It's really not that hard."

132.    On February 5, 2021 Erwine conducted a traffic stop with Officer Lisa Christensen.

133.    Officer Christensen, a Native-American female, held the position of Field Training Officer with the Washoe Tribe.

134.    Pursuant to the Washoe Tribe's Washoe Tribe Police Department Policy Manual, Officer Christensen, as a senior officer, outranked Erwine during periods of time when they worked together.

135.    After Erwine conducted field sobriety tests on the driver of the vehicle, Erwine and Officer Christensen determined that there was not sufficient probable cause to arrest the individual for driving under the influence (DUI).  Erwine and Officer Christensen had the individual leave his vehicle at the scene and obtain a ride.  Erwine and Officer Christensen determined this lack of probable cause after the individual successfully completed standardized field sobriety tests.

136.    On February 5, 2021, Erwine received disciplinary action for not arresting the individual subsequent to the DUI investigation during the traffic stop even though he lacked probable cause to do so.

137.    As part of the discipline, Erwine was placed on an "Performance Improvement Plan" by Westbrook that required Erwine to complete another full three-month field training program which outlined that he would be terminated if he did not complete successfully.

138.    Though Erwine and Officer Christensen were both involved in the incident, only Erwine received any disciplinary action.

139.    On February 18, 2021 Erwine filed a grievance in accordance with the employment policy manual requesting his February 5, 2021 disciplinary action be overturned and removed from his employment file.

140.    On or about February 24, 2021 Erwine was assigned to Officer Harris as his field training officer despite being physically threatened by this officer less than a month prior.  Erwine was forced to ride in a vehicle for over a month with Officer Harris during which time he was considered a subordinate officer.

141.    In March 2021 a hearing was held in front of the Human Resources board in accordance with employment policies.  Erwine received the board's outcome on March 31, 2021 which upheld the Performance Improvement Plan but overturned Erwine's termination from the department should he not complete the program.  The board concluded that the discipline should be focused on Erwine not calling his supervisor rather than not making the arrest.  The board also concluded that Erwine should be given the opportunity to receive additional DUI training.

142.    In June 2021 Erwine successfully completed the field training program for the second time however never received any DUI training.

143.    During the months following the March 31, 2021 Human Resources Review Board hearing, Chief Westbrook made several comments to Erwine and other officers about his disdain for Erwine "Dragging" him through the grievance procedure process.

144.    On one occasion during this period, Chief Westbrook grabbed Erwine's equipment off a conference table and threw it across the hallway at Erwine yelling "Get your shit off my table." Deputy Chief Leonard witnessed the incident and looked at Erwine and stated, "You better stay out of his way."

145.    In September of 2021, Sergeant Casey Ryan voluntarily met with Erwine's counsel for his ongoing Lawsuit with Churchill County.

146.    Erwine was preparing for an upcoming trial in the Lawsuit and requested Sergeant Ryan complete a declaration regarding his role in conducting Erwine's background investigation prior to being hired by the Washoe Tribe.

147.    During this meeting Sergeant Ryan was shown Trotter's Memorandum from Churchill county and confirmed that he had never before seen the Memorandum nor spoke to anyone from Churchill County during Erwine's background investigation.

148.    A few days after Sergeant Ryan's meeting with Erwine's legal counsel Sergeant Ryan told Erwine that it was good that he did not see the Memorandum during Erwine's background investigation otherwise he could not have been hired.  Sergeant Ryan went on to say that Erwine better hope Chief Westbrook does not find out about Trotter's Memorandum.

149.    In November of 2021, Erwine received his second annual review at the Washoe Tribe. Erwine again received "Outstanding" remarks in many categories and improved from his previous years review obtaining a higher overall score which entitled him to a 3.5% pay increase, which Erwine did not receive.

150.    On November 9, 2021, a USA Today article about law enforcement corruption was published.  The article was titled "Dead rats, death threats, destroyed careers.  How law enforcement punishes its whistleblowers."

151.    Erwine was featured in the USA Today article detailing some of his experiences at Churchill County Sheriff's Office and his subsequent struggle to gain employment in the law enforcement field.

152.     Shortly after the article was published Erwine was dubbed by many members of the department, including Chief Westbrook, as the "Bus driver" (referring to Erwine throwing other cops under the bus for reporting misconduct).

153.     On November 15, 2021, Erwine and Officer Harris responded to a call for a noise disturbance.  After thoroughly investigating the circumstances both Erwine and Officer Harris determined no law enforcement action was appropriate to take.

154.     Upon returning to the police station Erwine was approached by Deputy Chief Leonard and asked why he did not arrest the individual from the disturbance call.

155.     Erwine explained that arresting the individual would have been an unlawful arrest as the individual in question clearly did not meet the elements of the crime as stated in Nevada Revised Statute.  Erwine further explained that he had contacted the individual's parole officer who confirmed that the individual was in compliance with the statute.

156.     After Erwine expressed this reasoning, Deputy Chief Leonard ordered Erwine to go arrest the individual or Erwine could be arrested himself for "Dereliction of duty."

157.     Erwine refused the unlawful order and was immediately called into Chief Westbrook's office with Deputy Chief Leonard.

158.     Chief Westbrook began yelling at Erwine stating that siding with a "Chomo," slang for "child molester" [Referring to the individual Erwine refused to arrest] was not a good look for him considering his ongoing Lawsuit.

159.     After leaving Chief Westbrook's Office, Erwine was presented with a disciplinary action notice by Deputy Chief Leonard.

160.     Erwine was forced to sign the disciplinary action but was told he would not receive a copy and it was not finalized until Chief Westbrook reviewed and signed it.

161.     On December 6, 2021 Erwine responded to a call to assist Officer Harris.  During the call Officer Harris snapped at Erwine yelling at him, stating Erwine is a "Fucking idiot," and should just go

21

home.  This conduct from Officer Harris prompted Washoe Tribe Court Prosecutor Gary Larance to file a complaint against Officer Harris for his treatment of the Erwine and his unprofessionalism.

162.    On December 18, 2021, Erwine found a memo from Chief Westbrook in his department mailbox upholding the disciplinary action from Deputy Chief Leonard on November 15, 2021.

163.    Erwine attempted to speak to Chief Westbrook about the memo but was told to "Take it up with HR."

164.    On December 29, 2021, Erwine contacted the human resources department of the Washoe Tribe via email enquiring about the grievance procedures since Erwine was not made aware that the disciplinary action was sustained till December 18, 2021.

165.    Though Erwine was still within the timeframe to file a grievance per department policy the human resources department said that too much time had passed to be able to file a grievance about the action.

166.    On February 19, 2022 Erwine responded to a domestic battery call of which during the incident Erwine contacted Deputy Chief Leonard via cell phone.

167.    Erwine notified Leonard of the circumstances of the incident, explaining that Erwine was unable to determine the primary aggressor of the domestic battery as both parties had provided conflicting information and there was no independent witness to the incident.

168.    Erwine informed Deputy Chief Leonard that he was going to complete a report and forward it to the tribal prosecutor as outlined in department policy pertaining to how to handle domestic violence incidents where the primary aggressor is not determined.

169.    Leonard demanded that Erwine arrest one or both individuals involved in the incident or again told Erwine could be arrested for "Dereliction of duty."

170.    After Erwine consulted the two other officers on scene and obtained information from their investigation, Erwine arrested one of the individuals from the incident.

171.    On February 20, 2022, Erwine and Officer Christensen responded to a call for trespassing in their jurisdiction that resulted in Erwine issuing an individual a citation for trespassing.

172.    On February 21, 2022, Erwine was ordered by Sergeant Ryan to report to his office.

173.    Sergeant Ryan told Erwine that there were some complaints of misconduct and policy violations made against him regarding the February 20 and 21, 2022 incidents.

174.    Sergeant Ryan went over the police report and body camera footage of the incidents with Erwine and asked him questions about the body camera footage and his report.  At the conclusion of the meeting Sergeant Ryan told Erwine that he did not find any grounds to substantiate the allegations of misconduct or policy violations.

175.    On or about February 23, 2022, Erwine told Chief Westbrook in front of Deputy Chief Leonard and Sergeant Hall, that he needed to take some time off to testify in his Lawsuit that he had notified the former Chief of Police he was involved in.

176.    Westbrook told Erwine, "That's personal" and work takes priority.

177.    Erwine explained that he was unable to change the trial date as the case had been ongoing for a few years and the trial date had already been rescheduled more than once and in response Erwine was told "That's your problem."

178.    On February 25, 2022, Erwine was ordered by Westbrook to arrive early for his shift to teach an annual training class to members of the department.

179.    After completing the department training Erwine was served a disciplinary action by Leonard and Hall.  The disciplinary action was in regards to the February 19 and 20, 2022 incidents that Erwine had already been questioned by Sergeant Ryan about and cleared of any wrongdoing.

180.    After being served the disciplinary action Hall informed Erwine that he was being placed on administrative leave pending investigation for allegations of misconduct during the February 19 and 20, 2022 incidents.

181.    Along with the paperwork Erwine was served for his administrative leave, Erwine was also given a form titled "Notice of Rights".

182.    Erwine was stripped of his law enforcement gear including his body armor and told he would be driven home by another Officer from the department.  Erwine requested that he be able to wear his body armor for the ride home as its required per policy and he was being given a ride in another marked police vehicle and still had a badge on his shirt identifying him as a law enforcement officer - Erwine was denied his request without explanation and escorted out of the building.

183.    While being driven home by Officer J Feliciano, Officer Feliciano conducted a traffic stop that resulted in Erwine having to take action in a back-up Officer role despite being stripped of most of his equipment and protective gear.

184.    On February 28, 2022 Erwine attended an investigation interview with Sergeant Hall in regards to his alleged misconduct on February 19 and 20, 2022.  Erwine elected to have a representative with him during the meeting.  Erwine answered all of Sergeant Hall's questions completely and honestly.

185.    On March 4, 2022 Erwine attended a meeting with Chief Westbrook, Deputy Chief Leonard, Sergeant Hall, and Washoe Tribe General Counsel Gene Burk.  Erwine was accompanied by his representative from the February 28, 2022 meeting.  At the onset of the meeting Chief Westbrook informed Erwine that he was being fired and the decision was final.  Chief Westbrook gave Erwine his "Personnel file" which contained new charges of dishonesty from Sergeant Hall and Chief Westbrook that were never previously addressed with Erwine as well as other allegations of misconduct.  Also included in Erwines' personnel file were other disciplinary actions that had been previously unfounded or removed from his file in accordance with department policy.  Both Chief Westbrook and Burk stated during the meeting that the Tribal Chairman had already been forwarded Erwine's termination and signed off on it as required by policy.  Erwine's representative informed everyone in the meeting of Erwine's intent to file a grievance and Burk requested that all communication go through him.

186.    Westbrook's, Leonard's, and Hall's memorandums specifically alleges and asserts facts that would preclude Erwine from becoming reemployed as a police officer for the remainder of his career:

> This is a direct failure to cooperate with the investigation by answering truthfully, which is deemed to be insubordination.". "Albeit this may have been an omission on the application you failed to be truthful.", "I find Officer Erwine's statement….., to be deceitful and dishonest.", "Based upon the dishonesty and the severity of the Washoe Tribe Police Department and Washoe Tribe Human Resource policy violation, it is my recommendation that Officer Ermine's employment with the Washoe Tribe Police Department be terminated immediately.

187.    NRS 289.110(4)(d) states that a person may not be appointed to perform the duties of a peace officer if he or she has: been terminated from any civil service employment for substantiated misconduct involving dishonesty.

188.    In early March 2022 Churchill County's counsel of record in Erwine's ongoing Lawsuit sent Erwine's counsel a subpoena notifying him of their intent to call Chief Westbrook as a witness for Erwine's jury trial that was scheduled for just a few days away.

189.    Prior to this, Chief Westbrook was never listed or disclosed by Churchill County as a witness or otherwise.

190.    On March 11, 2022, Erwine filed a grievance in accordance with Section 11-2 Step 1 of the Tribes employment policies and procedures.  Erwine sent the grievance to Burk as requested as well as the human resources director.  Burk responded, confirming its receipt.

191.    On or about March 14, 2022, Erwine received a letter from Gene Burk denying him the opportunity to file a grievance and respond to the allegations surrounding his termination.

192.    On March 25, 2022, Erwine sent a copy of his request to move to Step 2 of the grievance process in accordance with Section 11-2 of the Tribes employment policies and procedures.  This request was sent to Burk as previously requested as well as a member of the human resources department.

193.    On April 25, 2022, Erwine sent a copy of his request to move to Step 3, the third and finale step, of the grievance process in accordance with Section 11-2 of the Tribes employment policies and procedures.  Burk responded to this request stating that he had received the request but did not anticipate having a response until the following week.

194.    On or about March 24, 2022 Erwine, attempted to contact the Tribal Chairman Sorrell Smokey regarding his being denied the grievance procedure as stated in policy Section 11-3 that he was entailed to.  Erwine was informed that Smokey was unavailable however left a message with his assistant.

195.    Shortly after Erwine attempted to contact the Tribal Chairman, Erwine's representative received a call from Burk asking why Erwine was attempting to communicate with the Tribe and again requested that all communication go through him.

196.    Between March 24, 2022 and June 8, 2022, Erwine tried numerous times to call and schedule a meeting with the Smokey but was unsuccessful.

197.    On June 9, 2022 Erwine was finally able to secure a meeting with Smokey and at the onset of the meeting Smokey informed Erwine that he knew nothing about Erwine's termination nor that he ever attempted to file a grievance. Erwine provided Smokey a written copy of his grievance as well as the letter of denial from Burke.  Erwine was informed during the meeting that it is unusual for Burk to be involved in the process outside of a direct threat of legal action.

198.    Smokey informed Erwine that he would personally look into his termination and report his findings to the Tribes human resources review board of which Erwine would probably then have to present his case in front of the board.

199.    Erwine subsequently never received any response from Smokey or any other Washoe Tribe Officials regarding the matter.

200.    At this point Erwine had exhausted all administrative remedies available to him as outlined in the department policy in place at the time of his termination.

26

201.    On June 24, 2022 Erwine met with a friend and current officer of the Washoe Tribe on the Tribe's reservation in Carson City.  Officer Harris was also present.

202.    When Erwine and the other officer began talking, Officer Harris snapped and began screaming at Erwine calling him a "Fucking faggot" and stating that he is not welcome there.

203.    After the encounter Officer Harris sent out an email to the entire police department stating that he warned Erwine that he was not welcome on the reservation and provided a description of the vehicle Erwine was driving.

**ERWINE'S JOB SEARCH AFTER HIS TERMINATION FROM CHURCHILL**

**COUNTY AND THE WASHOE TRIBE**

204.    After Erwine' s termination from Churchill County and the Washoe Tribe, Erwine again sought employment elsewhere with numerous law enforcement agencies in the State of Nevada as well as across the entire United States.

205.    For all the law enforcement agencies that Erwine sought employment with, he met or exceeded the job qualifications in respect to prior criminal history and experience.

206.    At this point in his career, Erwine achieved numerous certifications that would make him an attractive candidate to many law enforcement employers with respect to his training and experience.

207.    Erwine had achieved certification from the Federal Bureau of Investigation as a firearms instructor, Erwine was certified as a law enforcement defensive tactics instructor as well as a baton instructor.  In addition Erwine was able to certify other law enforcement officers in the use of traffic safety radar equipment as well as administer the State of Nevada physical fitness test to law enforcement officers.

208.    In March of 2023, Erwine filed an unemployment claim with the Nevada Department of Unemployment.

209.    The Washoe Tribe responded to a request from the Nevada Department of Unemployment and disclosed numerous "Disciplinary" and "Insubordination" records in response.

210.   In September of 2022, Erwine was contacted by a recruiter with the Nevada Department Of Public Safety regarding a law enforcement position with the department and Erwine told the recruiter he had applied in the past and was not successful in the background investigation stage of the process. The recruiter asked Erwine to send in a copy of Trotters Memorandum of which Erwine did.

211.   In May of 2023, Erwine reached out to the recruiter to check on the status of things since he had sent in a copy of Trotters Memorandum and Erwine was told that he was welcome to apply but there was a possibility he would be disqualified.

212.   Erwine subsequently attempted to apply with the Nevada Department of Public safety and his application was denied for failing the "pre-screening" process prohibiting him to proceed in the application process.

213.   On March 30, 2023, a background investigator hired by Erwine was given access and showed Erwine's entire employment file from the Washoe Tribe.

214.   In April 2023, Erwine was interviewed and given a conditional job offer from North American Security Services to perform work as an armed government contractor for various federal buildings in the Reno Nevada area.  Erwine was required to undergo a background investigation by the Federal Protective Service (FPS), which is a federal law enforcement agency under the Department of Homeland Security.

215.   During his interview Erwine, was asked numerous questions about his previous law enforcement employment history and was informed by the  interviewer that he had "asked around" in the area and the things he heard about Erwine were "not good."

216.   On April 19, 2023, Erwine received a letter from the Department of Homeland Security asking for additional information surrounding his termination from his previous law enforcement employers including Churchill County Sheriff's office and The Washoe Tribe of Nevada and California. The document requested Erwine provide any documentation including written reprimands, of which Erwine provided.

217.    On May 23, 2023, Erwine received a letter from the Department Of Homeland Security outlining an unfavorable determination which disqualified Erwine from the job.

218.    The letter went on to outline the circumstances surrounding Erwine's termination from both the Churchill County Sheriff's Office as well as the Washoe Tribe of Nevada California and held that because of those reasons Erwine was not suitable.

219.    In May of 2023, Erwine contacted the Henderson Police Department regarding applying for employment.  A background investigator from the department requested Erwine send in his employee file from Churchill County and Erwine received an email response stating that "It doest look good based on the info in the memo."

220.    Erwine subsequently applied with the Henderson Police Department and received an email response stating that he did not meet the minimum qualifications and/ or standards.

221.    In early July of 2023, Erwine was offered a position with Comprehensive Security Services Inc (CSSI) to work as an armed government contractor for the Federal Emergency Management Agency (FEMA) in Truckee, California.

222.    Erwine began his first day of work with CSSI on July 19, 2023.  When Erwine arrived to work he was asked to complete a declaration for federal employment as part of working as a government contractor.

223.    On July 24, 2023 Erwine was contracted by FEMA and asked to provide additional information regarding his previous employment history.

224.    In accordance with the request, Erwine provided the same information he provided during his previous application as a government contractor.

225.    On July 25, 2023, Erwine received a "Notice of Ineligible Determination" letter from FEMA making him ineligible to continue working on the contract and Erwine was immediately terminated.

226.    In August of 2023 Erwine's state license to work as an armed security guard expired and was subsequently not able to be renewed as Erwine was not able to obtain gainful employment in the security field.

227.    On October 11, 2023 Erwine applied for a police officer position with the Reno Police Department.

228.    Erwine filled out the Reno Police Department online job application and provided all the requested information.

229.    Despite meeting all of the required job posting qualifications, Erwine received an email dated October 19, 2023 stating that he did not meet the "minimum qualification requirements".

230.    On October 11, 2013 Erwine contacted the Las Vegas Metro Police Department in regards to submitting an application for employment due to numerous open job postings.

231.    Erwine was told that due to his previous denial in 2017 from the department he was ineligible to reapply but could request reconsideration by sending an email to the backgrounds division.

232.    Erwine followed up with the background division via email and provided them with documentation from his previous lawsuit as requested.  Erwine subsequently never received a response and is still not eligible to apply.

233.    On November 16, 2023 Erwine received an email from the North Las Vegas Police department in reference to an application.  Erwine responded to the email enquiring if he was able to reapply as he was already disqualified by the agency previously.  Erwine did not receive a reply to the email however followed up via phone directly with the officer who had sent it.  Erwine was informed by the office that he was still disqualified and would not be able to reapply until he requested reconsideration.  Erwine subsequently sent an email to request reconsideration of which the department responded that Erwine was "permanently disqualified" and "not eligible to re-apply with the police department".

234.    On December 1, 2023 Erwine applied to the Las Vegas Marshals Service.

235.     On December 6, Erwine received an email from the Las Vegas Marshals Service congratulating him on a passing score for his training and experience assessment for the position.  The email informed Erwine that his application was forwarded to the background unit and he would be contacted in the future in regards to the background process.

236.     On December 17, 2023 Erwine completed the requested Personal History Questionnaire which required Erwine to disclose details of his previous employment history including his disciplinary and termination records.

237.     On December 27, 2023 Erwine received an email from the Las Vegas Marshals Service notifying him that he was not able to continue in the hiring process.

238.     In early January 2024, Erwine inquired about applying with the Dallas Police Department in Dallas Texas.  The Department's website recommended that out of town applicants contact a recruiter with the department to ensure hiring requirements are met and an applicant has no disqualifying factors. Erwine spoke to the recruiter in regards to his previous law enforcement employment experience.  The recruiter informed Erwine that the Dallas Police Department classifies previous law enforcement terminations as either "Honorable" or "Dishonorable" and that an "Dishonorable" termination is a disqualifying factor for employment with the department.  Erwine sent the recruiter a copy of Trotters Memorandum and was subsequently told that because he was fired from a law enforcement agency he would be disqualified from the hiring process.

239.     On January 5, 2024 Erwine spoke to Sergeant Lentz with the Greenville Police Department in South Carolina regarding applying with the department for a position as a police officer. Erwine told Sergeant Lentz about his previous struggles obtaining a job in law enforcement.  Sergeant Lentz asked Erwine to send in a copy of Trotters Memorandum.  Sergeant Lentz replied to Erwines email with the memorandum stating that "Based on the documentation you have provided, it appears that this does not meet the employment standards we have at the Greenville Police Department."

240.    On January 10, 2015 Erwine spoke to Officer Happle from the background investigations unit of the San Francisco Police Department regarding applying with the agency.  Officer Happle had Erwine send in a copy of Trotters Memorandum.  A few days later Erwine received an email from Officer Happle stating that in his experience with the background investigations unit Erwines background would be a "Tough sell" to the command staff and he did not see them proceeding with employment for Erwine.

241.    On January 15, 2024 Erwine spoke with a member of the Denver Police Department recruiting unit in regards to applying with the agency.  The recruiter requested that Erwine send her a copy of Trotter's memorandum.  The recruiter responded to Erwines email stating that "given the ground as to why you were terminated, you would not make it past our background investigation."

242.    On January 17, 2024 Erwine received an email from Officer Jimison with the Las Vegas Metro Police Corrections Department in reference to an inquiry Erwine sent in for interest as a corrections officer with the department.  Officer Jimison stated in the email that the process is the same as Las Vegas Metro Police Department and Erwine's disqualification from them would disqualify him from all positions in the department.

243.    On January 18, 2024 Erwine contacted a recruiter from the Nashville Metro Police Department in regards to applying with the agency.  Erwine provided Trotters Memorandum to the recruiter.  The recruiter informed Erwine that a termination from another law enforcement organization would disqualify him from the process with the Nashville Metro Police Department.

244.    On January 18, 2024 Erwine received an email from the New Orleans Police department in reference to an employment inquiry of which Erwine provided the department Trotters Memorandum. The email informed Erwine that "You [Erwine] cannot apply if you have been terminated or forced to resign from any law enforcement agency for disciplinary reasons."

245.    On March 12, 2024 Sarah Tracy, a former employee of the Clerk of the Court for the New River Township Justice court in Churchill County, contacted Erwines counsel.  Tracy had worked

directly under Trotter who was elected Justice of the Peace in Churchill County in 2019.  Tracy stated that she found out about Erwines lawsuit against Trotter from other county employees.  Tracy stated that Trotter brought up Erwine's case with her a few times over the past few years.  Tracy stated that Trotter told her that he would convey to all other law enforcement agencies when they would call about Erwine that Erwine was a "Piece of shit" and that he would sabotage other law enforcement agencies.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. §1981 – RACIAL DISCRIMINATION
### (Against Westbrook, Leonard, Hall, and Burk)

246.    Erwine realleges and incorporates each and every allegation contained in the preceding paragraphs.

247.    On March 3, 2020, Erwine received a disciplinary for not adhering to police practices in regards to civil rights.  Though both Erwine and Officer Christensen were both directly involved in the incident that led to Erwine's disciplinary action, only Erwine received any disciplinary action.

248.    On February 5, 2021, Erwine conducted a traffic stop with Officer Christensen which ultimately led to Erwine receiving disciplinary action and requiring him to repeat a three month long training process.  Even though both Erwine and Officer Christensen participated in and made the final decision to let the driver go at the completion of the traffic stop, only Erwine received any type of disciplinary action or mandated training.

249.    On February 19, 2022, Erwine received disciplinary action subsequent to arresting an individual.  Officer Christensen participated in the investigation and arrest of the individual with Erwine however only Erwine received any disciplinary action.

250.    On February 20, 2022, Erwine received disciplinary action for violation of a department policy/ directive during a call for service with Officer Christensen.  Even though both Erwine and Officer Christensen were present and participated during the incident, only Erwine received any disciplinary action.

33

251.    The United States Code, Title 42, Section 1981, 42 USC §1981, prohibits an employer from discriminating on the basis of race in the making, performance, modification and termination of contracts and the enjoyment of all benefits of the contractual relationship.  A racially hostile work environment is a form of race discrimination.

252.    Erwine is White.  Defendants discriminated against Erwine on the bases of race in the performance of and enjoyment of all the benefits of his employment relationship with the Washoe Tribe of Nevada and California.

253.    Erwine was qualified to hold the position of Police Officer.

254.    The conduct to which Erwine was subjected was unwelcome.

255.    Defendants also discriminated against Erwine based on race by subjecting him to a racially hostile work enjoyment.

256.    The conduct of Defendants was both severe and pervasive, objectively and subjectively offensive, and negatively affected the terms and conditions of Erwine's employment.

257.    But for Erwine's race, he would not have suffered the loss of his legally protected right.

258.    Defendants also discriminated against Erwine by subjecting him to disparate treatment on the basis of race.  Defendants treated Erwine less favorably than similarly situated American Indian employees.

259.    A policy making individual was involved in the discrimination, ratified the discrimination and allowed subordinates to continue the discrimination conduct.

260.    Defendants' actions, as described above, directly and proximately have caused and continued to cause Erwine to suffer loss of income and other financial benefits, pain and suffering, humiliation, indignity, loss of professional reputation, and personal embarrassment.

261.    The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

262.     Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

263.     In addition to the relief requested above, the Erwine requests relief as described in the prayer for relief below.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. 1983 – VIOLATION OF DUE PROCESS
### PROTECTED LIBERTY INTEREST
#### (Against Trotter)

264.     Erwine realleges and incorporates each and every allegation contained in the preceding paragraphs.

265.     By his conduct, as described herein, Trotter is liable to Erwine under 42 U.S.C. § 1983 for the violation, under color of state law, of the constitutional right to be free from any deprivation of liberty without due process of law under the Fifth and Fourteenth amendments of the United States Constitution.

266.     Trotter made false and stigmatizing statements about Erwine.

267.     Trotter's false and stigmatizing statements were publicly disclosed and published in Erwine's personnel file mandated by state statute (NRS 239B.020) to be disclosed to all prospective public safety employers upon request.

268.     Erwine was not given a name clearing hearing or an opportunity to refute the charges before they were placed in his file or published.

269.     Trotter's false and stigmatizing statements attack Erwine's reputation for honesty and morality.

270.     By placing the stigmatizing statements in Erwines personnel file in connection with his termination, Trotter set into motion a series of acts by other law enforcement agencies that Trotter knew or reasonably should have known would result in denial of employment causing Erwine to be effectively excluded from the profession of law enforcement.

271.    Every employer or potential employer of Erwine that has either directly seen or been made aware of Trotters stigmatizing statements has either summarily denied Erwine employment or told Erwine that he does not meet their hiring standards.

272.    Erwine has not been able to secure gainful employment by a single employer that is aware of Trotters stigmatizing statements or reasons stated for his termination from Churchill County; effectively and actually excluding him from his profession.

273.    Erwine meets or exceeds every requirement of every employer he applied for in respect to criminal history requirements and experience requirements.

274.    Since Erwine's termination, Trotter has conveyed the false and stigmatizing statements regarding Erwines termination to law enforcement agencies that have contacted Trotter in reference to a background investigation of Erwine.

275.    Trotter's false and stigmatizing statements about Erwine violate Erwine's right to Due Process under the Fourteenth amendment to the Constitution, the violation of which caused damages to Erwine.

276.    The acts of the Trotter described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

277.    As a direct and proximate result of the acts as stated herein by Trotter, Erwine's constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

278.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

279.    In addition to the relief requested above, the Erwine requests relief as described in the prayer for relief below.

///

///

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. 1983 – MONELL CLAIM
#### (Against Churchill County)

280.    Erwine realleges and incorporates each and every allegation contained in the preceding paragraphs.

281.    At all times herein, Defendant Churchill County acting through its Sheriff's Office, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to the Erwine's constitutional rights caused the violation of such rights as described herein, including Erwine's constitutional right to be free from any deprivation of liberty without due process of law under the Fifth and Fourteenth amendments of the United States Constitution.

282.    All actions described herein by Trotter are a policy or custom of Churchill County.   See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Trotter was the municipal officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office.

283.    Churchill County's unlawful actions were done willfully, knowingly and with the specific intent to deprive the Erwine of his constitutional rights under the Fourteenth Amendment to the U.S. Constitution without due process of law.

284.    The constitutional abuses and violations by Churchill County through the actions of its Sheriff's Office, were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by Churchill County, including its practice and policy of unlawfully terminating the employment of law enforcement officers who monitor and document police activities and/or misconduct by other officers in the Churchill County Sheriff's

Office and failing to follow the requirements of the provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060.

285.     Upon information and belief, Churchill County has, acting through its Sheriff's Office, developed, implemented, enforced, encouraged and sanctioned a de facto policy, practice, and/or custom of unlawfully terminating the employment of law enforcement officers who monitor and document police activities and/or misconduct by other officers in the Churchill County Sheriff's Office and failing to follow the requirements of the provisions of NRS Chapter 289 specifically 289.040, 289.057, and 289.060.

286.     Churchill County's unlawful actions were done willfully, knowingly and with the specific intent to deprive Erwine of his constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

287.     Churchill County has acted with deliberate indifference to the constitutional rights of the Erwine.

288.     The acts of Churchill County described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

289.     As a direct and proximate result of the acts as stated herein by Churchill County Erwine's constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

290.     Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

291.     In addition to the relief requested above, the Erwine requests relief as described in the prayer for relief below.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. 1985(2) – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS – OBSTRUCTING JUSTICE**
**(Against Westbrook, Leonard, Hall, and Burk)**

292.    Erwine realleges and incorporates each and every allegation contained in the preceding paragraphs.

293.    Westbrook, Leonard, Hall, and Burk conspired to deter Erwine, by force, intimidation, or threat, from attending court, or from testifying in a matter pending therein, freely, fully, and truthfully, and to injure Erwine on account of his having to attend testimony.

294.    Westbrook, Leonard, Hall, and Burk conspired to deprive or injure Erwine on account of Erwine's having to testify in his lawsuit against Churchill County.

295.    After Westbrook, Leonard, Hall, and Burk became aware of Erwine's need to attend the trial, Erwine was ordered to be reinvestigated by Westbrook for incidents that Erwine had already been investigated for and cleared of any wrongdoing by another supervisor.

296.    The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

297.    Erwine was injured in his person or property by the actions of Westbrook, Leonard, Hall, and Burk.

298.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

299.    In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

### FIFTH CLAIM FOR RELIEF

**42 U.S.C. 1985(3) – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS – DEPRIVATION OF RIGHTS AND PRIVILEGES**
**(Against Westbrook, Leonard, Hall, and Burk)**

300.    Erwine realleges and incorporates each and every allegation contained in the preceding paragraphs.

301.    Section 1985(3) of the Civil Rights Act of 1964 provides a civil remedy for conspiracies that interfere with federally protected rights when motivated by invidiously discriminatory animus.

302.     On numerous occasions as discussed herein Erwine as a white male was treated vastly different than that of Native American female police officer, Officer Christensen.

303.     Erwine had a protected liberty interest in being free from professional stigmatization under the 5th and 14th Amendments.

304.     Westbrook, Leonard, Hall, and Burk conspired to deprive Erwine of both his procedural and substantive due process rights in respect to his property interest in his continued employment and his liberty interest in his reputation.

305.     Erwine was a non-probationary employee of the Washoe Tribe and had a protected property interest in continued employment with the Washoe Tribe under the 5th and 14th Amendments.

306.     Erwine was not given a pre deprivation notice, a hearing, or an opportunity to be heard in regards to all the charges against him before he was deprived of his property interest in his continued employment.

307.     Erwine was not given a name clearing hearing or opportunity to refute the false and stigmatizing charges before they were published in his employee file.

308.     The charges against Erwine attack his reputation for honesty and morality.

309.     Westbrook, Leonard, Hall, and Burk conspired to engage in conduct motivated by a racial or perhaps otherwise class-based, invidiously discriminatory animus.

310.     Westbrook, Leonard, Hall, and Burk engaged in a conspiracy.

311.     Westbrook, Leonard, Hall, and Burk committed overt acts in furtherance of the object of the conspiracy.

312.     Westbrook, Leonard, Hall, and Burk intended to deprive Erwine of the equal protection of, or equal privileges and immunities under the law.

313.     The actions of Westbrook, Leonard, Hall, and Burk resulted in an injury or deprivation of federally protected rights of Erwine described above.

314.     It would have been clear to a reasonable person that Westbrook, Leonard, Hall, and Burk, conduct was unlawful.

315.     The acts of Westbrook, Leonard, Hall, and Burk, described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

316.     Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

317.     In addition to the relief requested above, the Erwine requests relief as described in the prayer for relief below.

**SIXTH CLAIM FOR RELIEF**

**WRONGFUL TERMINATION/ TORTIOUS DISCHARGE**
**(FEDERAL TORT CLAIMS ACT)**
**(Against the United States)**

318.     Erwine  realleges and incorporates each and every allegation contained in the preceding paragraphs.

319.     Employers are required to follow the procedural protections given to an employee as set forth in their employee handbook. See  *Miller v. United States*, 992 F.3d 878 (9th Cir. 2021).

320.     The Tribe and United States of America are party to a P.L. 93-638 self-determination contract ("Contract") which, among other agreements, the United States of America agreed to provide monies for law enforcement and investigative services to the Tribe and to monitor the Tribe's use of said funds in accordance with the contract and applicable law.

321.     The Contract was ratified by the tribe and the BIA on a multi-year basis, and at all times relevant to this action.

322.     By the terms of the Contract the United States of America is the Tribe's employer of law enforcement personnel and administration and is charged with the duty of monitoring the Tribe's actions to ensure compliance with all laws and the Contract.

323.    Wrongful termination/ tortious discharge occurs where an employer improperly dismisses an employee for reasons that violate public policy. *Wayment v. Holmes,* 112 Nev. 232, 912 P.2d 816 (1996).

324.    By and through its actions as described herein the United States through the Washoe Tribe terminated Erwine for refusal to engage in conduct that Erwine, in good faith, reasonably believed to be illegal.

325.    The Washoe Tribe outlined many of these incidents in Erwines termination paperwork that it used as justification to terminate Erwine.

326.    The Washoe Tribe noted Erwines failure to arrest an individual during a DUI traffic stop in April of 2021 even though Erwine lacked probable cause to do so as determined by Erwine after the subject satisfactorily completed standardized sobriety tests.  Arrest of the individual in question would have been a violation of the subject's Constitutional right under the 4th Amendment to be free from an unlawful arrest, as well as a violation of  NRS 199.310, for malicious prosecution for unlawfully causing someone to be arrested or prosecuted for a crime they did not commit.

327.    The Washoe Tribe also noted Erwines "refusal or deliberate failure to carry out or follow lawful directives and orders…."; referencing Erwines refusal to arrest the individual on November 15, 2021 as discussed herein.  This was subsequent to Erwine explaining that it would have been unlawful to arrest the individual in question as he clearly did not meet the elements of the crime as stated in Nevada Revised Statute.

328.    Also discussed in Erwines termination paperwork is Erwines "Insubordination" for refusing a "Lawful order" by supervisory staff.  This is in reference to the incident on February 20, 2022 where Erwine detained an individual during a trespassing investigation and failed to follow an alleged order to place the individual in the back of his patrol vehicle.  Not only does this order not exist anywhere in Washoe Tribe policy or otherwise, it would have been illegal for Erwine to remove an

individual who was not under arrest, from the scene of the investigation and place him in his patrol car absent exigent circumstances and or probable cause to arrest the individual.

329.    As a direct and proximate result of the acts as stated herein by the United States Of America, Erwine's Constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

330.    In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

**SEVENTH CLAIM FOR RELIEF**

**BAD FAITH DISCHARGE**
**(FEDERAL TORT CLAIMS ACT)**
**(Against the United States)**

331.    Erwine  realleges and incorporates each and every allegation contained in the preceding paragraphs.

332.    The Tribe and United States of America are party to a P.L. 93-638 self-determination contract ("Contract") which, among other agreements, the United States of America agreed to provide monies for law enforcement and investigative services to the Tribe and to monitor the Tribe's use of said funds in accordance with the contract and applicable law.

333.    The Contract was ratified by the tribe and the BIA on a multi-year basis, and at all times relevant to this action.

334.    By the terms of the Contract the United States of America is the Tribe's employer of law enforcement personnel and administration and is charged with the duty of monitoring the Tribe's actions to ensure compliance with all laws and the Contract.

335.    By and through its actions as described herein the United States through the Washoe Tribe terminated Erwine in bad faith.

336.    Erwine entered into a signed employment contract with the United States through the Washoe Tribe with an implied covenant of good faith and fair dealing.

337.    The written provisions of the Washoe Tribes employee handbook and policies were part of the contract.

338.    As part of this contract Erwine became a permanent employee after successfully completing a one year probationary period of which Erwine was no longer an at-will employee.

339.    After Erwine successfully completed his probationary period and was no longer an at-will employee, Erwine became a tenured employee of which his employment with the Washoe Tribe would be guaranteed to continue years into the future being bound by the written provisions in the employee handbook and associated policies.  Erwine and the Washoe Tribe had a special reliance upon each other for each party to abide by the contract and its provisions.

340.    This reliance was predicated on a premise of both parties trusting each other to abide by the contract and specifically Erwine relying upon the Washoe Tribe for his continued employment and subsequent career in law enforcement.

341.    In this contract both parties agreed to be bound by a strict and comprehensive disciplinary process and the Washoe Tribe could only terminate Erwine in accordance with these policies and procedures.

342.    The Washoe Tribe wrongfully and in bad faith breached this contract and terminated Erwine without notifying Erwine of all of his employment deficiencies, failed to afford Erwine the progressive disciplinary procedure as promised, and therefore could not possibly have based Erwines termination on a conclusion that Erwines conduct was unacceptable to maintain employment.

343.    This conduct by the Washoe Tribe was malicious and oppressive and further motivated to destroy Erwines career in law enforcement.

344.    This contract included a special trust relationship between Erwine and the Washoe Tribe whereas the Washoe Tribe intentionally contravened both the spirit and intention of the contract.

345.    As a direct and proximate result of the acts as stated herein by the United States Of America through the Washoe Tribe, Erwine's Constitutional rights have been violated which has caused

him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

346. In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

## EIGHTH CLAIM FOR RELIEF

## BIVENS ACTION – VIOLATION OF 5th AMENDMENT RIGHT TO DUE PROCESS
### (Against Westbrook, Leonard, Hall)

347. Erwine  realleges and incorporates each and every allegation contained in the preceding paragraphs.

348. The Supreme Court has recognized actions under *Bivens* against Federal Officials action in the landmark case *Davis v. Passman*, 442 U.S. 228 (1979) to a Fifth Amendment due process claim for sex discrimination where an individual was discriminated on the basis of gender in employment.

349. Defendants Westbrook, Leonard, and Hall acted under color of Federal Law.

350. On March 3, 2020, Erwine received a disciplinary for not adhering to police practices in regards to civil rights.  Though both Erwine and Officer Christensen were both directly involved in the incident that lead to Erwine's disciplinary action, only Erwine received any disciplinary action.

351. On February 5, 2021, Erwine conducted a traffic stop with Officer Christensen which ultimately led to Erwine receiving disciplinary action and requiring him to repeat a three month long training process.  Even though both Erwine and Officer Christensen participated in and made the final decision to let the driver go at the completion of the traffic stop, only Erwine received any type of disciplinary action or mandated training.

352. On February 19, 2022, Erwine received disciplinary action subsequent to arresting an individual.  Officer Christensen participated in the investigation and arrest of the individual with Erwine however only Erwine received any disciplinary action.

353.    On February 20, 2022, Erwine received disciplinary action for violation of a department policy/ directive during a call for service with Officer Christensen.  Even though both Erwine and Officer Christensen were present and participated during the incident, only Erwine received any disciplinary action.

354.    The acts of Westbrook, Leonard, and Hall described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

355.    As the proximate cause of the Westbrook, Leonard, and Hall unconstitutional conduct, Erwine has suffered economic losses due to loss of employment, advance placement and promotional opportunities.

356.    As a direct and proximate result of the acts as stated herein by the Westbrook, Leonard, and Hall, Erwine's Constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

357.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

358.    In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

### NINTH  CLAIM FOR RELIEF

### VIOLATION OF DUE PROCESS - NEVADA CONSTITUTION
#### (Against Churchill County, Trotter)

359.    Erwine  realleges and incorporates each and every allegation contained in the preceding paragraphs.

360.    Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice.  *Summers v. Warden of Nev. State Prison*, 84 Nev. 326, 329, 440 P.2d 388, 390 (1968).  Nevada law very clearly requires that a state

agency must follow procedures required by statute governing employee discipline. *McCracken v. Elko County Sch. Dist.*, 103 Nev. 655, 747 P.2d 1373 (1987). Because Erwine had a constitutionally protected liberty interest in his chosen profession, he was entitled to due process before being deprived of that interest under Nevada law. *Pressler v. City of Reno*, 118 Nev. 506, 511, 50 P.3d 1096, 1098 (2002)

361. The provisions of NRS Chapter 289 create a liberty interest that is protected by the Due Process Clause of the Nevada Constitution, the violation of which by Trotter and Churchill County caused damages to Erwine.

362. Trotter violated numerous provisions of NRS Chapter 289 governing the due process rights of Peace Officers in the State of Nevada, including Erwine, which rules secure certain benefits that support a claim of entitlement to those benefits by Erwine, including but not limited to violation of NRS 289.040, which provides the opportunity to either review or sign disciplinary documents before they are placed into a peace officers file; NRS 289.057, which provides a peace officer the opportunity to review their file after an investigation; NRS 289.060, which requires that a peace officer be given notice of investigation; NRS 289.080, which provides that a peace officer be given opportunity to have representatives at an investigatory or disciplinary hearing.

363. Trotters conduct was also fundamentally unfair and shocking to the universal sense of justice, as Erwine was fired by Trotter for trying to protect the Constitutional rights of inmates at Churchill County. Trotter then inserted and shared with other law enforcement agencies the false and defamatory statements about Erwine, such that no other law enforcement agency would consider hiring him.

364. The acts Trotter and Churchill County were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

365.     As the proximate cause of Trotter and Churchill Counties unconstitutional conduct, Erwine has suffered economic losses due to loss of employment, advance placement and promotional opportunities.

366.     As a direct and proximate result of the acts as stated herein by Trotter and Churchill County, Erwine's State Constitutional rights have been violated which has caused him to suffer mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

367.     Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

368.     In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

**TENTH CLAIM FOR RELIEF**

**DEFAMATION**
**(Against Churchill County, Trotter, Westbrook, Leonard, Hall)**

369.     Erwine repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

370.     The "Memorandum" authored by Trotter on October 10, 2016 and placed in Erwines employee file contains numerous false and defamatory statements about Erwine by Trotter.

371.     Trotter knowingly published many false and defamatory statements about Erwine in the October 10, 2016 Memorandum: namely, [Erwine's conduct] is "unprofessional behavior", [Erwine] "creates liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action.", [Erwine] "is siding with the inmate against his own agency or, possibly, encouraging civil action against his own agency.", [Erwine] "discredits our agency and our profession.", "In a time when scrutiny is high on all of us in law enforcement, this type of play [Erwine's alleged actions] is inexcusable.", "Deputy Erwine clearly violated our policies on Taser and Use of Force, as well as, behavior standards."

372.     Since Erwine's termination, Trotter has continuously conveyed the false and stigmatizing statements regarding Erwines termination to law enforcement agencies that have contacted him in reference to a background investigation of Erwine.

373.     The "Personal file" given to Erwine when he was terminated on March 4, 2022 contains numerous false and defamatory statements about Erwine from Westbrook, Leonard, and Hall.

374.     Westbrook knowingly published many false and defamatory statements about Erwine in a March 2, 2022, Memorandum: namely, [Erwine has] "shown a pattern of disregard for the practices of conducting law enforcement functions and/ or being able to follow directives given by Supervisors", Erwine was argumentative with another officer, [Erwine was disciplined for] "Failure to disclose or misrepresenting facts", [Erwines behavior] "is deemed insubordination", [Erwine failed to] "competently conduct a DUI investigation/ arrest in which the individual was allowed to leave with a firearm even though the individual was over the legal drinking limit to possess said firearm", [Erwine violated policy] "Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor and/ or other employee", [Erwine has an] "inability to discern criminal process", [Erwines' conduct] "is a direct failure to cooperate with the investigation by answering truthfully, which is deemed to be insubordination", [Erwine] "failed to be truthful" on his job application, [Erwine] "decided not to follow directives given by supervisory staff of this Department", [Erwine is not able to] "correctly discern chain of command."

375.     Hall knowingly published many false and misleading statements about Erwine in a March 1, 2022, Memorandum: namely, [Erwine was] "deceitful and dishonest". [Erwine's dishonestly] "is a violation of Washoe Tribe Police Department Policy 318.3.4 Performance (e): Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority along with Washoe Tribe Police Department Policy 1009.6 (L): All employees shall provide complete and truthful responses

49

to questions posed during interviews which coincide with Washoe Tribe Human Resources Policy 10-3 (21): Refusal or failure to comply with a reasonable and proper order or directive from a supervisor.", [Erwine violated] "Washoe Tribe Police Department Policy 318.3.4 Performance (e): Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority which coincides with Washoe Tribe Human Resources Policy 10-3 (21): Refusal or failure to comply with a reasonable and proper order or directive from a supervisor," "Based upon the dishonesty and the severity of the Washoe Tribe Police Department and Washoe Tribe Human Resources policy violations, it is my recommendation that Officer Erwine's employment with the Washoe Tribe Police Department be terminated immediately."

376.    Leonard knowingly published many false and defamatory statements about Erwine in a February 25, 2022, Memorandum: namely, [Erwine] "failed to disclose vital investigative information" to his supervisor as well as other law enforcement officers, [Erwines behavior] "is in violation of Washoe Tribe Police Department Policy 318.3.4(q) Failure to disclose or misrepresenting material facts, or the making of any false or misleading statements on any application, examination form or other official document, report or form, or during the course of any work-related investigation, which coincides with Washoe Tribe Human Resources Policy Title 10, Prohibition #6: Willful or negligent withholding of job related information from supervisor or other individuals having a need for such information."

377.    Leonard knowingly published false and defamatory statements about Erwine in a December 15, 2021 Memorandum : namely, "Officer M. Erwine is in violation of Washoe Tribe Police Department Policy #318.3.4(e) Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority; which coincides with Washoe Tribe Human Resources Section 10

Conduct and Discipline Prohibition #10-3(23) Failure to cooperate with supervisor and/ or other employee."

378.    The false statements made by Defendants lower Erwine's reputation in the community, and in the profession and business or industry in which Erwine worked and would excite derogatory opinions about the Erwine and hold the Erwine up to contempt.

379.    The statements of Westbrook, Leonard, and Hall were made with actual malice, i.e. with knowledge of their falsehood, and were made with no purpose for agency advancement, and were made for vindictive reasons, i.e. to destroy Erwine's career as a police officer.

380.    As a direct and proximate cause of Defendant's conduct, as described above, Erwine was prevented from securing future employment and has been damaged in an amount to be proven at trial.

381.    Defendant's false and defamatory statements were made in reckless disregard of the rights of Erwine, and in reckless disregard of the truth of the matter and constitute actual or implied malice giving rise of a claim for punitive and exemplary damages.

382.    The acts of the Defendants described above were dishonest, intentional, wanton, malicious, and oppressive, thus entitling Erwine to an award of punitive damages.

383.    As a direct and proximate result of the acts as stated herein by each of the Defendants Erwine has suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

384.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

385.    In addition to the relief requested above, Erwine requests relief as described in the prayer for relief below.

### ELEVENTH CLAIM FOR RELIEF

### DEFAMATION PER SE
**(Against Churchill County, Trotter, Westbrook, Leonard, Hall)**

386.    Erwine repeats and realleges the allegations set forth in the foregoing Paragraphs as though fully set forth herein.

387.    The "Memorandum" authored by Trotter on October 10, 2016 and placed in Erwines employee file contains numerous false and defamatory statements about Erwine by Trotter.

388.    Trotter knowingly published many false and defamatory statements about Erwine in the October 10, 2016 Memorandum: namely, [Erwine's conduct] is "unprofessional behavior", [Erwine] "creates liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action.", [Erwine] "is siding with the inmate against his own agency or, possibly, encouraging civil action against his own agency.", [Erwine] "discredits our agency and our profession.", "In a time when scrutiny is high on all of us in law enforcement, this type of play [Erwine's alleged actions] is inexcusable.", "Deputy Erwine clearly violated our policies on Taser and Use of Force, as well as, behavior standards."

389.    Since Erwine's termination, Trotter has continuously conveyed the false and stigmatizing statements regarding Erwines termination to law enforcement agencies that have contacted him in reference to a background investigation of Erwine.

390.    The "Personal file" given to Erwine when he was Terminated on March 4, 2022 contains numerous false and defamatory statements about Erwine from Westbrook, Leonard, and Hall.

391.    Westbrook knowingly published many false and defamatory statements about Erwine in a March 2, 2022, Memorandum: namely, [Erwine has] "shown a pattern of disregard for the practices of conducting law enforcement functions and/ or being able to follow directives given by Supervisors", Erwine was argumentative with another officer, [Erwine was disciplined for] "Failure to disclose or misrepresenting facts", [Erwines behavior] "is deemed insubordination", [Erwine failed to] "competently conduct a DUI investigation/ arrest in which the individual was allowed to leave with a firearm even though the individual was over the legal drinking limit to possess said firearm", [Erwine violated policy] "Disobedience or insubordination to constituted authorities, including refusal or

deliberate failure to carry out or follow lawful directives and orders from any supervisor and/ or other employee", [Erwine has an] "inability to discern criminal process", [Erwines' conduct] "is a direct failure to cooperate with the investigation by answering truthfully, which is deemed to be insubordination", [Erwine] "failed to be truthful" on his job application, [Erwine] "decided not to follow directives given by supervisory staff of this Department", [Erwine is not able to] "correctly discern chain of command."

392.    Hall knowingly published many false and misleading statements about Erwine in a March 1, 2022, Memorandum: namely, [Erwine was] "deceitful and dishonest". [Erwine's dishonestly] "is a violation of Washoe Tribe Police Department Policy 318.3.4 Performance (e): Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority along with Washoe Tribe Police Department Policy 1009.6 (L): All employees shall provide complete and truthful responses to questions posed during interviews which coincide with Washoe Tribe Human Resources Policy 10-3 (21): Refusal or failure to comply with a reasonable and proper order or directive from a supervisor.", [Erwine violated] "Washoe Tribe Police Department Policy 318.3.4 Performance (e): Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority which coincides with Washoe Tribe Human Resources Policy 10-3 (21): Refusal or failure to comply with a reasonable and proper order or directive from a supervisor.", "Based upon the dishonesty and the severity of the Washoe Tribe Police Department and Washoe Tribe Human Resources policy violations, it is my recommendation that Officer Erwine's employment with the Washoe Tribe Police Department be terminated immediately."

393.    Leonard knowingly published many false and defamatory statements about Erwine in a February 25, 2022, Memorandum: namely, [Erwine] "failed to disclose vital investigative information" to his supervisor as well as other law enforcement officers, [Erwines behavior] "is in violation of

Washoe Tribe Police Department Policy 318.3.4(q) Failure to disclose or misrepresenting material facts, or the making of any false or misleading statements on any application, examination form or other official document, report or form, or during the course of any work-related investigation, which coincides with Washoe Tribe Human Resources Policy Title 10, Prohibition #6: Willful or negligent withholding of job related information from supervisor or other individuals having a need for such information."

394.    Leonard knowingly published false and defamatory statements about Erwine in a December 15, 2021 Memorandum : namely, "Officer M. Erwine is in violation of Washoe Tribe Police Department Policy #318.3.4(e) Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority; which coincides with Washoe Tribe Human Resources Section 10 Conduct and Discipline Prohibition #10-3(23) Failure to cooperate with supervisor and/ or other employee."

395.    The false statements made by Defendants lower the reputation of the Erwine in the community, and in the profession and business or industry in which Erwine worked and would excite derogatory opinions about the Erwine and hold the Erwine up to contempt.
The statements of Westbrook, Leonard, and Hall were made with actual malice, i.e. with knowledge of their falsehood, and were made with no purpose for agency advancement, and were made for vindictive reasons, i.e. to destroy Erwine's career as a police officer.

396.    Defendants' statements constitute defamation per se in that they tend to injure Erwine in his trade, business, and profession.

397.    Defendant's false and defamatory statements were made in reckless disregard of the rights of Erwine, and in reckless disregard of the truth of the matter and constitute actual or implied malice giving rise to a claim for punitive and exemplary damages in an amount to be proved at trial.

398.    As a direct and proximate cause of Defendant's conduct, as described above, Erwine was prevented from securing future employment and has been damaged in an amount to be proved at trial.

399.    As a direct and proximate result of the acts as stated herein by each of the Defendants Erwine has suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

400.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

401.    In addition to the relief requested above, the Erwine requests relief as described in the prayer for relief below.

## TWELVETH CLAIM FOR RELIEF

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE EMPLOYMENT
### (Against Churchill County and Trotter)

402.    Erwine repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

403.    Defendants intentionally disclosed adverse and false statements regarding Erwines employment history to numerous potential employers of Erwine.

404.    Defendants knew that prospective business relationships existed and acted intentionally to interfere with those prospective business relationships, specifically the Washoe County Sheriff's Office and the Las Vegas Metropolitan Police Department, pursuant to its transmission of false statements concerning Erwines previous employment with them.

405.    Since Erwine's termination, Trotter has continuously conveyed the false and stigmatizing statements regarding Erwines termination to law enforcement agencies that have contacted him in reference to a background investigation of Erwine.

406.    Defendants intended to harm Erwine by wrongfully preventing Erwine from obtaining new employment.

407.    Defendants had no privilege or justification for its wrongful actions.

408.    The acts of the Defendants as described above were dishonest, intentional, wanton, malicious, and oppressive thus entitling Erwine to an award of punitive damages.

409.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

### THIRTEENTH CLAIM FOR RELIEF

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
#### (Against Westbrook, Leonard, Hall, Burk)

410.    Erwine repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

411.    Defendants were aware of a contractual relationship between Erwine and the Washoe Tribe.

412.    Defendants knew that the contractual relationship existed and acted intentionally to interfere with that relationship.

413.    The Defendants intended to harm Erwine by wrongfully interfering with and concealing the circumstances surrounding Erwine's termination from Tribal Chairman Smokey, who was required to approve all employee terminations as outlined in the Washoe Tribe human resource policy manual.

414.    Burk interfered with and concealed Erwine's attempt to grieve his termination as outlined in the Washoe Tribe human resources policy manual.

415.    Defendants had no privilege or justification for its wrongful actions.

416.    As a direct and proximate cause of Defendant's conduct, as described above, Erwine was terminated and denied his contractually obligated grievance procedure remedy.

417.    The acts of Westbrook, Leonard, Hall, and Burke as desecrated above were dishonest, intentional, wanton, malicious, and oppressive thus entitling Erwine to an award of punitive damages.

418.    As the proximate cause of Westbrook, Leonard, and Hall's conduct, Erwine has suffered economic losses due to loss of employment, advance placement and promotional opportunities.

419.    Erwine has been required to retain the services of an attorney to pursue this action and is entitled to recover attorney's fees and costs incurred.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure (FRCP) Rule 38, Plaintiff hereby demands a trial by jury as to all applicable issues.

## PRAYER FOR RELIEF

WHEREFOR, the Plaintiff requests that this court:

a.      Enter a declaratory judgment that the actions complained of herein are unlawful and violate the United States Constitution of Nevada law;

b.      Order Defendants to pay the compensation denied or lost to Plaintiff to date by reason of Defendant's unlawful actions, in amounts to be proven at trial;

c.      Order Defendant to pay compensatory damages for the Plaintiff's lost property and emotional pain and suffering, in an amount to be proven at trial;

d.      Order Defendant to pay exemplary and punitive damages as permitted by law;

e.      Order Defendant to pay attorneys' fees and costs of the cation pursuant to 42 U.S.C. 1988 or as otherwise permitted by law;

f.      Order Defendant to pay interest at the legal rate on such damages as appropriate; and

g.      Grant any further relief that the Court deems just and proper.

///

///

///

///

///

Respectfully submitted this April 15, 2024:

By: __/s/ Luke Busby, Esq._____
LUKE A. BUSBY
Nevada Bar No. 10319
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the date shown below, I caused service to be completed of a true and correct

copy of the foregoing by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

\_\_\_\_\_ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

\_\_x\_\_ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509

Patrick A Rose
U.S. Attorney's Office
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, NV 89101
702-388-6336
Email: Patrick.Rose@usdoj.gov

Melanie Bernstein Chapman
2460 Professional Court # 110
Las Vegas, NV 89128
702-408-6332
Email: melanie.chapman@cardinalefayardlaw.com

Gene Burk
geneburke@msn.com

April 15, 2024

By: /s/ Luke Busby, Esq._____