Luke Busby, Esq.
Nevada State Bar #10319
316 California Avenue
Reno, Nevada 89509
Phone (775) 453-0112
luke@lukeandrewbusbyltd.com
*Attorney for Plaintiff Michael Erwine*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL ERWINE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>    Defendants. | 3:24-cv-00045-MMD-CSD<br><br>**MOTION FOR PRESUMPTION AND ADVERSE JURY INSTRUCTION DUE TO SPOLIATION OF EVIDENCE, OR IN THE ALTERNATIVE, DEFAULT JUDGEMENT** |

COMES NOW Plaintiff, MICHAEL ERWINE, by and through the undersigned counsel, and hereby moves this Court for an Order presuming that lost, destroyed, and/or non-disclosed information was unfavorable to the Defendants and instructing the jury accordingly, or, in the alternative, entering default judgment against CHURCHILL COUNTY and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER (collectively, "Churchill County" or "Defendants"), based upon the spoliation of critical evidence in this matter.

This Motion is based upon the pleadings and records on file, the exhibits attached hereto (each incorporated by reference), and the points and authorities set forth below.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Mr. Erwine is a former Churchill County Deputy Sheriff.  In October of 2016, Mr. Erwine witnessed and documented the mistreatment of an inmate at the Churchill County Jail by his fellow deputies. Rather than investigating that misconduct, Sheriff Trotter — then head of the agency — covered it up. Sheriff Trotter then authored, and placed in Mr. Erwine's personnel file, a false and defamatory Memorandum that framed Mr. Erwine with manufactured wrongdoing in order to justify his constructive discharge. When prospective law-enforcement employers thereafter conducted background investigations of Mr. Erwine, Sheriff Trotter personally communicated with their background investigators and represented to them, falsely, that an internal investigation had cleared the agency of any wrongdoing in the incident Mr. Erwine had attempted to document.  The result was the actual foreclosure of Mr. Erwine from his chosen profession through the publication of stigmatizing information to his prospective employers, without any opportunity to clear his name. See First Amended Complaint (ECF #59) at ¶¶ 1–10, 240–278.

The spoliation in this case is not explainable by happenstance. The lost or destroyed evidence maps directly onto the same pattern of concealment of evidence that would have favored Erwine's claims: the auto-deleted videos that would have shown the inmate mistreatment Sheriff Trotter denied to Las Vegas Metro ("LVMPD"); the "investigation" Sheriff Trotter told LVMPD had been "conducted" and cleared the agency, which the assigned investigator denied under oath ever conducting; the missing nine-month performance evaluation that would have contradicted the Defendants' bad-employee narrative; personnel-file documents destroyed under cover of an ENE "settlement" the Ninth Circuit reversed; and — most consequentially for the §1983 claim — the destruction of records of the documented background-investigation inquiries received from law enforcement agencies Erwine applied to.

Those inquiries would have established that at minimum The LVMPD, The Reno Police Department (RPD), The Nevada Department of Public Safety (DPS), and The Carson City Department of Alternative Sentencing (DAS), each made inquiries to Churchill County about Mr. Erwine and what

personnel-file materials Churchill County may have transmitted in response. Their destruction cannot be explained as a routine retention failure: as this Motion shows, the Defendants continued producing personnel-file documents related to Erwine long after the supposed destruction date following the ENE.

Because Churchill County produced no inquiry-and-waiver packet for the LVMPD or RPD investigations comparable to the surviving Washoe County packet disclosed by Churchill County, Mr. Erwine obtained those background reports by subpoena directly from the agencies. Each report memorializes that Sheriff Trotter personally spoke with the investigator and represented that an internal investigation had cleared the agency in the Beaulieu incident — a representation contradicted by Captain Matheson's testimony that no investigation occurred and by Mr. Beaulieu's account of the mistreatment, and corroborated by Sheriff Trotter's admission to his former court clerk that he told prospective employers that Mr. Erwine was a "piece of shit."

## II.  STANDARD OF REVIEW

"[A] party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). Spoliation encompasses "the destruction or significant alteration of evidence, or the failure to preserve [evidence] . . . in pending or reasonably foreseeable litigation." *Colonies Partners, L.P. v. County of San Bernardino*, 2020 WL 1496444, at *2 (C.D. Cal. Feb. 27, 2020). The duty to preserve attaches when a party reasonably should have known the evidence is relevant to anticipated litigation. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006). "Courts have 'inherent power to impose sanctions for . . . bad-faith conduct.'" *Biron v. Wyndham Vacation Ownership, Inc.*, 2021 WL 7160716, at *3 (D. Nev. Aug. 27, 2021) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)).

The governing sanctions analysis depends on the form of the evidence. FRCP 37(e) supplies the exclusive framework for the loss of electronically stored information, and where it applies it displaces the Court's inherent authority. *Gregory v. State of Montana*, 118 F.4th 1069, 1075–76 (9th Cir. 2024). Rule 37(e) does not reach the spoliation of tangible, non-electronic evidence; the loss or destruction of

3

paper records remains governed by the Court's inherent authority and the pre-2015 common-law spoliation doctrine. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (a finding of bad faith is "not a prerequisite to" an adverse-inference instruction). The spoliation in this case spans both categories: the auto-deleted jail videos are electronically stored information governed by Rule 37(e), while the destroyed inquiry-and-waiver packets, the nine-month performance evaluation, the Beaulieu investigatory file, and the personnel-file documents removed under the reversed ENE settlement are tangible records governed by the Court's inherent authority.

FRCP 37(e)(1) authorizes measures "no greater than necessary to cure the prejudice" where ESI is lost through failure to take reasonable steps to preserve. FRCP 37(e)(2) authorizes adverse-inference, dismissal, or default-judgment sanctions on a finding the party "acted with the intent to deprive another party of the information's use in the litigation." The Ninth Circuit's controlling guidance on FRCP 37(e)(2) is *Jones v. Riot Hospitality Group, LLC*, 95 F.4th 730 (9th Cir. 2024), holding that intent to deprive "involv[es] the willful destruction of evidence with the purpose of avoiding its discovery," *id.* at 735, and may be shown by circumstantial evidence: "the timing of destruction, affirmative steps taken to delete evidence, and selective preservation," *id.*, and supports inferences of both unfavorable content and prejudice, *id.* at 736. The Ninth Circuit's five-factor dismissal-as-sanction test also applies. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).

### III.   FACTS

#### A.   The October 10, 2016 Memorandum and Mr. Erwine's Termination

Subsequent to Mr. Erwine's constructive discharge and unbeknownst to him, Sheriff Trotter placed a defamatory memorandum in Mr. Erwine's personnel file dated October 10, 2016 ("the October 10, 2016 Memorandum"). See Exhibit 7. The First Amended Complaint identifies numerous law enforcement agencies that have relied on the Memorandum to deny Mr. Erwine employment. See ECF #59 at ¶¶ 69-75, ¶¶ 210–245. At his September 9, 2025 deposition, Sheriff Trotter conceded that he "did not" show Mr. Erwine the Memorandum or allow him to read or initial it before it was placed in his personnel file. See Exhibit 8 (Trotter Dep., Sept. 9, 2025) at 8:11–16.

The October 10, 2016 Memorandum makes specific reference to two videos that purportedly captured the Beaulieu and Maes incidents, and to a written "investigation" into the Beaulieu incident. See Exhibit 7. The Memorandum recites that Sheriff Trotter "inquired about possible video showing" the Maes incident, and reflects Sheriff Trotter's express, contemporaneous awareness of probable civil litigation: "This creates liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action," and "It is as if Erwine is siding with the inmate against his own agency or, possibly, encouraging civil action against his own agency." Id.

### B.   The Beaulieu and Maes Videos — Auto-Deleted Despite Notice

Plaintiff served the Defendants with requests for production of the videos of the Beaulieu and Maes incidents and other related video and audio recordings from the Churchill County Sheriff's Office detention facility. See Defendants' June 6, 2025 Responses to Plaintiff's Requests for Production at Request Nos. 5, and 7 (Confidential Exhibit 3). Defendants responded "None" to each.

At his September 9, 2025 deposition, Sheriff Trotter testified that he assigned someone (likely Captain Matheson) to review video footage at the time of the events, but acknowledged that the Sheriff's Office video system would auto-delete after 30 to 60 days unless an incident was specifically pulled and "burned." Exhibit 8 at 36:1–18. Asked directly whether he had ordered any of the officers involved in the investigation of Mr. Erwine to preserve any of the video evidence relied on to support the memoranda placed in Mr. Erwine's personnel file, Sheriff Trotter answered: "I didn't. I did not." Exhibit 8 at 36:19–24.

Sheriff Trotter further confirmed that he did not personally review the videos before discharging Mr. Erwine. Exhibit 8 at 37:6–9 ("I did not personally review any of the — of the videos."). When asked whether the Sheriff's Office had a policy regarding the preservation of evidence that may be used in a court proceeding, he acknowledged: "I'm sure they do." Id. at 37:13. He nevertheless testified that he gave no instruction tying that policy to the videos at issue here.

The content of the Beaulieu video, had it been preserved, would not have been favorable to the Defendants. Mr. Beaulieu's declaration describes inmate mistreatment that the video would have captured: a bleeding cut on his hand left untreated upon admission (Exhibit 9 at ¶ 6); deputies ignoring

his repeated requests for water for approximately two hours and "flush[ing] the drain to make [his] request inaudible" (id. ¶ 7); and Mr. Erwine being the only deputy who responded, providing water and medical attention (id. ¶¶ 8–9). Sheriff Trotter himself acknowledged at his September 9, 2025 deposition that the conduct Mr. Erwine attempted to document "would constitute misconduct" and was conduct he "wouldn't tolerate." Exhibit 8 at 34:5–13. The Beaulieu video would have corroborated Mr. Erwine's account, undermined Trotter's accusations against Erwine, and exposed Churchill County to the very civil liability Sheriff Trotter anticipated in writing. Auto-deletion of that video, against the backdrop of an admitted preservation capability, the inmate's direct preservation request, and the agency's own contemporaneous awareness of litigation risk, is not consistent with mere inadvertence.

### C.   Mr. Beaulieu Personally Requested the Video, Independently Triggering the Duty to Preserve

The duty to preserve was independently triggered the day after Mr. Beaulieu's release. In his sworn declaration, Mr. Beaulieu states that he himself contacted the Detention Center the day after the incident and "requested a copy of the videotape and recording." Exhibit 9 at ¶ 13. Mr. Beaulieu's direct, contemporaneous request for the video provided Churchill County notice — separate from and in addition to Trotter's own internal references to the video and to the prospect of a lawsuit — that the recording was material evidence which the Sheriff's Office was obligated to preserve. Once an inmate who claims he was mistreated calls the very facility that allegedly mistreated him to ask for the video, no reasonable agency could conclude the video was anything other than evidence in foreseeable litigation. Yet Sheriff Trotter has admitted, under oath, that he gave no preservation directive whatsoever. Exhibit 8 at 36:19–24.

### D.   The Beaulieu Investigatory File — Either Never Created or Destroyed

The October 10, 2016 Memorandum reflects that the Sheriff's Office investigated the Beaulieu incident. Sheriff Trotter testified at his September 9, 2025 deposition that the basis for his Memorandum allegations was "possibly citing the fact finding involving the Beaulieu incident," Exhibit 8 at 19:7–8, that the Beaulieu video review "was assigned to others," id. at 19:25–20:2, and that as to the parallel

Maes incident he had ordered "a fact finding to be done by the captain of the jail" — most likely Captain Matheson, who was "over the jail." Id. at 18:19–22; 36:1–8.

Despite this testimony, Defendants have never produced any investigatory file for the Beaulieu incident. Defendants' June 6, 2025 RFPD responses do not identify any such file. See Confidential Exhibit 3. Sheriff Trotter further admitted that the investigation he claims to have "assigned," if conducted at all, was never memorialized in writing in any form he can identify or describe. He testified that he "assigned that to be done" and "believe[d] [he] would have delegated that to the -- Captain Matheson," but acknowledged: "I don't specifically remember exactly how -- who I assigned to do certain things." Exhibit 8 at 36:1–8.  This presents two possibilities, and both support the relief requested. If an investigation was conducted and its results reduced to writing, the absence of any investigatory file — in the face of an admitted directive to investigate, an admitted records-retention policy, and admitted litigation risk — is spoliation of that file. If no investigation ever occurred, then Sheriff Trotter's contemporaneous representation in the October 10, 2016 Memorandum that the incident had been "investigated," and his later representation to LVMPD that "an investigation was conducted and no mistreatment took place" (Confidential Exhibits 1 at 2), were affirmatively false — and that fabrication is direct evidence of the bad faith and intent to deprive that independently support the spoliation findings as to the videos, the inquiry-and-waiver packets, and the nine-month evaluation. Plaintiff need not prove which is true; Defendants' control of the facts and their own contradictory sworn accounts make the uncertainty itself a product of their conduct.

Sheriff Trotter has also publicly conceded the absence of a written investigation. In a November 9, 2021 article published by USA TODAY, Sheriff Trotter was directly asked why his prior representations that the Beaulieu episode had been "investigated" could not be reconciled with the Sheriff's Office's inability to produce any responsive records. Sheriff Trotter answered: "Not everything makes it onto paper." Exhibit 10 at CC0500. That admission — made by the head of the agency — transforms what might otherwise be characterized as institutional inadvertence into an institutional choice not to document misconduct that the agency knows creates civil-liability exposure. As discussed

7

below, this admission is highly probative of bad faith and concealment under the Court's inherent authority, and of intent to deprive as to any electronically stored evidence.

Most significantly, the very person to whom Sheriff Trotter testified he delegated the Beaulieu investigation — Captain Michael Matheson — flatly denied that any such investigation occurred. At his January 7, 2021 deposition, Matheson testified that Mr. Beaulieu's name did not sound familiar, that he was being shown the October 10, 2016 Memorandum for the first time at deposition, that he had "not" reviewed the allegations it described, and — asked directly whether he ever investigated what happened to Mr. Beaulieu at the jail — answered "I — I did not." Exhibit 11 (Matheson Dep., Jan. 7, 2021) at 30:15–19; 32:7–9. He likewise never investigated the Maes incident, id. at 33:4–5, and never received the inmate grievance concerning Beaulieu, id. at 38:1–6. The LVMPD report's attribution to Sheriff Trotter of the representation that "an investigation was conducted and no mistreatment took place," Confidential Exhibit 1 at 2, is likely false: the captain Trotter says he delegated the matter to has confirmed no investigation ever happened.

Sheriff Trotter's individual June 6, 2025 RFPD responses sharpen the point. In response to Request No. 12 (all Beaulieu/Maes investigation documents), he affirmatively states that responsive documents existed but were "removed from Plaintiff's personnel file by Churchill County in connection with the [February 4, 2019 ENE]." Exhibit 12 at Resp. No. 12; see also id. at Resp. No. 8. That is Sheriff Trotter's own admission that the documents existed and were removed under cover of the reversed settlement.

### E.   Mr. Erwine's Nine-Month Performance Evaluation — Lost or Destroyed

Churchill County's Administration Policy 1.200, "Performance Evaluations," requires that "New Hire Probationary Employees: Shall be evaluated in the third and ninth month of their probation." Exhibit 13. Mr. Erwine's employment with Churchill County began on December 9, 2015, making his nine-month evaluation due in September 2016 — weeks before his October 10, 2016 termination. According to the Declaration of Michael Erwine attached as Exhibit 14, the evaluation was completed by Sergeant Nuckolls, was signed, and rated his performance favorably. Id at ¶7 - ¶12

At his September 9, 2025 deposition, however, Sheriff Trotter denied that nine-month evaluations had ever been conducted: "Never saw one of those done while I was at the Sheriff's Office," and "didn't even know about them until [Plaintiff's counsel] enlightened [him]." Exhibit 8 at 41:2–12. That testimony cannot be reconciled with Policy 1.200. The strategic significance of the missing evaluation cannot be overstated: a favorable evaluation dated mere weeks before termination would directly contradict the central premise of the October 10, 2016 Memorandum that Mr. Erwine's conduct was so deficient and continuing as to warrant immediate discharge. The disappearance of that evaluation, paired with Sheriff Trotter's 2025 disclaimer that nine-month evaluations were not conducted — in direct contradiction of the agency's own written policy — supports the inference that the evaluation existed, was favorable, and was suppressed because of what it would have shown about Mr. Erwine's actual performance.

### *F.   Defendants' Reliance on the Reversed ENE Settlement Agreement*

In their June 6, 2025 Responses to Plaintiff's Requests for Production, the Defendants repeatedly invoke an unwritten and unenforceable "settlement" they falsely claim was reached at an Early Neutral Evaluation ("ENE") on February 4, 2019 in the predecessor case as the explanation for the absence of personnel-file documents. For example, in response to Request No. 1 (Mr. Erwine's complete personnel file), Churchill County stated:

> Churchill County no longer maintains a copy of Plaintiff's "complete personnel file" as it existed between December 9, 2015, and October 10, 2016. As Plaintiff and his attorney are aware through their participation in case No. 3:18-cv-00461, all documents which Plaintiff requested be removed from his personnel file as a result of settlement negotiations undertaken in connection with an Early Neutral Evaluation held on February 4, 2019, were removed from Plaintiff's personnel file.

> See Confidential Exhibit 3 (Churchill County's June 6, 2025 RFPD Responses) at Resp. No. 1.

Substantively identical responses appear at Request Nos. 15 (Letter of Separation and drafts) and 16 (background-investigation request records). See Confidential Exhibit 3. The Defendants thus base their wholesale removal of personnel-file documents on a single proposition: that the parties reached a binding settlement agreement at the ENE.

That is simply false. On June 11, 2020, the United States Court of Appeals for the Ninth Circuit reversed the District Court's order enforcing that very settlement agreement. See Exhibit 15 (*Erwine v. Churchill County*, No. 19-16094 (9th Cir. June 11, 2020)). The Ninth Circuit held that the parties "needed to: (1) agree which documents Churchill County would remove from Erwine's personnel file; (2) agree what information Nevada Revised Statute ("NRS") § 239B.020 required Churchill County to disclose to public safety agencies who might be interested in hiring Erwine; and (3) execute a written agreement. Even then, the written agreement — not the tentative agreement from the ENE proceeding — would be the binding settlement agreement." Exhibit 15 at 2–3. The Ninth Circuit "REVERSED AND REMANDED." Id.

In short, the ENE produced no settlement agreement justifying the removal or destruction of any document from Mr. Erwine's personnel file. The Ninth Circuit specifically recognized that Mr. Erwine demonstrated the proposed settlement "did not resolve his concerns regarding NRS § 239B.020," which were related to future inquiries about his employment at Churchill County. Id. at 3. Documents which would otherwise have been required to be preserved in Mr. Erwine's personnel file pursuant to NRS Chapter 289 and the Sheriff's Office's own retention policies are simply gone.

Churchill County's then-Director of Human Resources, Geof Stark, has confirmed by sworn affidavit that "the memorandum prepared by Ben Trotter on October 10, 2016, and documents related to Michael Erwine's termination from employment with the Churchill County Sheriff's Office, were removed from Erwine's personnel file maintained by Churchill County" in connection with the ENE, and that "[a]lthough the settlement was never finalized, the documents which Churchill County agreed to remove from Erwine's personnel file were never returned to that file and do not exist in Erwine's personnel file maintained by Churchill County." Exhibit 16 (Stark Aff., Mar. 20, 2024) ¶¶ 3–5.

Mr. Stark's affidavit is limited to documents that "do not exist in Erwine's *personnel file*." Id. ¶ 5 (emphasis added). Yet, as discussed herein, Defendants continued producing personnel-file content twenty-two months after the supposed ENE-removal. The removed documents thus either remain in Defendants' possession outside the named "personnel file" or were destroyed; either way, the relief sought is supported.

### G.   *Material Shifts in Sheriff Trotter's Testimony Between His 2020 and 2025 Depositions*

Sheriff Trotter has been deposed twice in connection with this dispute. His December 4, 2020 deposition testimony and his September 9, 2025 deposition testimony, when compared against each other and against the documentary record produced in discovery, reveal shifts and contradictions on several points central to the spoliation analysis.

First, on video preservation, Sheriff Trotter's 2020 testimony was evasive: asked whether the videos were preserved, he answered "I'm not aware of that." Exhibit 17 (Trotter Dep., Dec. 4, 2020) at 93:23. By 2025, his answer was direct: "I didn't. I did not." Exhibit 8 at 36:19–24. The 2025 admission elevates a 2020 ambiguity into an affirmative concession that no preservation directive was given despite known litigation risk described above.

Second, on the nine-month evaluation, Sheriff Trotter testified in 2025 that he "[n]ever saw one of those done while I was at the Sheriff's Office" and "didn't even know about them until you enlightened me." Exhibit 8 at 41:5–12. That sworn denial is irreconcilable with the documentary and testimonial record: Administrative Policy 1.200 affirmatively requires a nine-month evaluation of probationary employees, Exhibit 13, and Mr. Erwine attests that his nine-month evaluation was in fact completed by Sergeant Nuckolls, rated his performance satisfactory or above, was signed by both Sergeant Nuckolls and Mr. Erwine, and was absent from the personnel file Mr. Erwine received in April 2018. Exhibit 14 ¶¶ 7–12. Sheriff Trotter's 2020 testimony confirms the agency's records practice made such an evaluation retrievable: he scanned every personnel file into "a readily accessible … electronic version … for doing evaluations" and transferred departing employees' hard-copy files to Human Resources. Exhibit 17 at 24:5–16. An evaluation that policy required, that the deputy swears was completed and signed, and that the agency's own records practice would have preserved does not simply vanish; its absence, coupled with Trotter's quizzical denial that such evaluations were ever done — is itself evidence of spoliation and/or concealment.

Third — and most significantly for the §1983 publication element — Sheriff Trotter's sworn 2020 testimony that his "typical practice" was to refer employment inquiries to Human Resources, Exhibit 17 at 23:21–24:2, is squarely contradicted by the LVMPD and RPD background reports

(Confidential Exhibits 1, 2), each of which clearly identifies Trotter as the source of a personal communication with the investigator. At his 2025 deposition Trotter confirmed that 2020 "typical practice," Exhibit 8 at 48:17–20, yet swore he did "not recall ever talking to any law enforcement agency about Mr. Erwine … specifically including Las Vegas Metro," id. at 30:3–6; when confronted with the RPD report he testified, "I do not recall that conversation at all," id. at 42:7. The shift is from a definite account of a "typical practice" to a failure of recollection once that practice was documented to be false by third party agencies. Sheriff Trotter's June 6, 2025 RFPD responses complete the pattern: asked to produce all documents reflecting communications with any law-enforcement agency about Mr. Erwine, he answered "None" (Exhibit 12 at Resp. Nos. 6, 14) — responses that Confidential Exhibits 1 and 2 show are either false or an admission that responsive records once existed and were not preserved.

### H.   Background-Investigation-Inquiry Records — Removed Under the Reversed ENE Settlement

Among the most consequential categories of spoliation in this case is the destruction of records of background-investigation inquiries that Churchill County received from other law-enforcement agencies and prospective employers concerning Mr. Erwine. Publication of the October 10, 2016 Memorandum was complete when Sheriff Trotter caused it to be placed in Mr. Erwine's personnel file — a file that, under NRS 239B.020, is mandated to be disclosed to all prospective public-safety employers upon request. In *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004), the Court held that "placement of the stigmatizing information in [the public employee's] personnel file, in the face of a state statute mandating release upon request, constituted publication sufficient to trigger [his] liberty interest under the Fourteenth Amendment," and that "the lack of an opportunity for a name-clearing hearing violated [his] due process rights." *Id.* The factual pattern in *Cox* is materially indistinguishable from this case, and Plaintiff's right to a name-clearing hearing accrued at the moment of placement.

The destroyed records remain central to this case under any theory of publication. They go to: scope and reach of dissemination; damages and causation; the defamation and intentional-interference claims, each of which independently requires proof of each act of communication; *Monell* liability,

which may turn on a pattern or custom of disclosure; and — in the alternative, in the event the Court were to require receipt-based proof under §1983 — the publication element itself.

The declaration of Sarah Tracy, attached as Exhibit 6, provides direct evidence of what the destroyed records would have contained.  Ms. Tracy was Sheriff Trotter's subordinate Justice Court clerk for over five years, from his January 2019 election as Justice of the Peace until her termination on March 11, 2024. Exhibit 6 ¶¶ 1–3. She has declared that Sheriff Trotter himself told her, on multiple occasions, that he "told other law enforcement agencies that Erwine was a 'piece of shit' and that he would sabotage [Mr. Erwine] other agencies," id. ¶ 7, and that he "would convey this to other agencies whenever they would call." Id. ¶ 8. Sheriff Trotter told Ms. Tracy that he had spoken about Mr. Erwine to "more than one" agency. Id. ¶ 9. The inquiry-and-waiver packets from LVMPD, RPD, the Nevada DPS, and the Carson City DAS, which Churchill County would have to had received in order to disclose any information about Erwine, would have established the identity of those inquiring agencies, what materials Churchill County transmitted in response, and the timing of each inquiry.

The LVMPD Background Investigation Report (Confidential Exhibit 1) and the Reno PD Background Investigation Report (Confidential Exhibit 2), each subpoenaed by Mr. Erwine directly from the receiving agencies, independently establish that LVMPD and RPD conducted background investigations of Mr. Erwine pursuant to signed waivers and that Sheriff Trotter personally communicated with each investigator. The corresponding inquiry-and-waiver packets that would have documented each agency's inquiry at Churchill County's end — including the written request for personnel-file information and Mr. Erwine's signed authorization — are missing from Defendants' Request No. 16 production.

Plaintiff's Request for Production of Documents No. 16 sought all records of background-investigation requests received by Churchill County concerning Mr. Erwine, along with copies of all documents Churchill County provided in response. Confidential Exhibit 3 at Req. No. 16. Churchill County's response is a written admission of destruction:

> The documents demanded by Plaintiff in Request No. 16 were removed from Plaintiff's personnel file by Churchill County in connection with the agreement reached by the parties in connection with the Early Neutral Evaluation held on February 4, 2019, in Case

No. 3:18-cv-00461. Notwithstanding, and based upon the fact that the documents demanded in Request No. 16 were produced in connection with Case No. 3:18-cv-00461 and were maintained by counsel for the Defendants in connection with Case No. 3:18-cv-00461, Defendant responds as follows: See, documents produced herewith bate-stamp numbered CC0028-CC0029.

Confidential Exhibit 3 at Resp. No. 16.

Churchill County's response is an admission that responsive records once existed: the documents "were removed," not "never existed." Confidential Exhibit 3 at Resp. No. 16. The two pages defense counsel preserved from the predecessor litigation — CC0028-CC0029 — comprise a December 6, 2016 fax transmittal sheet from the Washoe County Sheriff's Office to Churchill County's HR office requesting Mr. Erwine's background and employment information, together with the corresponding "AUTHORIZATION TO RELEASE INFORMATION" / "PRE-EMPLOYMENT INVESTIGATION DISCOVERY WAIVER" signed and notarized by Mr. Erwine on November 9, 2016. See Confidential Exhibit 3 at CC0028-CC0029. The packet is the documentary template — the standard form an inter-agency background-investigation inquiry record takes for a peace-officer background investigation of a candidate previously employed at a law enforcement agency.

When an law-enforcement agency conducts a background investigation of a candidate with previous employment history, the candidate must sign and notarize a release authorizing the inquiring agency to obtain personnel and background information from prior employers; the inquiring agency then submits that signed waiver — together with its inquiry request — to the prior employer pursuant to NRS 239B.020. See Confidential Exhibit 18 (Olson Dep., Nov. 24, 2025) at 8:11–14, 46:21–47:1 (LVMPD candidates must "sign and submit all waivers that are needed to do the background investigation"; confidential personnel records "would not be provided" to LVMPD "without a waiver from the candidate"); Exhibit 19 (Bowden Dep., Oct. 30, 2025) at 9:24–10:11 (RPD same: candidates "do the waivers and things of that nature"); Exhibit 20 (Expert Report of Thomas Green) at 11 (background process "begins with a signed and notarized waiver authorizing the Nevada law enforcement agency to elicit information from other agencies regarding an applicant's character, credibility, and job history"). Detective Scott Olson personally conducted LVMPD's background investigation of Mr. Erwine, including a phone interview with Sheriff Trotter. Confidential Exhibit 1 at 3; Confidential Exhibit 18 at

19:6–15 (Olson confirming under oath: "I spoke to him on the phone"; "you had a direct conversation with Mr. Trotter" — "Yes"; substance "would've been about Mr. Erwine"). Detective Jerry Bowden personally conducted RPD's background investigation of Mr. Erwine, including a phone conversation with Sheriff Trotter during which, in Detective Bowden's words, Trotter "explained what — what was going on." Exhibit 19 at 22:6–13, 23:8–14; see also Confidential Exhibit 2 at 1.

The Nevada Department of Public Safety and the Carson City Department of Alternative Sentencing have themselves confirmed in writing that they conducted background investigations of Mr. Erwine pursuant to signed waivers. The Nevada DPS rejection letter dated January 4, 2017 states that Mr. Erwine "signed and notarized" the agency's "Pre-employment Waiver and Liability Release Form," under which he had "waived [his] right to examine, review or otherwise discover the contents of the background investigation and all related documents," and confirms that DPS had "carefully reviewed [his] qualifications … and considered [his] background information" before rescinding the conditional offer of employment. Exhibit 21 (Nevada DPS Rejection Letter, Jan. 4, 2017). The Carson City Department of Alternative Sentencing rejection letter dated September 8, 2017 confirms that, "Pursuant to the pre-employment waiver and the liability release form," Mr. Erwine had "no right of review of any information obtained during the selection process," and identifies "Background Investigation" as one of the portions of the selection process Mr. Erwine had failed. Exhibit 22 (Carson City DAS Rejection Letter, Sept. 8, 2017). Neither agency could have completed Mr. Erwine's background investigation and the conclusions they reached without sending the waiver and inquiry packet to Churchill County under NRS 239B.020. The records of each such inquiry — at minimum the inquiring agency's request and Mr. Erwine's signed waiver, in the form of CC0028-CC0029 — should reside in Churchill County's files. Defendants have produced none of them.

Sheriff Trotter has separately acknowledged the underlying contacts. In his 2020 deposition he admitted receiving calls from agencies about former employees and being "the head guy" who took them. Exhibit 17 at 24:8–19. And Sheriff Trotter admitted out of court to Sarah Tracy that he spoke about Mr. Erwine to "more than one" agency. Exhibit 6 ¶ 9. Plaintiff does not contend that Sheriff Trotter was required to maintain personal notes of those phone conversations on Churchill County's

side. The spoliation claim is for the documentary inquiry-and-waiver packets for at minimum, four inquiring agencies necessarily sent to Churchill County under NRS 239B.020 to obtain the personnel-file information their background investigations required — packets in the form of the surviving Washoe County packet, CC0028-CC0029.

Mr. Stark's affidavit confirms the destruction but, by its own terms, describes only "the memorandum prepared by Ben Trotter on October 10, 2016, and documents related to Michael Erwine's termination from employment." Exhibit 16 ¶ 3. The LVMPD, RPD, Nevada DPS, and Carson City DAS waiver-plus-request inquiry packets are incoming records from third-party agencies, not personnel-file documents Mr. Erwine ever asked to have removed at the ENE. Even on Mr. Stark's account of what was removed, those inquiry records were not within the scope of that removal — yet they too are missing, without explanation.

Plaintiff requests the adverse inference as to LVMPD, RPD, Nevada DPS, and Carson City DAS because those four agencies are the only ones for whom Erwine can show the record now affirmatively documents an inquiry to Churchill County under the NRS 239B.020 waiver-based framework. The four-agency limit is not a concession of the actual scope of dissemination — it is the foreseeable consequence of the spoliation. Erwine's First Amended Complaint identifies multiple additional law-enforcement employers that rejected Mr. Erwine in proximity to background-investigation activity, see ECF #59 ¶¶ 69–79, 234–245, including the Washoe County Sheriff's Office, the North Las Vegas Police Department, and the Las Vegas Marshals Service. Each of those agencies was required to contact Mr. Erwine's prior law-enforcement employer — Churchill County — as part of any pre-employment background investigation under NRS 239B.020 and the receiving agency's own hiring standards. See Confidential Exhibit 18 (Olson Dep.) at 11:11–19 (LVMPD "typically seek[s] employee files from candidates who have been previously employed by other law enforcement agencies" and "conduct[s] phone interviews … regarding candidates and their previous law enforcement employers"); Exhibit 19 (Bowden Dep.) at 10:11–18 (RPD contacts former employers, including law-enforcement employers, "via phone"); Exhibit 20 (Green Expert Report) at 11 ("one of the first steps in any investigation is a phone call to the applicant's prior employer"). The destruction of Churchill County's inquiry-and-waiver

packets — the only records on Churchill County's side documenting which agencies inquired and what materials Churchill County may have transmitted — means Mr. Erwine cannot identify with certainty which additional agencies contacted Churchill County, when, or what was disseminated. Sheriff Trotter's sworn 2025 testimony that he "does not recall ever talking to any law enforcement agency about Mr. Erwine," Exhibit 8 at 30:3–6, compounded by his "I do not recall that conversation at all" denial of the documented RPD communication, id. at 42:7, makes the unknown unknowable on Defendants' side as well. The four-agency adverse inference is therefore a floor; the full scope of dissemination remains structurally hidden from Mr. Erwine by the operation of the spoliation itself, and that hidden scope is itself the prejudice the inference is designed to remedy.

### I.   Defendants Continued to Produce Documents from the Personnel File in December 2020 — Disproving Their ENE-Settlement Document Destruction Claim and Establishing Selective Concealment

Defendants' principal explanation for the absence of documents from Mr. Erwine's personnel file is that those documents were removed pursuant to the February 4, 2019 ENE "settlement." That explanation is conclusively rebutted by Defendants' own discovery conduct.

On December 3, 2020 — over twenty-two months after the supposed destruction date, and nearly six months after the Ninth Circuit had reversed the District Court's order enforcing the ENE settlement, Exhibit 15 — Defendants filed Second Supplemental FRCP 26 Disclosures producing additional documents from Mr. Erwine's personnel file. Exhibit 23. Among the documents newly produced were "Background information for Michael Erwine, bate-stamped numbered DEF00266-DEF00345" (80 pages) and "Voice analysis test for Michael Erwine, bate-stamped numbered DEF00346-DEF00364" (19 pages). Id. at 4. Defendants further confirmed in writing that additional documents existed in their possession, representing that "Defendants anticipate that other documents will be available following discovery in light of the fact that these documents are currently in the possession of others and Defendants will supplement their disclosures as obtained." Id.

This timeline cannot be reconciled with Defendants' current position. If Mr. Erwine's personnel file had been destroyed in 2019 pursuant to the ENE settlement as described in Stark's Declaration in

Exhibit 16, Defendants could not have continued producing documents from that file through December 2020. The inescapable conclusion is that the documents now claimed to be "unavailable" either remain in Defendants' possession or were wrongfully destroyed to conceal what they would have shown. The fact that Defendants' December 3, 2020 supplemental production occurred exactly one day before Sheriff Trotter's December 4, 2020 deposition (Exhibit 17) — the deposition that established Sheriff Trotter's "typical practice" testimony that LVMPD and Reno PD records have since exposed as false — only deepens the inference of selective and tactical document handling occurred in this case.

The December 3, 2020 production confirms what Mr. Stark's affidavit reveals by omission: Churchill County maintained records of Mr. Erwine's employment outside the single "personnel file" Mr. Stark describes. The 80 pages of "Background information" at DEF00266–DEF00345 cannot have come from the personnel file Defendants claim was emptied in 2019, see Exhibit 16 ¶ 5, and must have come from a parallel records source Defendants have never identified or searched in responding to Request No. 16. The missing inquiry-and-waiver packets may exist there. Defendants' categorical claim that responsive documents "were removed" under the ENE cannot be reconciled with their continued production from another source. Further, although a settlement agreement may call for the removal of documents from an employee's personnel file, those documents remain public records and cannot be destroyed or withheld from production in response to a request under FRCP 34.

## IV.  ARGUMENT

### A.  The Defendants' Duty to Preserve Was Triggered No Later Than October 9, 2016

There is no reasonable dispute that Churchill County and Sheriff Trotter had notice that the videos, investigatory files, and personnel records identified above were relevant to and could be used as evidence in litigation before they were destroyed, allowed to auto-delete, or removed. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)

Here, the trigger occurred no later than October 9, 2016, when Mr. Beaulieu personally contacted the Detention Center asking for the video. See Exhibit 9 ¶ 13. By that date: (i) inmate Beaulieu had directly demanded preservation of the recording; and (ii) Sheriff Trotter himself had drafted a memorandum reciting that Mr. Erwine's conduct "creates liability for this agency now or for some time

into the future should Inmate Maes elect to pursue civil action," and that Mr. Erwine appeared to be "encouraging civil action against his own agency." Exhibit 7. By the standards of every reasonable law-enforcement administrator — and certainly by the standards Sheriff Trotter himself articulated in his contemporaneous memorandum, i.e that he was worried Beaulieu would sue,  the duty to preserve attached on these facts. Mr. Erwine then filed suit in 2018, well within the limitations period, crystallizing the preservation obligation as to all evidence concerning the Beaulieu and Maes incidents, and Mr. Erwine's personnel file.

### B.    Defendants Failed to Take Reasonable Steps to Preserve the Evidence

Reasonable steps were not just absent here; they were affirmatively rejected. Where a sheriff drafts a memorandum expressly recognizing the prospect of "civil action," and where the inmate has directly requested the very recording at issue, anything less than an immediate hold is unreasonable as a matter of law. The *Apple v. Samsung* court — addressing a corporate email system with auto-deletion, no litigation hold, and foreseeable litigation — held that failure to disable the auto-delete supported an adverse-inference instruction. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1149–50 (N.D. Cal. 2012). The same is true here. Churchill County's jail-video system overwrote itself on a 30-to-60-day cycle, the agency had technical capability to "burn" specific incidents to preserve them, and Sheriff Trotter "did not" order anyone to do so. Exhibit 8 at 36:12–24. As the *Apple* court put it, the agency "kept the shredder on long after it should have known about this litigation." 881 F. Supp. 2d at 1150.

### C.   Defendants Acted with the Intent to Deprive Mr. Erwine of the Use of the Evidence

As *Jones v. Riot* makes clear, intent to deprive "can rarely be shown directly," and the Court may rely on circumstantial evidence — including "the timing of destruction, affirmative steps taken to delete evidence, and selective preservation" — to find the requisite intent. 95 F.4th at 735. The circumstances here permit no other inference.

The cumulative evidence supports the intent finding required by Rule 37(e)(2). The factual record establishes contemporaneous notice of litigation risk, technical capability to preserve, a refusal to issue any preservation directive, destruction of records under cover of a "settlement" the Ninth Circuit

reversed, material shifts in Sheriff Trotter's sworn testimony between 2020 and 2025, direct out-of-court admissions by Sheriff Trotter (to Sarah Tracy), direct documentary evidence (Confidential Exhibits 1 and 2) that the testimonial denials were false, and Sheriff Trotter's own RFPD responses (Exhibit 12 at Resp. Nos. 6, 12, 14) which either falsely deny the existence of records that Confidential Exhibits 1 and 2 conclusively show existed, or alternatively admit that responsive records were destroyed. Most fundamentally, Defendants continued producing documents from Mr. Erwine's personnel file as late as December 3, 2020, conclusively showing that Erwine's file was not "destroyed" in 2019, as described in the numerous responses to Erwine's production requests.

The Defendants also had an incentive for each piece of evidence to disappear. The Beaulieu video would have shown the mistreatment Sheriff Trotter acknowledged "would constitute misconduct," Exhibit 8 at 34:5–13; the nine-month evaluation would have exposed the disciplinary narrative as post-hoc framing; and the destroyed inquiry-and-waiver packets — paired with Trotter's admission to Ms. Tracy that he would convey that Erwine was a "piece of shit" to other agencies whenever they would call, Exhibit 6 ¶ 8 — suppressed the record of which agencies inquired and what Churchill County transmitted. Sheriff Trotter testified under oath that the underlying conversations never occurred, Exhibit 8 at 30:3–6; 48:17–20 — sworn denials now contradicted on the face of Confidential Exhibits 1 and 2. That is the textbook pattern of bad-faith spoliation supporting sanctions under the Court's inherent authority, and intent to deprive under Rule 37(e)(2) as to any electronic copies. The pattern is not just spoliation; it is concealment of facts favorable to Erwine's case.

The advisory committee notes to FRCP 37(e) admonish that "the remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures … would be sufficient to redress the loss." Here, the lost information — the videos, the investigatory files, the nine-month evaluation, and the personnel-file records destroyed under cover of a reversed settlement — is the central evidence of this case.

### D.   The Lost Evidence Is Indispensable to Mr. Erwine's Case

Mr. Erwine's claims include 42 U.S.C. § 1983 stigma-plus liberty-interest deprivation, *Monell* municipal liability claim based on Trotter's position as the decision maker for the Sheriff's Office,

defamation, intentional interference with prospective employment, and violation of the due process provisions of Article 1, Section 8 of the Nevada Constitution. See ECF #59. Each category of lost evidence directly addresses a disputed factual element on those claims: the videos would have shown whether the misconduct alleged in the October 10, 2016 Memorandum occurred; the investigatory file would have shown whether any investigation corroborated the Memorandum's narrative; the nine-month evaluation would have contradicted the "bad-employee" narrative; and the destroyed inquiry-and-waiver packets would establish the scope of dissemination under any publication theory.

Multiple Nevada and out-of-state law-enforcement agencies and prospective employers rejected Mr. Erwine in proximity to application inquiries or background-investigation activity. ECF #59 ¶¶ 69–79, 234–245. As to the four agencies whose inquiries are affirmatively documented in the record — LVMPD, RPD, Nevada DPS, and Carson City DAS — Churchill County produces nothing at all. Confidential Exhibit 3 at Resp. No. 16. The only inquiry-record packet Defendants have produced is the Washoe County packet, CC0028-CC0029, which is complete on its face and survives only because Churchill County's own counsel happened to retain it in connection with the predecessor 2018 litigation.

The prejudice is structural. NRS 239B.020 creates a closed information loop: the officer candidate waives any right to discover the contents of each background investigation, the receiving agencies are statutorily barred from disclosing those contents back to him, NRS 239B.020(2), and Churchill County is the only entity that retains records of which agencies inquired and what it transmitted in response. That loop is not theoretical. When Plaintiff's counsel subpoenaed LVMPD and Carson City DAS for their inquiry-side records in 2019, each refused and directed Mr. Erwine back to Churchill County as the proper source. See Exhibit 4 (LVMPD Written Objection to Subpoena, Feb. 22, 2019) at 2 ("the less intrusive means by which to discover what Churchill County may have sent to LVMPD is through discovery requests to Churchill County"); Exhibit 5 (Carson City DAS Subpoena Response, Mar. 4, 2019, incl. Decl. of DAS Chief Tad Fletcher ¶ 11) ("the same information could be obtained by less intrusive means including a discovery request to Churchill County"). The receiving agencies redirected Mr. Erwine to Churchill County; inquiries from further agencies are not knowable to

him at all. That structural unknowability is itself the prejudice Rule 37(e) remedies, and it goes directly to §1983 publication-scope, defamation, IIPER, and damages.

See *Colonies Partners, L.P. v. County of San Bernardino*, 2020 WL 1496444, at *7–9* (C.D. Cal. Feb. 27, 2020) (adverse-inference instruction granted in §1983-adjacent civil-rights case against a county and senior county official for destruction of text messages and emails).

///

### E.   The Reversed ENE Settlement Cannot Excuse the Spoliation

Defendants' reliance on the February 4, 2019 ENE "settlement" fails for the reasons set forth herein.   The Ninth Circuit reversed the order enforcing it as non-binding, Exhibit 15, and LR 16-6 forecloses any reliance on the ENE's contents in subsequent proceedings. Most fundamentally, Defendants' continued production of Erwine's employee records through December 3, 2020, Exhibit 23, demonstrates that no actual destruction occurred — only selective concealment.   Defendants cannot stand on a reversed and unenforceable settlement to excuse either.

### F.   Appropriate Sanctions

Based on the foregoing, Plaintiff requests that the Court issue adverse-inference instructions on two tracks. First, under Federal Rule of Civil Procedure 37(e)(2), as to the electronically stored information Defendants failed to preserve: that the missing video recordings of the October 8, 2016 Beaulieu incident and the October 9, 2016 Maes incident would have been unfavorable to the Defendants. Second, under the Court's inherent authority and the common-law spoliation doctrine, as to the tangible records Defendants destroyed or failed to preserve: (1) that the missing Beaulieu investigatory file; (2) that Mr. Erwine's missing nine-month employee evaluation; (3) that the documents removed from Mr. Erwine's personnel file in connection with the reversed February 4, 2019 ENE settlement; and (4) that the inquiry-and-waiver packets received by Churchill County from outside law-enforcement agencies during the background investigations of Mr. Erwine — each would have been unfavorable to the Defendants.

The same factual record that establishes intent to deprive under Rule 37(e)(2) as to the videos — contemporaneous notice of litigation risk, an admitted refusal to issue any preservation directive,

destruction under cover of a reversed settlement, and false sworn denials contradicted by Confidential Exhibits 1 and 2 — independently satisfies the bad-faith showing for an adverse-inference instruction under the Court's inherent authority, where bad faith is not even a prerequisite. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Leon*, 464 F.3d at 958. Plaintiff is prepared to submit proposed jury instructions for each of these adverse inferences if the Court grants the relief sought.

### G.   *Default Judgment Is the Appropriate Sanction on the § 1983 Claim*

The adverse-inference instructions requested above are appropriate as to most of the missing evidence, but the §1983 stigma-plus claim against Sheriff Trotter presents a different problem. Sheriff Trotter's continuing denials of personal communications with inquiring agencies have been contradicted by Confidential Exhibits 1, 2, and 6; Defendants destroyed the inquiry-and-waiver packets at least four documented agencies sent, yet continued producing documents from the personnel file as late as December 3, 2020. Even on Plaintiff's primary publication theory, see *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004), lesser sanctions cannot cure trial conducted under sworn testimony discovery has exposed as false. Default judgment under FRCP 37(e)(2)(C) is appropriate.

Ninth Circuit authority supports this result. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 960 (9th Cir. 2006) (dismissal warranted where lesser measures inadequate because "the most salient evidence has been destroyed"); *Valley Engineers Inc. v. Electric Engineering Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998) (dismissal warranted upon "pattern of deception and discovery abuse"). Because the §1983 claim turns on the destroyed inquiry-and-waiver packets — tangible records outside the scope of Rule 37(e) — the Court's inherent authority supplies the power to enter default judgment on this record of deception and concealment. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995); *Leon*, 464 F.3d at 958. As to any electronically stored evidence, Rule 37(e)(2)(C) independently authorizes default judgment upon a finding of intent to deprive. *Jones v. Riot Hospitality Group, LLC*, 95 F.4th 730, 735 (9th Cir. 2024). Once the Court finds intent to deprive (for the electronic evidence) and bad-faith concealment (for the tangible records), default judgment is appropriate.

**V.   CONCLUSION**

Defendants used NRS 239B.020 as both sword and shield: a sword to disseminate the false October 10, 2016 Memorandum and Trotter's false "investigation cleared the agency" representation to Mr. Erwine's prospective employers, and a shield — through the statute's confidentiality, the apparent destruction of Churchill County's inquiry records, and Trotter's sworn denials — to obscure the scope of that dissemination. Trotter has admitted the conduct through his deposition, his Tracy admissions, and Matheson's contradictory testimony that no investigation occurred, and cannot now benefit from the destruction of records that would have shown the full scope.

WHEREFORE, Plaintiff requests that the Court: (1) on the §1983 stigma-plus claim against Sheriff Trotter, enter default judgment under FRCP 37(e)(2)(C) or, alternatively, issue adverse-inference instructions that the missing Beaulieu and Maes videos and the destroyed inquiry-and-waiver packets would have been unfavorable to Defendants; (2) on each remaining claim, issue adverse-inference instructions that the missing Beaulieu investigatory file, Mr. Erwine's missing nine-month performance evaluation, and the personnel-file documents removed would have been unfavorable to Defendants; or (3) grant other relief as is just and proper, including sanctions, fees, and costs.

Dated:  May 27, 2026

By: */s/ Luke Busby*
    Luke Busby, Esq.
    Nevada State Bar #10319
    316 California Avenue
    Reno, Nevada 89509
    Phone (775) 453-0112
    luke@lukeandrewbusbyltd.com
    *Attorney for the Plaintiff*

**Exhibit List**

1.  LVMPD Background Investigation Report re Michael Erwine (Jan. 18, 2018)  (FILED UNDER SEAL)

2.  RPD Background Investigation Report re Michael Erwine (Feb. 13, 2018)  (FILED UNDER SEAL)

3.  Churchill County's Responses to Plaintiff's First RFPD (June 6, 2025), incl. Washoe County packet CC0028–CC0029  (FILED UNDER SEAL)

4.  LVMPD Letter Objecting to Subpoena (Feb. 22, 2019)

5.  Carson City DA Letter Responding to Subpoena, incl. Declaration of Tad Fletcher (Mar. 4, 2019)

6.  Declaration of Sarah Tracy (Mar. 12, 2024)

7.  Memorandum of Termination by Sheriff Benjamin Trotter (Oct. 10, 2016)

8.  Excerpts, Deposition of Benjamin Trotter (Sept. 9, 2025)

9.  Declaration of Andrew Allen Beaulieu

10. Reno Gazette-Journal / USA TODAY Article (Aug. 9, 2017)

11. Excerpts, Deposition of Capt. Michael Matheson (Jan. 7, 2021)

12. Defendant Trotter's Responses to Plaintiff's First RFPD (June 6, 2025)

13. Churchill County Sheriff's Office Admin. Policy 1.200 (Performance Evaluations)

14. Declaration of Michael Erwine

15. Mem. Disposition, Erwine v. Churchill County, No. 19-16094 (9th Cir. June 11, 2020)

16. Affidavit of Geof Stark (Mar. 20, 2024)

17. Excerpts, Deposition of Benjamin Trotter (Dec. 4, 2020)

18. Excerpts, Deposition of Det. Scott Olson (Nov. 24, 2025)  (FILED UNDER SEAL)

19. Excerpts, Deposition of Det. Jerry Bowden (Oct. 30, 2025)

20. Expert Report of Thomas Green

21. Nevada DPS Letter Rejecting Employment Application (Jan. 4, 2017)

22. Carson City DAS Letter Rejecting Employment Application (Sept. 8, 2017)

23. Defendants' Second Supplemental FRCP 26 Disclosures (Dec. 3, 2020)

**CERTIFICATE OF MEET AND CONFER**

I certify that on May 22, 2026, I met and conferred with Katherine F. Parks, Esq., counsel for Defendants Churchill County and Benjamin Trotter, in compliance with Local Rule 16-3 and Local Rule IA 1-3(f), in a good-faith effort to resolve the discovery dispute that is the subject of this Motion. The parties were unable to resolve the dispute without Court action.

May 27, 2026

By: /s/ Luke Busby, Esq._____

**CERTIFICATE OF SERVICE**

I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

\_\_\_\_\_ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

\_\_x\_\_ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509

May 27, 2026

By: /s/ Luke Busby, Esq._____