# EXHIBIT 8

Excerpts from the Deposition of Benjamin Trotter, taken September 9, 2025

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MICHAEL ERWINE, )
Plaintiff, ) Case No.:
v. ) 3:24-cv-00045-MMD-CSD
UNITED STATES OF AMERICA, et al., )
Defendants. )
_________________________________)

RECORDED DEPOSITION OF BENJAMIN DANIEL TROTTER

Taken on September 9, 2025

At 12:55 p.m.

RECORDED VIA VIDEO CONFERENCE UNDER

STIPULATION BY ALL PARTIES

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MICHAEL ERWINE, )
Plaintiff, ) Case No.:
v. ) 3:24-cv-00045-MMD-CSD
UNITED STATES OF AMERICA, et al., )
Defendants. )
________________________________________)

RECORDED DEPOSITION OF BENJAMIN DANIEL TROTTER

Taken on September 9, 2025

At 12:55 p.m.

RECORDED VIA VIDEO CONFERENCE UNDER

STIPULATION BY ALL PARTIES

APPEARANCES:

For the Plaintiff:

LUKE BUSBY, ESQ.
LUKE ANDREW BUSBY, LTD.
316 California Avenue
Reno, Nevada 89509

For the Defendant:

KATHERINE F. PARKS, ESQ.
THORNDAL ARMSTRONG
6590 S. McCarran Blvd, Suite B
Reno, Nevada 89509

INDEX

| | Direct | Cross | Redirect |
|---|---|---|---|
| MR. BUSBY | 5 | | |

Certificate of Record Page 60

EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 2 | Trotter's First Responses | 9 |
| Exhibit 5 | Background Report | 30 |
| Exhibit 1 | First Amended Complaint | |
| Exhibit 3 | Trotter's Second Responses | 24 |
| Exhibit 4 | Answers to Interrogatories | |
| Exhibit 6 | Memorandum | 30 |
| Exhibit 7 | RPD Background Report | |
| Exhibit 8 | Sarah Tracy's Declaration | |
| Exhibit 9 | Trotter's Deposition | |
| Exhibit 10 | Email | 55 |

DEPOSITION OFFICER: We are now on the record in the matter of Michael Erwine v. United States of America, et al. My name is Alicia Staats, I'm the videographer and deposition officer. I work for E-Depositions, LLC located at 750 Sandhill Road Suite 120, Reno, Nevada 89521. Today's date is September 9th, 2025 and the time is 12:55 p.m. This is the video recorded deposition of Benjamin Trotter and is being recorded via video conference under stipulation by all parties. For confirmation of identity pursuant to NRS 240.1997, Mr. Trotter did show me his ID prior to the deposition.
Mr. Trotter, can you please raise your right hand? Do you solemnly affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
DEPOSITION OFFICER: Thank you. Can you please state your full name with spelling?
THE WITNESS: Benjamin Daniel Trotter. Benjamin, B-E-N-J-A-M-I-N. Daniel, D-A-N-I-E-L. Trotter, T-R-O-T-T-E-R.
DEPOSITION OFFICER: Thank you. The electronic audio and visual recording of this deposition will be the official record. A transcript

will be created as an aid to the audio video recording by E-Depositions LLC. Would all attorneys present, please identify themselves, their firm, anybody with them and the party they represent beginning with the party noticing this proceeding.

MR. BUSBY: This is Luke Busby appearing for plaintiff Michael Erwine.

MS. PARKS: Katherine Parks, Thorndal Armstrong on behalf of Churchill County and Ben Trotter.

DEPOSITION OFFICER: Perfect. You guys are all set. Thank you.

EXAMINATION

BY MR. BUSBY:

**Q. Good afternoon, Mr. Trotter. Pleasure to see you again.**

A. Hello.

**Q. So you've been deposed multiple times, correct?**

A. Twice.

**Q. Okay. And you understand that the answers you're -- you're providing to the questions are given under oath subject to penalty the -- of perjury, the same as if you were testifying in a courtroom, right?**

A. Yes.

**Q. Okay. And you understand that your**

deposition testimony may be used later in this proceeding as evidence before the Court, right?

A. Yes.

Q. Okay. All right, let's get right into it then. So have you reviewed the exhibits that I've provided today?

A. I saw some just recent -- just today, yes.

Q. Okay. I'm going to walk through those one by one. You've previously reviewed the first amended complaint that we filed in this case, right?

A. Sometime ago, yes.

Q. Okay. The complaint alleges you terminated my client, Michael Erwine, from the Churchill County Sheriff's Office on October 10th, 2016; is that correct?

A. Yes.

Q. Okay. It's correct that it says that -- that it's also true, right?

A. Yes.

Q. Okay. The complaint states that you placed a memorandum in Mr. Erwine's personnel file dated October 10, 2016 that contained derogatory statements about him. Is that correct?

MS. PARKS: Are you asking if that's what the first amended complaint says?

MR. BUSBY: I'm asking if that's a true

statement from the complaint.
THE WITNESS: No.
BY MR. BUSBY:
**Q. Okay. How is it untrue?**
A. Well, there's partial truth. So I put that memo in his file, I disagree that it's derogatory.
**Q. Okay. The complaint alleges you told Mr. Erwine during his termination meeting that his concerns about the Beaulieu incident described in the complaint were intentional to harm the department. Did you make that statement?**
A. I don't recall the exact conversation, it's been nine years. But no, that's not something I would've said.
**Q. Okay. The complaint states that you told potential employers of Mr. Erwine that he was a piece of shit and would sabotage their agencies. Do you deny making those statements?**
A. Unequivocally.
**Q. The complaint alleges that you did not provide Mr. Erwine with any written notice of any alleged misconduct before he executed the letter of separation on October 10th, 2016; is that true?**
MS. PARKS: Luke, you're fading out on me, sir.

MR. BUSBY: Oh, I'm sorry. I'm sorry.
BY MR. BUSBY:
**Q. Mr. Trotter, could you hear my question?**
A. I did hear. And that is true, he was not provided information before the meeting.
**Q. Okay. The complaint alleges you did not afford Mr. Erwine an opportunity to refute the charges against him before he executed the letter of separation. Is that the truth?**
A. Yes.
**Q. Okay. And the complaint states that you did not show Mr. Erwine the memorandum in question dated October 10th, 2016 or allowed him to read or initial it before it was placed into his personnel file; is that true?**
A. Yes.
**Q. Okay. The complaint states that you sent an email to all Churchill County Sheriff's Office staff on October 10th, 2016 stating that Mr. Erwine was no longer employed and that the facility's key code was being changed to lock him out; is that correct?**
A. I believe so. I mean, I saw that email today. I haven't seen it in years.
**Q. Okay.**
A. But yes, I did pen that email that he was no

longer employed and, typically, with an involuntary separation, I also change the code to the facility that I could change it to.

**Q. Okay. I'd like you to take a look at what's been marked as Exhibit 2. I'll show it to you here. Do you recognize what this is, Mr. Trotter?**

A. Yes. Looks like the responses from a while back.

**Q. Okay. Do you recognize these as your responses to my client's first request for admission to you?**

A. I'm trying to look at them.

**Q. Okay.**

A. I mean, it looks like something that we -- that was done recently, I believe. I'm not sure. I can't hardly read it on that size so --

**Q. Okay. All right, let me try and make it a little bit bigger for you if I can. All right, how's that?**

A. A little better.

**Q. Okay.**

A. See if I can blow my screen up.

**Q. Yeah, I'll start from the beginning.**

A. Okay. This does look like responses to admission, yes.

**Q. Okay. All right, let's take a look at request number 8. I'd like you to read that and then let me know when you're ready for questions.**

A. Okay.

**Q. Okay. In response to request number 8, you deny telling Mr. Erwine during the October 10th, 2016 meeting that his concerns about the booking of Andrew Beaulieu were intentional to harm the Churchill County Sheriff's Office. Did you not tell Mr. Erwine that during the meeting?**

MS. PARKS: Objection. Asked and answered, misstates his testimony.

THE WITNESS: Yes, I had indicated. I don't specifically recall exactly the conversation in that meeting but that is not something I would've included in such a conversation.

BY MR. BUSBY:

**Q. Okay. All right. In response to request for admission number 10, we ask that it admit you were aware of Erwine's previous DU -- arrest for DUI when he was hired as a deputy sheriff on December 9th, 2015. That's correct that you were aware of that when you hired him?**

A. Yes.

**Q. Okay. Does a previous arrest for a DUI**

**disqualify an individual from being hired in law enforcement for -- at Churchill County Sheriff's Office, for example?**

A. It -- one did not, no.

**Q. Okay. Why not?**

A. Essentially, there was periods of time -- I actually modified the policy when I became the sheriff to make it, I guess, less prohibitive and part of that included DUI related arrests. I believe there was a time period but I don't remember specifically. It was more of a modification of a hiring standard than I -- and I'm not sure if it was actually in a codified policy.

**Q. Okay. Is it -- can you describe your understanding of whether a previous arrest for a DUI is disqualifying for a law enforcement position?**

A. I mean, it could be challenging --

MS. PARKS: Hang -- hang on a -- hang on a second. I -- I'm going to just object to the extent you're asking about law enforcement agencies besides the Churchill County Sheriff's Office. Go ahead.

THE WITNESS: Okay. My primary answer would be that it is -- it'd be challenging for you to be a police officer if you were -- were not able to drive

because of a DUI revocation.

BY MR. BUSBY:

**Q. But would a -- a DUI that occurred say a decade ago, be disqualifying in your experience?**

MS. PARKS: Calls for speculation.

THE WITNESS: Yeah. Under my administration, it was not automatically a disqualifier.

BY MR. BUSBY:

**Q. Okay. What was your rationale for hiring candidates who had DUIs that were in their past?**

A. Well it couldn't be plural DUIs. If you had more than two or two or more in your lifetime, we would not hire you under what I had changed the practice to. The reason for modifying it was because it was becoming increasingly hard to find candidates that would qualify for law enforcement because of their, say, marijuana use or something of that sort, things have become legalized. And a lot of agencies had to change their -- at one point when I was hired, certain things were complete disqualifiers so we had to change that to adjust with the times and the legalization of certain things.

**Q. Okay. All right. So in requests -- response to request number 11, you denied recalling any conversation with a background investigators from LVMPD**

**about Mr. Erwine prior to January 17, 2017. Have you --**

A. I --

**Q. I'm sorry, go ahead.**

A. Go ahead. Are -- are you going to ask a question?

**Q. Yeah. Can you confirm now that you have no recollection of speaking with an LVMPD background investigation -- investigator about Mr. Erwine?**

A. I don't recall talking to anybody about Mr. Erwine specifically so --

**Q. Okay. Have you reviewed the records that have been disclosed in this case from LVMPD regarding the background investigation for Mr. Erwine?**

A. Yes.

**Q. Okay. Does that record, to your knowledge, indicate that you did speak to someone at LVMPD about Mr. Erwine?**

MS. PARKS: Objection. Calls for speculation.

THE WITNESS: It is what it is. I don't recall it.

BY MR. BUSBY:

**Q. Okay. Let's take a look at that, it's been marked as Exhibit Number 5. Do you recognize this document, Mr. Trotter?**

A. I believe I saw this some time back, yes.

**Q. Okay. So would you agree that this is the confidential background investigation report on Mr. Erwine?**

MS. PARKS: Hey, Luke, how -- how long is that exhibit? Is --

MR. BUSBY: Five pages.

MS. PARKS: Okay.

THE WITNESS: It's what the document is titled, yes.

BY MR. BUSBY:

**Q. Okay. Do you see on Page 2 there where it states, "Candidate Name: Michael Andrew Erwine"? That's my client, correct?**

A. I believe so.

**Q. Okay. All right. And do you see under subsection five there where it states employment history?**

A. Yes.

**Q. Okay. It states, "Candidate does not meet hiring standard as stated in Department Hiring Standard section 11. (A) Employment History, based on the following: Candidate resigned in lieu of termination from Churchill County Sheriff Office on 10/11/16. Per Churchill County (NV) Sheriff Ben Trotter, candidate**

**initiated an unauthorized investigation that was beyond the scope of candidate's duties - into the treatment of an inmate at the detention center." All right. So if you didn't communicate this information to LVMPD, how do you think they got it?**

MS. PARKS: Objection. Calls for speculation.

THE WITNESS: I don't recall a conversation. I've never said where they got it or that I didn't talk to them, I just don't recall it.

BY MR. BUSBY:

**Q. Okay. Do you see there at the top of Page 2** where it states, "(Candidate statement in attachments, Sheriff Trotter was a phone interview)"?

A. I see that.

**Q. Okay. But you don't recall that phone interview?**

A. No.

MS. PARKS: Objection. Asked -- objection. Asked and answered.

BY MR. BUSBY:

**Q. Okay. Do you recall speaking to any other law enforcement agencies about Mr. Erwine?**

A. Not one.

**Q. Okay. Do you see the read states,**

**"Candidate's actions make him unsuitable for employment with LVMPD"?**

A. I see that.

**Q. Okay. Do you think it's fair to attribute his unsuitability for employment with LVMPD based on statements you made to them as reported in this document?**

MS. PARKS: Objection. Lack of foundation, calls for speculation.

THE WITNESS: I believe their statement is what it is. I can't speculate why they decided not to hire him.

BY MR. BUSBY:

**Q. Okay. All right. But it states on the face of the document that his actions, which they described being described by you above, make him unsuitable for employment. So it's fair to say he didn't get the job because of what you said about him, right?**

MS. PARKS: Objection. Calls for speculation, lack of foundation.

THE WITNESS: I don't know why they did not hire him.

BY MR. BUSBY:

**Q. Okay. All right, let's go back to Exhibit 2. Let's take a look at RFA number 14. It states,**

**"Admit that you, Sheriff Trotter, spoke to former Court Clerk Sarah Tracy about Mr. Erwine's lawsuit against Churchill County between 2019 and April 15, 2024."**
**Okay. When did you -- or do you recall when you first spoke with Ms. Tracy about Mr. Erwine's lawsuit?**

A. I don't recall specifically speaking to her about it except that I know, when it -- when the first version ended, I did tell her that it was done. She also was being sued at some point in there in regards to her husband's fatal car crash and so, possibly, we had talked about suits. I had not discussed the details of this case with her.

**Q. And what did -- do you recall exactly what you discussed with her?**

A. I don't recall specifically talking to her about anything except I do recall it was late -- I remember when that ended, like November 2023, I recall going out and telling her and the clerks.

**Q. Okay. Which other clerks did you speak with?**

A. I just generally said that it finally was done.

**Q. And who -- what other clerks were working at the office at that time?**

A. Yeah, I don't specifically know. We have two now that are brand new. I think would've been

Sherry, Favi, Sarah. I think Dalynne was there.

**Q. I'm sorry, Dalynne?**

A. Dalynne. But she may not have been there yet, I'm not sure when we hired her.

**Q. Okay. In response to request for admission number 16, and I'm summarizing, I believe you stated you did not conduct a formal investigation into Mr. Erwine -- Mr. Erwine's conduct on October 9th, 2016; is that correct?**

A. Correct.

**Q. Okay. What, if any, investigation did you conduct before terminating Mr. Erwine?**

A. So the 9th was which incident?

**Q. October 9th was the day before Mr. Erwine was terminated and -- on October 10th, 2016.**

A. Was that the Beaulieu thing? I can't read this. Okay. But --

**Q. That's the Matthew Maes incident.**

A. Oh, this was Maes? Okay. So I did not conduct any investigation. I did assign it to be -- well, a fact finding to be done by the captain of the jail and he may have delegated it.

**Q. Okay. In request for -- or in your response to request for admission number 17, you admitted writing part of the language stating Mr. Erwine "is**

**siding with the inmate against his own agency or, possibly, encouraging a civil action against his own agency," correct?**

A. I see that in there.

**Q. What basis did you have to lodge that allegation against Mr. Erwine?**

A. I believe it was possibly citing the fact finding involving the Beaulieu incident.

**Q. Okay. What specifically did my client do to encourage Mr. Beaulieu to file a lawsuit?**

A. It was what was in the statements of the people that were spoken to about that.

**Q. Okay. But you didn't give Mr. Erwine an opportunity to refute that, did you?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: Correct.

BY MR. BUSBY:

**Q. In response to request for admission number 20, you admitted that you did not personally review the surveillance footage of the October 8th, 2016 incident involving Mr. Beaulieu or authoring the memorandum; is that correct?**

A. Correct.

**Q. Okay. Why did you not review the surveillance footage before making allegations against**

**Mr. Erwine?**
A. It was assigned to others.
**Q. Okay. And you also admitted in requests for admission number 21 that you did not personally observe any of Mr. Erwine's actions during the October 9th incident involving Matthew Maes; is that correct?**
A. Correct.
**Q. Did you personally review the incident before making the allegations related to that incident?**
A. Review what?
**Q. Video footage.**
A. No.
**Q. Was it available to review?**
A. Yes.
**Q. Okay. Do you know whether others reviewed it?**
A. I believe somebody did.
MS. PARKS: I -- I'm sorry, what was the question?
MR. BUSBY: Do you know whether others reviewed it?
MS. PARKS: Okay. I'm -- I'm having trouble when you look down like that hearing you, Luke.
MR. BUSBY: Okay. Let me try and lower my screen a little bit.

THE WITNESS: My answer is I believe it was reviewed.
BY MR. BUSBY:
**Q. Do you know by whom?**
A. Couldn't recall that off the top of my head.
**Q. Okay. In response to request for admission number 23, you denied providing the October 10th, 2016 memorandum to Churchill County personnel for distribution to inquiring law enforcement agencies. Are you aware of whether other law enforcement agencies acquired the October 10th, 2016 memorandum after Mr. Erwine was terminated from Churchill County?**
A. I am not.
**Q. Okay. Did you provide a copy of the memorandum to the HR department at Churchill County?**
A. Yes.
**Q. Okay. Did you --**
A. Actually, I want to correct that. It was not a copy, it was the original.
**Q. Okay. And was that included in his personnel file?**
A. Yes.
**Q. Did you refer other law enforcement agencies that called inquiring about Mr. Erwine to the HR department at Churchill County?**

MS. PARKS: Objection. Lack of foundation.
THE WITNESS: I don't recall anybody specifically calling about him. It has been nine years.
BY MR. BUSBY:
**Q. Okay. Was that your -- is that your standard practice when you receive an inquiry from a law enforcement agency about a particular officer to refer them to HR?**
A. Generally.
**Q. Okay. Did you know that, if you provided the personnel file of a former officer to HR, that it would be distributed to other law enforcement agencies?**
MS. PARKS: Objection. Lack of foundation, speculation.
THE WITNESS: I don't know what HR did with personnel files.
BY MR. BUSBY:
**Q. Okay. Do you -- you have experience in hiring candidates for police jobs and sheriff's jobs, correct?**
A. Yes.
**Q. Do you generally review, as part of the procedure of hiring candidates and evaluating their qualifications, their personnel files from their previous law enforcement employment?**

A. You could try.

**Q. Okay. Okay. In response to request number 24, you denied intending the memorandum to be shared with other law enforcement agencies conducting background investigations for Mr. Erwine; is that correct?**

A. Absolutely.

**Q. Okay. Why was the memorandum placed in Mr. Erwine's personnel file if not for potential disclosure to future employers?**

A. It was placed in the file because, if I had taken it home and kept it in case of a situation like this, it would have zero credibility. So I placed it in the most official way I could which was in the personnel file where it's -- would actually be a usable record. So I had no intention of it being distributed, I put it in the place that I thought was appropriate for actually storing things for future reference.

**Q. Let's turn to Exhibit Number 3. Do you recognize this document, Mr. Trotter?**

A. Yeah. Yes.

**Q. Okay. In your responses to request number 26 through 39, you objected to admitting to the authenticity of various documents from law enforcement agencies that denied Mr. Erwine employment. What**

**knowledge do you have to deny the authenticity or accuracy of these documents?**

MS. PARKS: Objection. Lack of foundation, calls for speculation.

THE WITNESS: I can't even see this document so I don't -- what I'm even discussing. I need to be able to pull it up.

BY MR. BUSBY:

**Q. All right.**

A. Is this the RFP or RFA from March --

**Q. All right.**

A. From March 30th?

**Q. Sorry. They're the request for admissions set number two.**

A. Just from March 30th, 2025?

**Q. Yes, I believe so. Let me see when --**

A. So I can pull that up.

**Q. It's from June 16th, 2025. It's when they are -- when they were responded to.**

A. I mean, I can't see yours and I do not have Exhibit 2 in my email. So --

**Q. Exhibit 3.**

A. Exhibit 3, whatever the number is. I have 5, 6, 7, 8 and 10.

**Q. Okay. Let's go off the record for a sec.**

MS. PARKS: I can email them if you want.
DEPOSITION OFFICER: Hang on, Katherine. We are going off the record and the time is 1:22 p.m.
(A recess was taken.)
DEPOSITION OFFICER: We are back on the record in the matter of Michael Erwine v. United States of America, et al, and the time is 1:29 p.m.
BY MR. BUSBY:
**Q. All right. Mr. Trotter, have you had a chance to review your responses to the re request set the second set of requests for admission?**
A. No.
**Q. Okay.**
A. Did -- I did in the past so --
**Q. Okay. Would you agree with me that they basically all pertain to admitting the genuineness of documents that were shown to you?**
A. It seems like it, yes, from --
**Q. Okay.**
A. Yes.
**Q. Did you conduct any inquiry as to whether the contents of those documents, was it accurate?**
A. No.
MS. PARKS: Object to form.
BY MR. BUSBY:

**Q. Okay. So do you have any basis for disputing the authenticity of these documents?**

MS. PARKS: Objection. Calls for a legal conclusion.

THE WITNESS: I cannot authenticate them or deny their authenticity.

BY MR. BUSBY:

**Q. Okay. But I asked if you had any basis for -- for believing that they're not authentic.**

MS. PARKS: Objection. Calls for a legal conclusion.

THE WITNESS: I cannot -- I don't know anything about these documents so, no, I have no reason to believe they're either authentic or not.

BY MR. BUSBY:

**Q. Okay. So I'd like you to take a look at what's been marked as Exhibit Number 4. Do you have that document?**

A. Yes.

**Q. Okay. All right. Do you recognize this document, Mr. Trotter?**

A. Let me get it open. Yes.

**Q. I'd like to refer you to your answer to interrogatory number seven. If you could review that and review your answer.**

A. Okay.

**Q. Okay. You described there that you obtained information from other persons in connection with the preparation of the memorandum. Do you recall who those other persons are?**

A. Yes. Sergeant Shawn Summers. And I did not specifically obtain it from them, it was obtained in the fact finding efforts. Sergeant Shawn Summer, Jolie Wroat, I think she may go by Long now. Deputy Darren Thompson had done a statement. I don't recall any other names specifically.

**Q. Okay. In response to interrogatory number 13, we asked the identities of other persons besides your attorneys with whom you've discussed the lawsuit. We already discussed your -- the staff at your office who you testified, I believe you discussed the case with or at least informed them about some things about the case. Do you recall speaking about the case with anyone else?**

A. No.

**Q. Have you ever spoke about this case with Jeff Stark?**

A. No, no.

**Q. No, okay. How about anybody -- anybody else at Churchill County besides your attorneys?**

A. Not that I recall.

**Q. Okay. I'd like you to turn to Exhibit Number 5 if you could. Do you recall us discussing this exhibit earlier, Mr. Trotter?**

A. Yes.

**Q. Okay. Did you inform or do you recall informing the LVMPD investigators that you had not personally reviewed the surveillance footage or other evidence related to Mr. Beaulieu's water request before terminating Mr. Erwine?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I don't recall talking to any agency about Mr. Erwine ever after his separation.

BY MR. BUSBY:

**Q. Did you provide LVMPD with any documentation related to Mr. Erwine?**

A. I didn't. I have never provided documentation to anybody on Mr. Erwine, it was all in his personnel file the day that he left that was in human resources.

**Q. Okay. You told him -- according to this, you told LVMPD that Mr. Erwine would've been terminated had he not resigned; is that correct?**

MS. PARKS: I -- I mean, are you asking if that's what it says?

MR. BUSBY: I'm asking him if that's what he said to the LVMPD investigator.

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I don't recall talking to an LVMPD investigator.

BY MR. BUSBY:

**Q. Okay. Do you recall whether you told the investigators from LVMPD that you had not given Mr. Erwine an opportunity to refute the charges against him before terminating him?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I don't recall talking to an LVMPD investigator or any law enforcement agency about Mr. Erwine after his termination.

BY MR. BUSBY:

**Q. Okay. The report --**

A. Or separation.

**Q. I'm sorry. Go ahead.**

A. Or separation.

**Q. The report states that you described Mr. Erwine as not rehirable. What did you mean by that?**

MS. PARKS: Objection. Misstates his testimony, lack of foundation.

THE WITNESS: This is the LVMPD report?

BY MR. BUSBY:

**Q. Yeah. It's the Exhibit Number 5 we're looking at.**

A. I do not recall ever talking to any law enforcement agency about Mr. Erwine after his separation from the agency specifically including Las Vegas Metro.

**Q. So do you deny the authenticity of this document that this conversation actually occurred?**

A. I do not recall the conversation.

**Q. Okay. So you don't deny having the conversation with the Las Vegas Metro investigator as recorded in Exhibit 5 which I'm showing you now?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I do not recall the conversation with Las Vegas.

BY MR. BUSBY:

**Q. That's not what I'm asking you. I'm asking you if you deny the truth of what's said in Exhibit 5.**

MS. PARKS: Yeah. Objection. Lack of foundation, calls for speculation.

THE WITNESS: I did not author the document so I can't verify the truth or -- or untruth of it.

BY MR. BUSBY:

**Q. Okay. All right, let's turn to Exhibit 6. Do you recognize this document, Mr. Trotter?**

A. Yes.

**Q. Yeah, okay. You state in the memorandum that Beaulieu first asked for water at 0350. Ten minutes after, he was placed in the security cell for being uncooperative. Do you see that?**

A. Where am I looking?

**Q. Second page, first bullet point.**

A. I see where I typed that, yes.

**Q. Okay. Did you personally verify this timeline? How did you determine, you know, the -- the times described here?**

A. I did not.

**Q. Okay. So where did you get this information?**

A. Possibly from Sergeant Summers. I'm -- I'm not sure. It's been nine years.

**Q. Okay. You wrote here Deputy Erwine is a probationary employee and does not have the authority to conduct his own personnel investigations; is that correct?**

A. Correct.

**Q. Okay. Was it against any agency policy for a deputy to document observations of misconduct by fellow deputies?**

MS. PARKS: Objection. Lack of foundation.

THE WITNESS: It was against general chain

of command and not part of his duties.
BY MR. BUSBY:
**Q. Okay. Do you think what Mr. Erwine did could be fairly characterized as conducting an investigation?**
A. I don't know at this point nine years later.
**Q. Okay.**
A. It would depend on your definition of investigation.
**Q. So if a deputy under your watch at the Sheriff's office when you were sheriff, if they observed misconduct of another -- of another officer, another deputy, what was the expectation that -- that -- what how what should they do about it, if anything?**
MS. PARKS: Objection. Lack of foundation.
THE WITNESS: Report it to the supervisor or higher up.
BY MR. BUSBY:
**Q. Okay. But they have to establish what the facts are before reporting that, right?**
A. Not specifically.
**Q. Okay. So what part of Mr. Erwine's investigation did you object to?**
MS. PARKS: Objection. Lack of foundation.
THE WITNESS: Where am I objecting to it?

In the document itself?
BY MR. BUSBY:
**Q. I'm referring to the statement that you made in the memorandum that Deputy Erwine is a probationary employee and does not have the authority to conduct his own personnel investigation. I'm wondering what exactly Mr. Erwine did that you -- you found beyond the scope of his authority.**
A. He failed to -- if he thought he had some atrocity that he had witnessed in the jail, he needed to report it to -- up to command chain staff where it is our job to do these investigations.
**Q. Okay. Did you ask him whether he had done that at any time before terminating him?**
A. No.
**Q. Okay. Did you revert -- review Erwine's notes that he made in the course of your reviewing the facts prior to Mr. Erwine's termination?**
A. I don't specifically recall if I reviewed that or not. Anything that I would've -- would recall would be in this document that is Exhibit 6.
**Q. Okay. Do you see where you wrote I also find or I find -- all right. I'm sorry, I'll start it over. I also find substantial concern that Deputy Erwine's investigation seems to have found and**

**confirmed what Beaulieu alleged that grave shift would flush the floor and toilet and laugh when Beaulieu would ask -- would yell for water; is that correct?**

A. I see where that is written.

**Q. Okay. Would that behavior constitute misconduct on the part of the deputies involved?**

A. I would think so.

**Q. Why?**

A. It's unprofessional and it's something I wouldn't tolerate.

**Q. Then is it fair to say that that's just unnecessarily antagonizing an inmate?**

A. Absolutely.

**Q. Okay. Is that the behavior that Mr. Erwine was concerned about?**

MS. PARKS: Objection. Lack --

BY MR. BUSBY:

**Q. To your knowledge?**

MS. PARKS: Lack -- lack of foundation, calls for speculation.

THE WITNESS: I'm not sure what Mr. Erwine's concerns were.

BY MR. BUSBY:

**Q. Okay. But you terminated Mr. Erwine in part for writing something that recorded that this event**

**occurred, right?**

MS. PARKS: Objection. Misstates his testimony.

THE WITNESS: Mr. Erwine resigned in lieu of termination because he failed to complete his probation.

BY MR. BUSBY:

**Q. Okay. That's not -- that's not the question I'm asking you. I'm asking you whether or not Mr. Erwine's recording of the incident involving Mr. Beaulieu formed part of the basis for your terminating him.**

A. He's conducting an investigation of his own about reporting it up the chain certainly was a consideration.

**Q. Okay. All right. In the memorandum, you also state that Erwine -- erwine quote, "Pulled his taser and pointed it at an inmate. Pulled cartridge off, pointed it again at the inmate and discharged it while laughing." Did you personally witness this incident?**

A. I did not.

**Q. Okay. Was there video footage of this incident available?**

A. Yes.

**Q. Okay. Why didn't you review the video**

**footage?**

A. I assigned that to be done.

**Q. By whom?**

A. I believe I would have delegated that to the -- Captain Matheson from the -- who was over the jail.

**Q. Okay.**

A. I don't specifically remember exactly how -- who I assigned to do certain things.

**Q. Okay. What's your knowledge of the Sheriff's Office retention policy or practice when it came to video that was taken in the jail?**

A. Back in that time, the video system would record for a certain period of time, possibly 30 or 60 days, and then it would start writing over itself. If you needed an incident off of it, you could pull it off of it but I don't I think the retention was just the size of the disc unless it was burned as a -- incident was burned.

**Q. Did -- did you order any of the officers involved in the investigation of Mr. Erwine to preserve any of the video evidence that they relied on to support their memorandums that they wrote?**

MS. PARKS: Objection. Lack of foundation.

THE WITNESS: I didn't. I did not.

BY MR. BUSBY:

**Q. So you didn't independently verify anything you were being told by the officers who wrote the memos that formed the foundation for your termination of Mr. Erwine; is that correct?**

MS. PARKS: Objection. Lack of foundation.

THE WITNESS: And the -- I would also say it's only part of the cause for the separation but, no, I did not personally review any of the -- of the videos.

BY MR. BUSBY:

**Q. Does the Sheriff's Office have a policy regarding the preservation of evidence that may be used in a court proceeding?**

A. I'm sure they do.

**Q. And do you know what it is?**

A. No. I have not been at the Sheriff's Office for six -- six, almost seven years.

**Q. Would your expectation be that evidence related to potential lawsuits would be preserved pursuant to that policy?**

A. I think that would be circumstance based.

**Q. Okay. Do you remember stating in the memorandum that the behavior towards Mr. Maes, quote, "Creates liability for this agency now or for some time into the future should Inmate Maes elect to pursue a civil action?"**

A. Yes.
**Q. Okay. So you were aware of the potential for litigation arising out of the incident involving my client with Mr. Maes, correct?**
MS. PARKS: Objection. Asked and answered.
THE WITNESS: I was aware that, essentially, any inmate can sue for essentially anything and so, sure, Mr. Maes could have filed something.
BY MR. BUSBY:
**Q. Okay. I'm just wondering practically why you didn't give Mike an opportunity to explain himself before you fired him.**
A. The determination had been made that he did not pass his probation.
**Q. Who made that determination?**
A. Well, I would ultimately be responsible for that.
**Q. Okay. Do you think it was fair for you to not hear him out before firing him and putting this memorandum in his file?**
MS. PARKS: Objection. Argumentative.
THE WITNESS: I believe so.
BY MR. BUSBY:
**Q. Why?**
A. I had a -- had a conversation about three

days prior to this, something, three to five days with Mr. Erwine in attempt to bring him back on board, I suppose, salvage him as I do with employees because you want them to stay. And so I -- I believe we were -- it was a good conversation so I don't believe that my -- what happened a few days later required a lot of explanation.

**Q. Okay. Did you have any personal animus against Mr. Erwine?**

A. Absolutely not.

**Q. Okay. You didn't dislike the guy who wasn't difficult or hard to work with or anything like that?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I didn't work with him much that I recall. I did not work in the jail. I may have seen him when I was assisting my deputies in court which I did for eight years. But no, I had no real -- I didn't know Mr. Erwine passed, you know, the interview and background situation that I was involved in.

BY MR. BUSBY:

**Q. Do you have any reason to believe, before the incidents described in your man memorandum, that he was a bad cop or anything like that?**

A. Before that?

**Q. Yeah.**
A. There was -- concerns had been raised for many months.
**Q. Okay.**
A. Which is why I had the conversation with him a few days prior to this.
**Q. Do you recall who raised those concerns?**
A. I had been hearing them from my jail sergeants and the captain over at the jail.
**Q. And who would those -- who would those individuals be?**
A. Captain Mike Matheson, jail staff and sergeants. There was numerous people, I don't specifically know who had -- if any of them had talked to me or if it all came from the captain.
**Q. Okay. So when you were at the -- when you were in charge of the Sheriff's Office, was there an expectation that employment reviews would be conducted according to policy?**
A. Yes.
**Q. Okay. And those employment reviews for a probationary employer are used as a basis for a decision whether to retain them or not, to let them pass the test and essentially become a non-probationary employee, correct?**

A. It can be.

**Q. Okay. Do you know whether all such employment reviews as required were completed for Mr. Erwine?**

A. Well, based on our conversation about five years ago, there was a nine-month employee -- or review. Never saw one of those done while I was at the Sheriff's Office.

**Q. Okay. Did the policy of the Sheriff's Office require a nine -- nine-month review?**

A. I don't recall what the policy was. I didn't even know about them until you enlightened me.

**Q. Was part of the performance review process to give employees guidance about how they're -- how they're doing, how they can improve to make the Sheriff's Office more effective in doing its work?**

A. Is that part of the performance review?

**Q. Yeah.**

A. Sure.

**Q. Okay. I'd like you to take a look at what's been marked as Exhibit Number 7. Have you seen this document before, Mr. Trotter?**

A. I just recently.

**Q. Okay. Have you reviewed it?**

A. I have looked at it just recently, yes.

**Q. Okay. Do you see under experience in employment where it states -- actually, I'll just ask you to read that paragraph if you could.**

A. I have read the paragraph.

**Q. Okay. Do you recall having a conversation with Detective Boden from RPD about Mr. Erwine?**

A. I do not recall that conversation at all.

**Q. Okay. Do you deny speaking to the background investigator, Mr. Boden, around this time the memo was authored in 2018?**

A. I don't recall speaking to him.

**Q. You're not saying that you didn't speak to him, correct?**

A. I'm saying I don't recall it, correct.

**Q. Do you recall making the statements attributed to you in this report?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I'm going -- I don't recall the conversation at all and it doesn't seem very accurate.

BY MR. BUSBY:

**Q. Okay. If you don't recall the conversation, how can you say that it's not accurate?**

A. Great, fair enough. I don't recall the conversation at all.

**Q. Okay. You see there where it states several law enforce -- agencies in Las Vegas permanently disqualified him from their process? The second paragraph under experience and employment.**

A. I see that.

**Q. Okay. Are -- do you have any knowledge of whether or not Mr. Erwine had been permanently disqualified from other agencies?**

A. Do I now or did I at the time?

**Q. Did you in February of 2018?**

A. No.

**Q. Okay. Do you see there at the following where it state -- or at the -- on the second page where there's a bold sentencing, "The following Reno Police Department automatic rejection criteria and/or administrative guidelines apply. Sixteen, work history, unfavorable recommendation from previous employer?"**

A. I see that

**Q. Based on that, do you think it's fair to say that RPD denied Mike -- Mr. Erwine employment based on what you said about him?**

MS. PARKS: Objection. Calls for speculation. Misstates his testimony.

THE WITNESS: I don't recall ever saying

anything to any agency about him and, you could look at the document, there could be two other agencies that permanently disqualified him.

BY MR. BUSBY:

**Q. Okay. Let's turn to Exhibit Number 8. Do you recognize this document, Mr. Trotter?**

A. I saw it for the first time today.

**Q. Okay. You've reviewed the document?**

A. I read it today, yes.

**Q. Okay. Do you see where it states there, "In the last two years, Trotter told me on several occasions that Trotter put the memorandum in Erwine's file after Erwine was terminated?" Do you see that?**

A. I see that.

**Q. Did you tell Ms. Tracy that?**

A. I don't recall any specific conversation with Ms. Tracy about this incident at all.

**Q. Okay.**

A. I'm not sure why I would tell her anything about it.

**Q. Okay. Do you see there were it states, "Trotter brought up Erwine's case with me three or four times?"**

A. I see that.

**Q. Okay. Do you dispute that?**

A. Yes.

**Q. Why?**

A. I believe we may have both talked one time where I was letting her know -- I know for sure that I let her know the suit was over back in November 2023. And then at one point, we were both going through a lawsuit at the same time and so we may have conversed about how it kind of weighs on you but I never discussed details of this case with her.

**Q. Okay. So she indicates in the declaration that you said that -- that you told other law enforcement agencies that Erwine was a piece of shit. Do you deny making that statement?**

MS. PARKS: Objection. Asked --

THE WITNESS: Absolutely.

MS. PARKS: Objection. Asked and answered.

THE WITNESS: Absolutely. Unequivocally.

BY MR. BUSBY:

**Q. But you already stated earlier that you don't recall the substance of your conversations with Ms. Tracy about the lawsuits; is that right?**

A. Correct.

**Q. Okay.**

A. But I would not refer to anybody in that way when I was talking to somebody in a professional

environment.

**Q. Do you see where Ms. Tracy states that you told other law enforcement agencies that Erwine would sabotage their agencies as -- if hired?**

A. I see that.

**Q. Do you not -- deny making that statement?**

A. Absolutely.

**Q. Okay. So you never told another law enforcement agency that Erwine would sabotage their agency if they hired him?**

MS. PARKS: Objection. Asked and answered.

THE WITNESS: I don't recall ever talking to another agency about Mr. Erwine. I certainly wouldn't have told Ms. Tracy that.

BY MR. BUSBY:

**Q. Okay. So do you recall whether anyone was in earshot when you and Tracy were discussing Erwine's lawsuit?**

A. You mean the time that I advised it was over?

**Q. Yeah.**

A. I'm not specifically sure if I just kind of let people know generally or how that went.

**Q. Okay. Let's take a look at Exhibit Number 9. Do you recognize this document, Mr. Trotter?**

A. I'll pull it up.

**Q. Okay.**

A. Sorry, my computer is kind of slow.

**Q. It's okay. Don't worry.**

A. Trying to see what the title is. Is this the complaint? No, this is a --

MS. PARKS: No, I'm asking -- nine is 142 pages worth of your prior deposition.

THE WITNESS: This is the deposition, okay. Then, yes, I have reviewed this five years ago.

BY MR. BUSBY:

**Q. Okay. Do you recall being deposed in the prior proceedings?**

A. Yes.

**Q. Okay.**

A. And I'll correct that I actually recently re-reviewed this, I believe, within the last week.

**Q. Okay. All right. Let's take a look at page 109, lines 12 through 15.**

A. Okay.

**Q. Okay. I'd like you to review those lines if you could.**

A. I see it. I have reviewed them.

**Q. Okay. There you're asked if a reasonable person conducting a background investigation of Mr. Erwine seeing the memorandum might be dubious about**

**hiring Mr. Erwine. Did you know that, when you were sent the memorandum as part of the personnel file to HR, that it would be reviewed by other agencies?**

MS. PARKS: Objection. Lack of foundation, calls for speculation.

THE WITNESS: No, I did not.

BY MR. BUSBY:

**Q. Okay. Okay. Okay. Do you see on Page 23 of your deposition? Starting at Line 21, could you read that question and answer?**

MS. PARKS: What lines?

MR. BUSBY: Starting at Line 21 on Page 23. And I'm using the page numbers at the top of the deposition.

THE WITNESS: I see that.

BY MR. BUSBY:

**Q. Okay. Do you see there where it states, "If someone wanted information on a former employee that was seeking a job, you refer them to HR?"**

A. Yes. That was my typical practice.

**Q. Okay. Do you know who Marshall Emerson is?**

A. Yes.

**Q. Okay. Who is he?**

A. He was the chief -- one of -- I think there were maybe three tribal chief of -- of polices at the

Fallon Paiute-Shoshone Tribe when I was the sheriff.

**Q. Okay. Did you have any professional relationship with Mr. Emerson?**

A. Yes.

**Q. Okay. So you have a prior working relationship with Mr. Emerson as well?**

A. Not from work. I believe he retired out of Washoe County.

**Q. Okay.**

A. I knew him when he became the chief over there and I was the sheriff and we met numerous times and collaborated a lot.

**Q. Okay. Did you ever speak with Mr. Emerson about Mr. Erwine?**

A. I would have no reason to have done so because I have no idea that Mr. Erwine was putting in for other agencies while he was still employed with us.

**Q. Okay. Do you know who Tad Fletcher is?**

A. Yes.

**Q. Who is Tad Fletcher?**

A. I -- I -- he was a partner of mine with the Fallon Police Department over a period of years and he went to various other agencies after that.

**Q. Okay. Did you ever speak with Mr. Fletcher about Mr. Erwine?**

A. I don't recall ever talking to him at all.

**Q. Okay.**

A. About -- about Mr. Erwine.

**Q. Okay. Just to be clear, are you saying you -- you never spoke to him about Mr. Erwine and you know that or are you saying you don't remember?**

A. I don't recall talking to him about Mr. Erwine.

**Q. Did you know that Mr. Erwine had applied for a job at the Carson City Department of Alternative Sentencing?**

A. I learned that through this process.

**Q. Okay.**

MS. PARKS: By this process, are you talking about this lawsuit?

THE WITNESS: Yes.

MR. BUSBY: Okay.

BY MR. BUSBY:

**Q. Sir, do you recall providing any information to Tad Fletcher or the Carson Department of Alternative Sentencing regarding Mr. Erwine's background or employment history?**

A. No.

**Q. Okay. Did you ever conduct background investigations personally in any of your history law**

**enforcement?**

A. Yes, sir, I did.

**Q. Okay. Can you describe your process for conducting background investigations?**

A. We have a -- first, we run a criminal history on them then we have them fill out a background packet, it's about 20 something pages. And then you call the references, call the other agencies, see if they'll talk to you. I personally never requested actual copies of people's personnel files when I was doing them, I would just ask and it was rather de minimis in result frequently.

**Q. Would you typically make a record of all the conversations you had with other departments when doing a background investigation on a potential employee?**

A. I don't recall what my notes looked like. And -- and then I would just -- generally, I would do notes and then I would do a summary and then, the notes, I would dispose of. So I would do a summary of what the conclusion was.

**Q. Okay. But you're aware that, under Nevada statute, you have a right to request background personnel files of officers who have prior employment history in law enforcement when they're applying for a police job, right?**

A. I'm not specifically aware of that in statute.

**Q. Okay. But you're aware that, generally -- I mean, are you aware that, generally, you know, you can't just go to the Reno Police Department and -- and request the employee file for an officer, right? They're generally confidential.**

A. I would imagine that would be the case.

**Q. Okay. So are you aware of the exception in Nevada law providing for the availability of those personnel records to other law enforcement agencies who are considering hiring such individuals?**

A. Not specifically.

MS. PARKS: Objection. Asked and answered.

THE WITNESS: Yeah. I'm not specifically aware of that.

BY MR. BUSBY:

**Q. Okay. So let's say you're -- would the number of previous rejections from other employers impact your decision about whether to hire a prospect for a law enforcement job?**

MS. PARKS: Objection. Lack of foundation.

THE WITNESS: I believe there was a question in our background packet about other agencies you'd put in for.

BY MR. BUSBY:

**Q. Okay.**

A. I don't recall that ever being something I considered heavily.

**Q. Okay. So if you saw a applicant who had applied and been rejected for numerous other law enforcement positions, that wouldn't bear on your decision about whether to hire them?**

A. No. Because I was one that applied for several agencies before I finally landed a job, too.

**Q. Okay. Would those rejections or the basis for those rejections influence your decision about whether to hire a prospect?**

A. If you could learn the basis for them --

**Q. Okay.**

A. Potentially it could.

**Q. Did you learn the basis for those by calling those other law enforcement agencies?**

A. You could try.

**Q. Okay. So I mean, it's fair to say that your reputation with your former employees has a substantial impact on whether or not you're hireable as a police officer.**

MS. PARKS: Objection. Improper hypothetical.

THE WITNESS: It can.
BY MR. BUSBY:
**Q. Okay. So, are -- are you aware now, based on the facts of this lawsuit, that Erwine has been denied employment with multiple law enforcement agencies since leaving Churchill County?**
A. Could you repeat that?
**Q. Sure. Are you aware that Mr. Erwine has been denied employment with several many law enforcement agencies since leaving Churchill County?**
A. Because of this suit, I'm aware of that, yes.
**Q. Okay. Do you remember being contacted by or speaking with anyone from FEMA about a job for Mr. Erwine?**
A. No.
**Q. His application there. How about the Federal Protective Service?**
A. No.
**Q. When you were --**
A. Never heard. Never heard of the agency.
**Q. So since you left the Sheriff's Office, have you been contacted by anybody regarding Mr. Erwine's potential employment with them?**
A. Now that's something I can recall. No.
**Q. Okay, all right.**

A. Because I had been served as a suit, I would most assuredly remember that and would not have said a word.

**Q. Okay.**

MR. BUSBY: I'd like to take a quick break if we could. We're going for about an hour and 10 minutes. Can we take seven minutes?

THE WITNESS: Sure.

MS. PARKS: Yeah.

MR. BUSBY: Thanks.

MS. PARKS: Only seven, not eight? Yeah, sure.

DEPOSITION OFFICER: We're going off the record and the time is 2:09 p.m.

(A recess was taken.)

DEPOSITION OFFICER: We're back on the record and the time is 2:19 p.m.

BY MR. BUSBY:

**Q. Mr. Trotter, I just have one more exhibit to show you, Exhibit Number 11.**

DEPOSITION OFFICER: Do you mean Exhibit 10? I don't think you have an 11.

MR. BUSBY: Oh, yeah, I'm sorry. Exhibit 10, I'm sorry. That's right.

THE WITNESS: Okay.

BY MR. BUSBY:
**Q. All right. Mr. Trotter, do you recognize this email?**
A. Yeah. It does remind me of an email I sent out after so I'm assuming it's mine, yes.
**Q. Okay. Do you see there -- and that's a -- an email that's dated October 17th, 2020; is that right? Or that's probably when it was produced.**
A. Yeah. I --
**Q. Do you recall -- I -- I'm sorry, go ahead.**
A. I would expect probably it was sent out the 16th of October 2016.
**Q. Okay. All right. So do you recall stating, "I do not have a good gauge on his current state of mind," and this is about Mr. Erwine, right?**
A. I don't recall saying it but I see it in the email.
**Q. Okay. Do you recall anything my client did that would make you question his state of mind after being terminated?**
A. No.
**Q. Okay. Did he lash out at you or yell at you or do anything like that?**
A. No.
**Q. Okay. Okay. Did you ever personally**

**observe Mr. Erwine do anything unprofessional while he worked for you at the Sheriff's Office?**

A. Personally?

**Q. Yeah.**

A. No.

**Q. Okay. Was he always professional in his interactions with you?**

A. Just didn't have many so --

**Q. Okay. Do you disagree with the assertion that Mr. Erwine had legitimate concerns about the way Mr. Beaulieu was being treated?**

A. No. Not specifically.

**Q. Okay. In what time frame would you expect an officer to report to his superiors his concerns about the conduct of fellow top deputies?**

A. Immediately I would hope if you're that concerned about it.

**Q. Okay. All right. What do you mean by that concerned about it?**

A. If you're concerned enough to initiate your own investigation, I would expect -- you should have just made a call to anybody including me. And I got plenty of calls when I wasn't on duty.

**Q. Okay.**

A. Of course, I was always on duty because I

was elected so --

**Q. Okay. But -- I have a similar job so I definitely understand. Not a -- not as an elected official but as a slave to the ship, meaning the courts, but -- I guess were you aware that Mr. Erwine was a young cop during this time frame?**

A. What's that mean?

**Q. Did you know whether or not this was his first real job in law enforcement?**

A. I believe it was.

**Q. Okay. All right. And incidents involving misconduct by fellow officers, that's not something, I assume, a law enforcement agency would take lightly, right?**

A. I wouldn't.

**Q. Okay. All right. And as a rookie cop, do you provide them with training or prepare them how to -- how to deal with situations like that?**

A. I did not do Mr. Erwine's training.

**Q. Okay. Was it your policy to provide such training to employees?**

A. We did field training, correct.

**Q. But I'm talking about specifically what to do if you observe your fellow officer or deputy engaging in conduct which you think breaks the rules.**

A. I don't recall what specifically we trained him on in regards to that.

MR. BUSBY: Okay. All right, that's all I have. Thank you for your time, Mr. Trotter.

MS. PARKS: I have no questions.

DEPOSITION OFFICER: Okay. That was going to answer my question. This concludes the recorded -- sorry, Luke, go ahead.

THE WITNESS: Oh, go ahead and get the closing admonition on --

DEPOSITION OFFICER: This concludes the recorded deposition of Benjamin Daniel Trotter. Before going off the record, Katherine, did you want a copy?

MS. PARKS: I do.

DEPOSITION OFFICER: Thank you. We are going off the record and the time is 2:24 p.m.

CERTIFICATE OF RECORDER

UNITED STATES DISTRICT COURT )
)
DISTRICT OF NEVADA )

NAME OF CASE: MICHAEL ERWINE, PLAINTIFF VS
UNITED STATES OF AMERICA, ET.AL., DEFENDANTS

I, Alicia Staats, a duly commissioned E-Notary Public, authorized to administer oaths or affirmations in the State of Nevada, do hereby certify: That I recorded the foregoing deposition of the witness, Benjamin Daniel Trotter on 9/9/2025.

That prior to being examined, the witness was duly sworn to testify to the truth. That deposition was recorded via audio and video pursuant to NRCP30(b)(3) and said deposition recording is a complete, true, and accurate recording of deposition testimony. A transcript was created by E-Depositions LLC to aid the audio video recording. A review of the deposition [ ] was [X] was not requested by the deponent and [ ] was [X] was not requested by a party of the action. If a review was requested, any changes communicated to me by the deponent during the period allowed are appended hereto.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor

a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Reno.

Alicia Staats
Notary Public
Appointment No. 23-8980-02

UNITED STATES DISCTRICT COURT )
)SS
DISTRICT OF NEVADA )

Case Name: MICHAEL ERWINE, PLAINTIFF VS
UNITED STATES OF AMERICA, ET.AL., DEFENDANTS
Case Number: 3:24-cv-00045-MMD-CSD
Deposition Date: 9/9/2025
Deponent: Benjamin Daniel Trotter

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the State of Nevada, that I have reviewed the entire recording of my deposition taken in the above-captioned matter or the same has been played or read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the ERRATA SHEET attached hereto and made part hereof, with the understanding that I offer these changes as if still under oath.

Executed on this_________ day of______________, 2025, at ____________________,

______________________________
Benjamin Daniel Trotter

ERRATA SHEET

Case Name: MICHAEL ERWINE, PLAINTIFF VS
UNITED STATES OF AMERICA, ET.AL., DEFENDANTS
Deposition Date: 9/9/2025
Deponent: Benjamin Daniel Trotter
REASON CODES: 1. To clarify the record.
2. To conform the facts.
3. To correct transcription errors if reviewed with the official audio video recording. Understanding the transcript reviewed is not the official record and is an aide to the audio video recording. Transcription errors will be corrected to match the audio video recording.

Page____________Line_________Reason_____________________________
From______________________________to____________________________
Page____________Line_________Reason_____________________________
From______________________________to____________________________
Page____________Line_________Reason_____________________________
From______________________________to____________________________
Page____________Line_________Reason_____________________________
From______________________________to____________________________
Page____________Line_________Reason_____________________________
From______________________________to____________________________
Page____________Line_________Reason_____________________________
From______________________________to____________________________

Benjamin Daniel Trotter

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Page_____________Line__________Reason________________________________

From_________________________________to_______________________________

Benjamin Daniel Trotter

**Exhibits**

**Exhibit 1** 3:11
**Exhibit 2** 3:9 9:5 16:24,25 24:21
**Exhibit 3** 3:12 23:19 24:22,23
**Exhibit 4** 3:13 26:17
**Exhibit 5** 3:10 13:24 28:2,3 30:1,12,18
**Exhibit 6** 3:14 30:24 33:21
**Exhibit 7** 3:15 41:21
**Exhibit 8** 3:16 44:5
**Exhibit 9** 3:17 46:23,24
**Exhibit 10** 3:18 55:21,23,24

**(**

**(A)** 14:22

**0**

**0350** 31:3

**1**

**10** 6:21 10:19 24:24 55:6,21,24
**10/11/16** 14:24
**109** 47:18
**10th** 6:14 7:23 8:13,19 10:6 18:15 21:7,11
**11** 12:24 14:22 55:20,22
**12** 47:18
**120** 4:6
**12:55** 4:7
**13** 27:13
**14** 16:25
**142** 47:6
**15** 17:3 47:18
**16** 18:6
**16th** 24:18 56:12
**17** 13:1 18:24
**17th** 56:7
**1:22** 25:3
**1:29** 25:7

**2**

**2** 9:5 14:12 15:12 16:25 24:21
**20** 19:19 51:7
**2015** 10:21
**2016** 6:14,21 7:23 8:13,19 10:6 18:8,15 19:20 21:7,11 56:12
**2017** 13:1
**2018** 42:10 43:10
**2019** 17:3
**2020** 56:7
**2023** 17:17 45:5
**2024** 17:3
**2025** 4:7 24:15,18
**21** 20:4 48:9,12
**23** 21:7 48:8,12
**24** 23:3
**240.1997** 4:11
**26** 23:23
**2:09** 55:14
**2:19** 55:17
**2:24** 59:16

**3**

**3** 23:19 24:22,23
**30** 36:13
**30th** 24:12,15
**39** 23:23

**4**

**4** 26:17

**5**

**5** 13:24 24:24 28:3 30:1,12,18

**6**

**6** 24:24 30:24 33:21
**60** 36:13

**7**

**7** 24:24 41:21
**750** 4:5

**8**

**8** 10:2,5 24:24 44:5
**89521** 4:6
**8th** 19:20

**9**

**9** 46:24
**9th** 4:7 10:21 18:8,13,14 20:5

**A**

**Absolutely** 23:7 34:13 39:10 45:15,17 46:7
**accuracy** 24:2
**accurate** 25:22 42:20,23
**acquired** 21:11
**action** 19:2 37:25
**actions** 16:1,15 20:5
**actual** 51:10
**adjust** 12:21
**administration** 12:7
**administrative** 43:16
**admission** 9:10,25 10:19 18:5,24 19:18 20:4 21:6 25:11
**admissions** 24:13
**admit** 10:19 17:1
**admitted** 18:24 19:19 20:3
**admitting** 23:23 25:16
**admonition** 59:10

**advised** 46:19
**affirm** 4:14
**afford** 8:7
**afternoon** 5:14
**agencies** 7:17 11:20 12:18 15:23 21:9,10,23 22:12 23:4,25 43:2,8 44:2 45:12 46:3,4 48:3 49:17,23 51:8 52:11,24 53:10,18 54:6,10
**agency** 19:1,3 22:7 28:13 29:13 30:4,5 31:21 37:23 44:1 46:9,10, 13 54:20 58:13
**agree** 14:2 25:15
**ahead** 11:22 13:3,4 29:18 56:10 59:8,9
**aid** 5:1
**Alicia** 4:3
**allegation** 19:6
**allegations** 19:25 20:9
**alleged** 7:22 34:1
**alleges** 6:12 7:7,20 8:6
**allowed** 8:13
**Alternative** 50:10,20
**amended** 6:9,24
**America** 4:3 25:7
**and/or** 43:15
**Andrew** 10:7 14:13
**animus** 39:8
**answers** 5:20
**antagonizing** 34:12
**appearing** 5:6
**applicant** 53:5
**application** 54:16
**applied** 50:9 53:6,9
**apply** 43:16
**applying** 51:24
**April** 17:3
**Argumentative** 38:21
**arising** 38:3
**Armstrong** 5:9
**arrest** 10:20,25 11:15
**arrests** 11:9
**assertion** 57:9
**assign** 18:20
**assigned** 20:2 36:2,8
**assisting** 39:16
**assume** 58:13
**assuming** 56:5
**assuredly** 55:2
**atrocity** 33:10
**attachments** 15:13
**attempt** 39:2
**attorneys** 5:2 27:14,25
**attribute** 16:4
**attributed** 42:16
**audio** 4:24 5:1
**authentic** 26:9,14
**authenticate** 26:5
**authenticity** 23:24 24:1 26:2,6 30:7
**author** 30:21
**authored** 42:10
**authoring** 19:21
**authority** 31:17 33:5,8
**automatic** 43:15
**automatically** 12:7
**availability** 52:10
**aware** 10:20,22 21:10 38:2,6 51:21 52:1,3,4,9,16 54:3,8,11 58:5

**B**

**B-E-N-J-A-M-I-N** 4:21
**back** 9:8 14:1 16:24 25:5 36:12 39:2 45:5 55:16
**background** 12:25 13:7,13 14:3 23:5 39:19 42:9 47:24 50:21,24 51:4,6,15,22 52:24
**bad** 39:24
**based** 14:22 16:5 37:20 41:5 43:20,21 54:3
**basically** 25:16
**basis** 19:5 26:1,8 35:10 40:22 53:11,14,17
**bear** 53:7
**Beaulieu** 7:9 10:8 18:16 19:8, 10,21 31:3 34:1,2 35:10 57:11
**Beaulieu's** 28:9
**beginning** 5:4 9:23
**behalf** 5:9
**behavior** 34:5,14 37:22
**believing** 26:9
**Ben** 5:9 14:25
**Benjamin** 4:8,20,21 59:12
**bigger** 9:18
**bit** 9:18 20:25
**blow** 9:22
**board** 39:2
**Boden** 42:6,9
**bold** 43:14
**booking** 10:7
**brand** 17:25
**break** 55:5
**breaks** 58:25
**bring** 39:2
**brought** 44:22
**bullet** 31:7
**burned** 36:17,18
**Busby** 5:6,13 6:25 7:3 8:1,2 10:17 12:2,8 13:22 14:7,11 15:11,21 16:13,23 19:17 20:20, 24 21:3 22:4,17 24:8 25:8,25 26:7,15 28:14 29:1,6,15,25 30:16,23 32:2,18 33:2 34:17,23 35:6 36:25 37:9 38:9,23 39:21 42:21 44:4 45:18 46:15 47:10 48:7,12,16 50:17,18 52:17 53:1 54:2 55:5,10,18,23 56:1 59:3

C

**call** 51:8 57:22
**called** 21:24
**calling** 22:3 53:17
**calls** 12:5 13:18 15:6 16:9,19 24:4 26:3,10 30:20 34:20 43:23 48:5 57:23
**candidate** 14:13,20,23,25 15:13
**candidate's** 15:2 16:1
**candidates** 12:10,15 22:19,23
**captain** 18:21 36:5 40:9,12,15
**car** 17:10
**Carson** 50:10,20
**cartridge** 35:17
**case** 6:10 13:12 17:12 23:12 27:16,18,21 44:22 45:9 52:8
**cell** 31:4
**center** 15:3
**chain** 31:25 33:11 35:13
**challenging** 11:17,24
**chance** 25:10
**change** 9:2,3 12:18,20
**changed** 8:21 12:13
**characterized** 32:4
**charge** 40:17
**charges** 8:7 29:9
**chief** 48:24,25 49:10
**Churchill** 5:9 6:13 8:18 10:8 11:2,21 14:24,25 17:3 21:8,12, 15,25 27:25 54:6,10
**circumstance** 37:20
**citing** 19:7
**City** 50:10
**civil** 19:2 37:25
**clear** 50:4
**Clerk** 17:2
**clerks** 17:18,19,22
**client** 6:13 14:14 19:9 38:4 56:18
**client's** 9:10
**closing** 59:10
**code** 8:20 9:2
**codified** 11:12
**collaborated** 49:12
**command** 32:1 33:11
**communicate** 15:4
**complaint** 6:10,12,19,24 7:1,7, 9,15,20 8:6,11,17 47:5
**complete** 12:20 35:5
**completed** 41:3
**computer** 47:2
**concern** 33:24
**concerned** 34:15 57:17,19,20
**concerns** 7:8 10:7 34:22 40:2,7 57:10,14
**concludes** 59:7,11
**conclusion** 26:4,11 51:20
**conduct** 18:7,8,12,20 25:21 31:18 33:5 50:24 57:15 58:25
**conducted** 40:18
**conducting** 23:4 32:4 35:12 47:24 51:4
**conference** 4:9
**confidential** 14:3 52:7
**confirm** 13:6
**confirmation** 4:10
**confirmed** 34:1
**connection** 27:3
**consideration** 35:14
**considered** 53:4
**constitute** 34:5
**contacted** 54:12,22
**contained** 6:21
**contents** 25:22
**conversation** 7:12 10:14,16 12:25 15:8 30:8,9,11,15 38:25 39:5 40:5 41:5 42:5,7,19,22,25 44:16
**conversations** 45:20 51:14
**conversed** 45:7
**cop** 39:24 58:6,16
**copies** 51:10
**copy** 21:14,19 59:13
**correct** 5:18 6:14,16,22 8:21 10:22 14:14 18:9,10 19:3,16,22, 23 20:6,7 21:18 22:20 23:6 28:23 31:19,20 34:3 37:4 38:4 40:25 42:13,14 45:22 47:15 58:22
**County** 5:9 6:13 8:18 10:8 11:2, 21 14:24,25 17:3 21:8,12,15,25 27:25 49:8 54:6,10
**court** 6:2 17:1 37:12 39:16
**courtroom** 5:23
**courts** 58:5
**crash** 17:10
**created** 5:1
**Creates** 37:23
**credibility** 23:13
**criminal** 51:5
**criteria** 43:15
**current** 56:14

D

**D-A-N-I-E-L** 4:21
**Dalynne** 18:1,2,3
**Daniel** 4:20,21 59:12
**Darren** 27:9
**date** 4:6
**dated** 6:20 8:12 56:7
**day** 18:14 28:19
**days** 36:14 39:1,6 40:6
**de** 51:11
**deal** 58:18
**decade** 12:4
**December** 10:21
**decided** 16:11

**decision** 40:23 52:20 53:8,12
**declaration** 45:10
**definition** 32:8
**delegated** 18:22 36:4
**denied** 12:24 21:7 23:3,25 43:21 54:5,9
**deny** 7:17 10:6 24:1 26:6 30:7, 10,18 42:8 45:13 46:6
**department** 7:10 14:21 21:15, 25 43:15 49:22 50:10,20 52:5
**departments** 51:14
**depend** 32:8
**deposed** 5:17 47:11
**deposition** 4:1,4,8,12,18,23,25 5:10 6:1 25:2,5 47:7,8 48:9,14 55:13,16,21 59:6,11,12,15
**deputies** 31:23 34:6 39:16 57:15
**deputy** 10:21 27:9 31:16,22 32:10,13 33:4,24 58:24
**derogatory** 6:21 7:6
**describe** 11:14 51:3
**details** 17:12 45:9
**Detective** 42:6
**detention** 15:3
**determination** 38:13,15
**determine** 31:10
**difficult** 39:12
**disagree** 7:6 57:9
**disc** 36:17
**discharged** 35:18
**disclosed** 13:12
**disclosure** 23:9
**discussed** 17:11,14 27:14,15, 16 45:9
**discussing** 24:6 28:3 46:17
**dislike** 39:11
**dispose** 51:19
**dispute** 44:25
**disputing** 26:2
**disqualified** 43:3,8 44:3
**disqualifier** 12:7
**disqualifiers** 12:20
**disqualify** 11:1
**disqualifying** 11:16 12:4
**distributed** 22:12 23:16
**distribution** 21:9
**document** 13:25 14:9 16:7,15 23:20 24:5 26:18,21 30:8,21,25 31:22 33:1,21 41:22 44:2,6,8 46:24
**documentation** 28:15,18
**documents** 23:24 24:2 25:17,22 26:2,13
**drive** 11:25
**DU** 10:20
**dubious** 47:25
**DUI** 10:20,25 11:9,15 12:1,3
**DUIS** 12:10,11
**duties** 15:2 32:1
**duty** 57:23,25

**E**

**E-DEPOSITIONS** 4:5 5:2
**earlier** 28:4 45:19
**earshot** 46:17
**effective** 41:16
**efforts** 27:8
**elect** 37:24
**elected** 58:1,3
**electronic** 4:24
**email** 8:18,22,25 24:21 25:1 56:3,4,7,17
**Emerson** 48:21 49:3,6,13
**employed** 8:20 9:1 49:17
**employee** 31:17 33:5 40:25 41:6 48:18 51:15 52:6
**employees** 39:3 41:14 53:21 58:21
**employer** 40:22 43:18
**employers** 7:16 23:10 52:19
**employment** 14:17,22 16:1,5, 17 22:25 23:25 40:18,21 41:3 42:2 43:4,21 50:22 51:23 54:5,9, 23
**encourage** 19:10
**encouraging** 19:2
**ended** 17:8,17
**enforce** 43:2
**enforcement** 11:2,16,20 12:16 15:23 21:9,10,23 22:7,12,25 23:4,24 29:13 30:4 45:12 46:3,9 51:1,24 52:11,21 53:7,18 54:5,10 58:9,13
**engaging** 58:25
**enlightened** 41:12
**environment** 46:1
**erwine** 4:2 5:7 6:13 7:8,16,21 8:7,12,19 10:6,9 13:1,8,10,13,17 14:4,13 15:23 18:8,12,14,25 19:6,13 20:1 21:12,24 23:5,25 25:6 28:10,13,16,18,22 29:9,14, 21 30:4 31:16 32:3 33:4,7 34:14, 24 35:4,16 36:20 37:4 39:2,9,18 41:4 42:6 43:7,21 44:13 45:12 46:3,9,13 47:25 48:1 49:14,16,25 50:3,5,8,9 54:4,8,14 56:15 57:1, 10 58:5
**Erwine's** 6:20 10:20 17:2,5 18:8 20:5 23:9 32:22 33:16,18,25 34:21 35:9 44:12,22 46:17 50:21 54:22 58:19
**essentially** 11:6 38:6,7 40:24
**establish** 32:19
**et al** 4:3 25:7
**evaluating** 22:23
**event** 34:25
**evidence** 6:2 28:9 36:21 37:11, 17
**exact** 7:12
**EXAMINATION** 5:12
**exception** 52:9
**executed** 7:22 8:8

**exhibit** 9:5 13:24 14:6 16:24 23:19 24:21,22,23 26:17 28:2,4 30:1,12,18,24 33:21 41:21 44:5 46:23 55:19,20,21,23

**exhibits** 6:5

**expect** 56:11 57:13,21

**expectation** 32:13 37:17 40:18

**experience** 12:4 22:18 42:1 43:4

**explain** 38:11

**explanation** 39:7

**extent** 11:19

**F**

**face** 16:14

**facility** 9:2

**facility's** 8:20

**fact** 18:21 19:7 27:8

**facts** 32:20 33:18 54:4

**fading** 7:24

**failed** 33:9 35:5

**fair** 16:4,17 34:11 38:18 42:24 43:20 53:20

**fairly** 32:4

**Fallon** 49:1,22

**fatal** 17:10

**Favi** 18:1

**February** 43:10

**Federal** 54:17

**fellow** 31:23 57:15 58:12,24

**FEMA** 54:13

**field** 58:22

**file** 6:20 7:6 8:14 19:10 21:21 22:11 23:9,11,15 28:19 38:20 44:13 48:2 52:6

**filed** 6:10 38:8

**files** 22:16,24 51:10,23

**fill** 51:6

**finally** 17:20 53:10

**find** 12:15 33:23,24

**finding** 18:21 19:8 27:8

**fired** 38:12

**firing** 38:19

**firm** 5:3

**Fletcher** 49:18,20,24 50:20

**floor** 34:2

**flush** 34:2

**footage** 19:20,25 20:11 28:8 35:22 36:1

**form** 25:24

**formal** 18:7

**formed** 35:10 37:3

**found** 33:7,25

**foundation** 16:8,20 22:1,13 24:3 29:23 30:20 31:24 32:15,24 34:19 36:23 37:3,5 48:4 52:22

**frame** 57:13 58:6

**frequently** 51:12

**full** 4:19

**future** 23:10,18 37:24

**G**

**gauge** 56:14

**general** 31:25

**generally** 17:20 22:9,22 46:22 51:17 52:3,4,7

**genuineness** 25:16

**give** 4:15 19:13 38:11 41:14

**good** 5:14 39:5 56:14

**grave** 34:1

**Great** 42:24

**guess** 11:8 58:5

**guidance** 41:14

**guidelines** 43:16

**guy** 39:11

**guys** 5:10

**H**

**hand** 4:14

**hang** 11:18 25:2

**happened** 39:6

**hard** 12:15 39:12

**harm** 7:10 10:8

**head** 21:5

**hear** 8:3,4 38:19

**heard** 54:20

**hearing** 20:23 40:8

**heavily** 53:4

**Hey** 14:5

**higher** 32:17

**hire** 12:13 16:12,22 52:20 53:8, 13

**hireable** 53:22

**hired** 10:21,23 11:1 12:19 18:4 46:4,10

**hiring** 11:11 12:9 14:21 22:19,23 48:1 52:12

**history** 14:18,22 43:17 50:22,25 51:6,24

**home** 23:12

**hope** 57:16

**hour** 55:6

**how's** 9:18

**HR** 21:15,24 22:8,11,15 48:3,19

**human** 28:20

**husband's** 17:10

**hypothetical** 53:25

**I**

**ID** 4:12

**idea** 49:16

**identify** 5:3

**identities** 27:13

**identity** 4:11

**imagine** 52:8
**Immediately** 57:16
**impact** 52:20 53:22
**Improper** 53:24
**improve** 41:15
**incident** 7:9 18:13,18 19:8,20 20:6,8,9 35:9,20,23 36:15,17 38:3 44:17
**incidents** 39:23 58:11
**included** 10:15 11:9 21:20
**including** 30:5 57:22
**increasingly** 12:15
**independently** 37:1
**individual** 11:1
**individuals** 40:11 52:12
**influence** 53:12
**inform** 28:6
**information** 8:5 15:4 27:3 31:13 48:18 50:19
**informed** 27:17
**informing** 28:7
**initial** 8:13
**initiate** 57:20
**initiated** 15:1
**inmate** 15:3 19:1 34:12 35:17,18 37:24 38:7
**inquiring** 21:9,24
**inquiry** 22:6 25:21
**intending** 23:3
**intention** 23:16
**intentional** 7:10 10:8
**interactions** 57:7
**interrogatory** 26:24 27:12
**interview** 15:14,17 39:19
**investigation** 13:8,13 14:3 15:1 18:7,11,20 32:5,9,23 33:6,25 35:12 36:20 47:24 51:15 57:21
**investigations** 23:5 31:18 33:12 50:25 51:4
**investigator** 13:8 29:2,5,13 30:11 42:9
**investigators** 12:25 28:7 29:8
**involuntary** 9:1
**involved** 34:6 36:20 39:19
**involving** 19:8,21 20:6 35:9 38:3 58:11

**J**

**jail** 18:22 33:10 36:5,11 39:15 40:8,9,12
**January** 13:1
**Jeff** 27:22
**job** 16:17 33:12 48:19 50:10 51:25 52:21 53:10 54:13 58:2,9
**jobs** 22:19
**Jolie** 27:8
**June** 24:18

**K**

**Katherine** 5:8 25:2 59:13
**key** 8:20
**kind** 45:8 46:21 47:2
**knew** 49:10
**knowledge** 13:15 24:1 34:18 36:9 43:6

**L**

**lack** 16:8,20 22:1,13 24:3 29:23 30:19 31:24 32:15,24 34:16,19 36:23 37:5 48:4 52:22
**landed** 53:10
**language** 18:25
**Las** 30:5,11,15 43:2
**lash** 56:22
**late** 17:16
**laugh** 34:2
**laughing** 35:19
**law** 11:1,16,20 12:16 15:23 21:9, 10,23 22:7,12,25 23:4,24 29:13 30:3 43:2 45:11 46:3,8 50:25 51:24 52:10,11,21 53:6,18 54:5,9 58:9,13
**lawsuit** 17:2,5 19:10 27:14 45:7 46:18 50:15 54:4
**lawsuits** 37:18 45:21
**learn** 53:14,17
**learned** 50:12
**leaving** 54:6,10
**left** 28:19 54:21
**legal** 26:3,10
**legalization** 12:21
**legalized** 12:18
**legitimate** 57:10
**letter** 7:22 8:8
**letting** 45:4
**liability** 37:23
**lieu** 14:23 35:4
**lifetime** 12:12
**lightly** 58:13
**lines** 47:18,20 48:11
**litigation** 38:3
**LLC** 4:5 5:2
**located** 4:5
**lock** 8:21
**lodge** 19:5
**long** 14:5 27:9
**longer** 8:20 9:1
**looked** 41:25 51:16
**lot** 12:18 39:6 49:12
**lower** 20:24
**Luke** 5:6 7:24 14:5 20:23 59:8
**LVMPD** 12:25 13:7,12,16 15:4 16:2,5 28:7,15,22 29:2,5,8,13,24

**M**

**made** 16:6 33:3,17 38:13,15 57:22

**Maes** 18:18,19 20:6 37:22,24 38:4,8

**make** 7:10 9:17 11:8 16:1,16 41:15 51:13 56:19

**making** 7:18 19:25 20:9 42:15 45:13 46:6

**man** 39:23

**March** 24:10,12,15

**marijuana** 12:16

**marked** 9:5 13:24 26:17 41:21

**Marshall** 48:21

**Matheson** 36:5 40:12

**matter** 4:2 25:6

**Matthew** 18:18 20:6

**meaning** 58:4

**meet** 14:20

**meeting** 7:8 8:5 10:7,10,15

**memo** 7:6 42:10

**memorandum** 6:20 8:12 19:21 21:8,11,15 23:3,8 27:4 31:2 33:4 35:15 37:22 38:20 39:23 44:12 47:25 48:2

**memorandums** 36:22

**memos** 37:2

**met** 49:11

**Metro** 30:6,11

**Michael** 4:2 5:7 6:13 14:13 25:6

**Mike** 38:11 40:12 43:21

**mind** 56:15,19

**mine** 49:21 56:5

**minimis** 51:12

**minutes** 31:4 55:7

**misconduct** 7:22 31:22 32:12 34:6 58:12

**misstates** 10:12 29:22 35:2 43:24

**modification** 11:11

**modified** 11:7

**modifying** 12:14

**months** 40:3

**multiple** 5:17 54:5

**N**

**names** 27:11

**needed** 33:10 36:15

**Nevada** 4:6 51:21 52:10

**nine-month** 41:6,10

**non-probationary** 40:24

**notes** 33:17 51:16,18,19

**notice** 7:21

**noticing** 5:5

**November** 17:17 45:5

**NRS** 4:11

**number** 10:2,5,19 12:24 13:24 16:25 18:6,24 19:18 20:4 21:7 23:2,19,22 24:14,23 26:17,24 27:12 28:3 30:1 41:21 44:5 46:23 52:19 55:20

**numbers** 48:13

**numerous** 40:13 49:11 53:6

**NV** 14:25

**O**

**oath** 5:22

**object** 11:19 25:24 32:23

**objected** 23:23

**objecting** 32:25

**objection** 10:11 13:18 15:6,19 16:8,19 19:15 22:1,13 24:3 26:3,10 28:11 29:3,11,22 30:13,19 31:24 32:15,24 34:16 35:2 36:23 37:5 38:5,21 39:13 42:17 43:23 45:14,16 46:11 48:4 52:14,22 53:24

**observations** 31:22

**observe** 20:4 57:1 58:24

**observed** 32:12

**obtain** 27:7

**obtained** 27:2,7

**occasions** 44:12

**occurred** 12:3 30:8 35:1

**October** 6:14,21 7:23 8:13,19 10:6 18:8,14,15 19:20 20:5 21:7, 11 56:7,12

**office** 6:14 8:18 10:9 11:3,21 14:24 17:23 27:15 32:11 36:10 37:10,15 40:17 41:8,10,16 54:21 57:2

**officer** 4:1,4,18,23 5:10 11:25 22:7,11 25:2,5 32:12 52:6 53:23 55:13,16,21 57:14 58:24 59:6,11, 15

**officers** 36:19 37:2 51:23 58:12

**official** 4:25 23:14 58:4

**open** 26:22

**opportunity** 8:7 19:14 29:9 38:11

**order** 36:19

**original** 21:19

**P**

**p.m.** 4:7 25:3,7 55:14,17 59:16

**packet** 51:7 52:24

**pages** 14:7 47:7 51:7

**Paiute-shoshone** 49:1

**paragraph** 42:3,4 43:4

**Parks** 5:8 6:23 7:24 10:11 11:18 12:5 13:18 14:5,8 15:6,19 16:8, 19 19:15 20:18,22 22:1,13 24:3 25:1,24 26:3,10 28:11,24 29:3, 11,22 30:13,19 31:24 32:15,24 34:16,19 35:2 36:23 37:5 38:5,21 39:13 42:17 43:23 45:14,16 46:11 47:6 48:4,11 50:14 52:14, 22 53:24 55:9,11 59:5,14

**part** 11:8 18:25 22:22 32:1,22 34:6,24 35:10 37:7 41:13,17 48:2

**partial** 7:5

**parties** 4:10

**partner** 49:21

**party** 5:4,5

**pass** 38:14 40:24

**passed** 39:18
**past** 12:10 25:14
**pen** 8:25
**penalty** 5:22
**people** 19:12 40:13 46:22
**people's** 51:10
**Perfect** 5:10
**performance** 41:13,17
**period** 11:10 36:13 49:22
**periods** 11:6
**perjury** 5:22
**permanently** 43:2,7 44:3
**person** 47:24
**personal** 39:8
**personally** 19:19 20:4,8 28:8 31:9 35:19 37:8 50:25 51:9 56:25 57:3
**personnel** 6:20 8:14 21:8,21 22:11,16,24 23:9,15 28:19 31:18 33:6 48:2 51:10,23 52:11
**persons** 27:3,5,13
**pertain** 25:16
**phone** 15:14,16
**piece** 7:16 45:12
**place** 23:17
**plaintiff** 5:7
**Pleasure** 5:14
**plenty** 57:23
**plural** 12:11
**point** 12:19 17:9 31:7 32:6 45:6
**pointed** 35:17,18
**police** 11:25 22:19 43:14 49:22 51:25 52:5 53:22
**polices** 48:25
**policy** 11:7,13 31:21 36:10 37:10,19 40:19 41:9,11 58:20
**position** 11:16
**positions** 53:7
**possibly** 17:10 19:2,7 31:14 36:13
**potential** 7:16 23:9 37:18 38:2 51:15 54:23
**Potentially** 53:16
**practically** 38:10
**practice** 12:13 22:6 36:10 48:20
**preparation** 27:4
**prepare** 58:17
**present** 5:2
**preservation** 37:11
**preserve** 36:20
**preserved** 37:18
**previous** 10:20,25 11:15 22:25 43:17 52:19
**previously** 6:9
**primary** 11:23
**prior** 4:12 13:1 33:18 39:1 40:6 47:7,12 49:5 51:23
**probation** 35:5 38:14
**probationary** 31:17 33:4 40:22
**procedure** 22:23
**proceeding** 5:5 6:2 37:12
**proceedings** 47:12
**process** 41:13 43:3 50:12,14 51:3
**produced** 56:8
**professional** 45:25 49:2 57:6
**prohibitive** 11:8
**prospect** 52:20 53:13
**Protective** 54:17
**provide** 7:21 21:14 28:15 58:17, 20
**provided** 6:6 8:5 22:10 28:17
**providing** 5:21 21:7 50:19 52:10
**pull** 24:7,17 36:15 46:25
**Pulled** 35:16,17
**pursuant** 4:11 37:19
**pursue** 37:24
**put** 7:5 23:17 44:12 52:24
**putting** 38:19 49:16

**Q**

**qualifications** 22:24
**qualify** 12:15
**question** 8:3,12 13:5 20:19 35:7 48:10 52:23 56:19 59:7
**questions** 5:21 10:3 59:5
**quick** 55:5
**quote** 35:16 37:22

**R**

**raise** 4:13
**raised** 40:2,7
**rationale** 12:9
**re-reviewed** 47:16
**read** 8:13 9:16 10:2 15:25 18:16 42:3,4 44:9 48:10
**ready** 10:3
**real** 39:17 58:9
**reason** 12:14 26:13 39:22 49:15
**reasonable** 47:23
**recall** 7:12 10:14 13:9,21 15:8, 10,16,22 17:4,6,13,15,16,17 21:5 22:2 27:4,10,18 28:1,3,6,12 29:4, 7,12 30:3,9,14 33:19,20 39:15 40:7 41:11 42:5,7,11,14,15,18, 22,24 43:25 44:16 45:20 46:12, 16 47:11 50:1,7,19 51:16 53:3 54:24 56:10,13,16,18 59:1
**recalling** 12:24
**receive** 22:6
**recent** 6:7
**recently** 9:15 41:23,25 47:15
**recess** 25:4 55:15
**recognize** 9:6,9 13:24 23:20 26:20 30:25 44:6 46:24 56:2
**recollection** 13:7
**recommendation** 43:17

**record** 4:2,25 13:15 23:16 24:25 25:3,6 36:13 51:13 55:14,17 59:13,16

**recorded** 4:8,9 30:12 34:25 59:7,12

**recording** 4:24 5:1 35:9

**records** 13:11 52:11

**refer** 21:23 22:8 26:23 45:24 48:19

**reference** 23:18

**references** 51:8

**referring** 33:3

**refute** 8:7 19:14 29:9

**rehirable** 29:21

**rejected** 53:6

**rejection** 43:15

**rejections** 52:19 53:11,12

**related** 11:9 20:9 28:9,16 37:18

**relationship** 49:3,6

**relied** 36:21

**remember** 11:10 17:17 36:7 37:21 50:6 54:12 55:2

**remind** 56:4

**Reno** 4:6 43:14 52:5

**repeat** 54:7

**report** 14:3 29:16,20,24 32:16 33:11 42:16 57:14

**reported** 16:6

**reporting** 32:20 35:13

**represent** 5:4

**reputation** 53:21

**request** 9:10 10:2,5,18 12:24 18:5,23,24 19:18 21:6 23:2,22 24:13 25:10 28:9 51:22 52:6

**requested** 51:9

**requests** 12:23 20:3 25:11

**require** 41:10

**required** 39:6 41:3

**resigned** 14:23 28:23 35:4

**resources** 28:20

**responded** 24:19

**response** 10:5,18 12:24 18:5,23 19:18 21:6 23:2 27:12

**responses** 9:7,10,24 23:22 25:10

**responsible** 38:16

**result** 51:12

**retain** 40:23

**retention** 36:10,16

**retired** 49:7

**revert** 33:16

**review** 19:19,24 20:8,10,13 22:22 25:10 26:24,25 33:16 35:25 37:8 41:7,10,13,17 47:20

**reviewed** 6:5,9 13:11 20:15,21 21:2 28:8 33:19 41:24 44:8 47:9,22 48:3

**reviewing** 33:17

**reviews** 40:18,21 41:3

**revocation** 12:1

**RFA** 16:25 24:10

**RFP** 24:10

**Road** 4:5

**rookie** 58:16

**RPD** 42:6 43:21

**rules** 58:25

**run** 51:5

**S**

**sabotage** 7:17 46:4,9

**salvage** 39:3

**Sandhill** 4:5

**Sarah** 17:2 18:1

**scope** 15:2 33:8

**screen** 9:22 20:25

**sec** 24:25

**section** 14:22

**security** 31:4

**seeking** 48:19

**sentencing** 43:14 50:11,21

**separation** 7:23 8:9 9:2 28:13 29:17,19 30:5 37:7

**September** 4:7

**Sergeant** 27:6,8 31:14

**sergeants** 40:9,13

**served** 55:1

**Service** 54:17

**set** 5:11 24:14 25:10,11

**shared** 23:3

**Shawn** 27:6,8

**sheriff** 10:21 11:7 14:24,25 15:14 17:1 32:11 49:1,11

**sheriff's** 6:14 8:18 10:9 11:2,21 22:19 32:11 36:10 37:10,15 40:17 41:8,9,16 54:21 57:2

**Sherry** 18:1

**shift** 34:1

**ship** 58:4

**shit** 7:17 45:12

**show** 4:11 8:12 9:5 55:20

**showing** 30:12

**shown** 25:17

**siding** 19:1

**similar** 58:2

**sir** 7:25 50:19 51:2

**situation** 23:12 39:19

**situations** 58:18

**Sixteen** 43:16

**size** 9:16 36:17

**slave** 58:4

**slow** 47:2

**solemnly** 4:14

**sort** 12:17

**speak** 13:16 17:19 42:12 49:13,24

**speaking** 13:7 15:22 17:6 27:18 42:8,11 54:13

**specific** 44:16

**specifically** 10:14 11:10 13:10 17:6,15,24 19:9 22:3 27:7,11 30:5 32:21 33:19 36:7 40:14 46:21 52:1,13,15 57:12 58:23 59:1

**speculate** 16:11

**speculation** 12:5 13:19 15:7 16:9,20 22:14 24:4 30:20 34:20 43:24 48:5

**spelling** 4:19

**spoke** 17:1,5 27:21 50:5

**spoken** 19:12

**Staats** 4:3

**staff** 8:18 27:15 33:11 40:12

**standard** 11:11 14:21 22:6

**Stark** 27:22

**start** 9:23 33:23 36:14

**Starting** 48:9,12

**state** 4:19 31:2 35:16 43:13 56:14,19

**stated** 14:21 18:6 45:19

**statement** 7:1,11 15:13 16:10 27:10 33:3 45:13 46:6

**statements** 6:21 7:18 16:6 19:11 42:15

**states** 4:3 6:19 7:15 8:11,17 14:13,17,20 15:13,25 16:14,25 25:7 29:20 42:2 43:1 44:10,21 46:2 48:17

**stating** 8:19 18:25 37:21 56:13

**statute** 51:22 52:2

**stay** 39:4

**stipulation** 4:10

**storing** 23:18

**subject** 5:22

**subsection** 14:17

**substance** 45:20

**substantial** 33:24 53:21

**sue** 38:7

**sued** 17:9

**suit** 45:5 54:11 55:1

**Suite** 4:6

**suits** 17:11

**summarizing** 18:6

**summary** 51:18,19

**Summer** 27:8

**Summers** 27:6 31:14

**superiors** 57:14

**supervisor** 32:16

**support** 36:22

**suppose** 39:3

**surveillance** 19:20,25 28:8

**system** 36:12

**T**

**T-R-O-T-T-E-R** 4:22

**Tad** 49:18,20 50:20

**talk** 15:9 51:9

**talked** 17:11 40:14 45:3

**talking** 13:9 17:15 28:12 29:4,12 30:3 45:25 46:12 50:1,7,14 58:23

**taser** 35:17

**telling** 10:6 17:18

**Ten** 31:3

**terminated** 6:12 18:15 21:12 28:22 34:24 44:13 56:20

**terminating** 18:12 28:10 29:10 33:14 35:10

**termination** 7:8 14:23 29:14 33:18 35:5 37:3

**test** 40:24

**testified** 27:16

**testifying** 5:23

**testimony** 4:14 6:1 10:12 29:23 35:3 43:24

**thing** 18:16

**things** 12:17,19,22 23:18 27:17 36:8

**Thompson** 27:10

**Thorndal** 5:8

**thought** 23:17 33:9

**time** 4:7 11:6,10 14:1 17:23 25:3,7 33:14 36:12,13 37:23 42:9 43:9 44:7 45:3,7 46:19 55:14,17 57:13 58:6 59:4,16

**timeline** 31:10

**times** 5:17 12:21 31:11 44:23 49:11

**title** 47:4

**titled** 14:10

**today** 6:6,7 8:23 44:7,9

**Today's** 4:6

**toilet** 34:2

**told** 7:7,15 28:21,22 29:7 37:2 44:11 45:11 46:3,8,14

**tolerate** 34:10

**top** 15:12 21:5 48:13 57:15

**Tracy** 17:2,5 44:15,17 45:21 46:2,14,17

**trained** 59:1

**training** 58:17,19,21,22

**transcript** 4:25

**treated** 57:11

**treatment** 15:2

**tribal** 48:25

**Tribe** 49:1

**Trotter** 4:8,11,13,20,22 5:9,14 8:3 9:6 13:25 14:25 15:14 17:1 23:20 25:9 26:21 28:4 30:25 41:22 44:6,11,12,22 46:24 55:19 56:2 59:4,12

**trouble** 20:22

**true** 6:17,25 7:23 8:4,15

**truth** 4:15,16 7:5 8:9 30:18,22

**turn** 23:19 28:2 30:24 44:5

**typed** 31:8

**typical** 48:20

**typically** 9:1 51:13

U

ultimately 38:16
unauthorized 15:1
uncooperative 31:5
understand 5:20,25 58:3
understanding 11:15
Unequivocally 7:19 45:17
unfavorable 43:17
United 4:2 25:6
unnecessarily 34:12
unprofessional 34:9 57:1
unsuitability 16:5
unsuitable 16:1,16
untrue 7:4
untruth 30:22
usable 23:15

V

Vegas 30:6,11,15 43:2
verify 30:22 31:9 37:1
version 17:8
video 4:8,9 5:1 20:11 35:22,25 36:11,12,21
videos 37:8
visual 4:24

W

walk 6:8
wanted 48:18
Washoe 49:8
watch 32:10
water 28:9 31:3 34:3
week 47:16
weighs 45:8
witnessed 33:10
wondering 33:6 38:10
word 55:3
work 4:4 39:12,14,15 41:16 43:16 49:7
worked 57:2
working 17:22 49:5
worry 47:3
worth 47:7
would've 7:14 10:15 17:25 28:22 33:20
writing 18:25 34:25 36:14
written 7:21 34:4
Wroat 27:9
wrote 31:16 33:22 36:22 37:2

Y

years 7:13 8:23 22:3 31:15 32:6 37:16 39:17 41:6 44:11 47:9 49:22
yell 34:3 56:22
young 58:6