# EXHIBIT 11

Excerpts from the Deposition of Captain Michael Matheson, taken January 7, 2021

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL ERWINE; | ) |
| Plaintiff, | ) |
| vs. | ) Case No.: |
| CHURCHILL COUNTY, a political | ) 3:18-cv-00461-RCJ-WGC |
| subdivision of the State of Nevada; | ) |
| CHURCHILL COUNTY SHERIFF BEJAMIN | ) |
| TROTTER; and DOES 1-10 inclusive; | ) |
| Defendants. | ) |
| ______________________________________ | ) |

RECORDED DEPOSITION OF CAP. MICHAEL MATHESON

Taken on JANUARY 7, 2021

At 2:28 p.m.

RECORDED VIA VIDEO CONFERENCE

UNDER STIPULATION BY ALL PARTIES

Page 2

APPEARANCES:

For the Plaintiff: LUKE BUSBY, ESQ.
316 California Avenue
Reno, Nevada 89509

For the Defendants: KATHERINE F. PARKS, ESQ.
THORNDAL ARMSTRONG
6950 S. McCarran Blvd. Suite B
Reno, Nevada 89509

Page 3

INDEX


| Witness | Direct | Cross | Redirect |
|---|---|---|---|
| MR. BUSBY | 5 | | |
| MRS. PARKS | | 40 | |


EXHIBITS


| Number | Description | Page |
|---|---|---|
| EXHIBIT 1 | Employee Evaluation Report ERW0029 | 23 |
| EXHIBIT 3 | Letter of Seperation ERW0052 | 33 |
| EXHIBIT 4 | Memorandum ERW0053 | 30 |
| EXHIBIT 7 | Administrstion ERW0093 | 25 |
| EXHIBIT 8 | DECLARATION OF JIMMY THOMAS | 34 |

MS. FLETCHER: We are now on the record in the matter of Michael Erwine v. Churchill County, et al. My name is Sally Fletcher. I'm the videographer and deposition officer. I work for E-Depositions, LLC, located at 730 Sandhill Road, Suite 105, Reno, Nevada 89521. Today's date is January 7, 2021, and the time is 2:28 p.m. This is a video recorded deposition of Captain Michael Matheson, and is being recorded via video conference under stipulation by all parties. Captain Matheson, could you please raise your right hand? Do you solemnly affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. MATHESON: I do.

MS. FLETCHER: Thank you. Can you please state your full name with spelling.

MR. MATHESON: It's Michael Charles Matheson. Last name is M-A-T-H-E-S-O-N.

MS. FLETCHER: Thank you. The electronic audio and visual recording of this deposition will be the official record. A transcript will be created as an aid to the audio-video recording by E-Depositions, LLC. Would all attorneys present, please identify themselves, their firm, anybody with them, and the party they represent beginning with the party noticing this proceeding.

MR. BUSBY: Luke Busby appearing for plaintiff, Michael Erwine, who is also joining us via video.

MS. PARKS: Katherine Parks on behalf of the defendants. I'm here in my office with this witness.

MS. FLETCHER: Thank you. You may proceed.

DIRECT EXAMINATION

BY: Mr. Busby

**Q: Good afternoon, Captain Matheson.**

A: Good afternoon.

**Q: Pleasure to meet you.**

A: You too, sir.

**Q: So once again, my name is Luke Busby. I'm Mike Erwine's attorney. I'll be taking your deposition today, and I just want to start off by explaining the deposition process. And have you been deposed before?**

A: It's been many years, sir.

**Q: Okay. Do you know how many years approximately?**

A: Probably close to 30 years.

MR. BUSBY: Oh, wow. Okay. Well, I'll just explain the basic ground rules. So the court reporter is going to record your answers to my questions today. And your answers are given under oath, subject to penalty of perjury, the same as if you were testifying in a courtroom. Do you understand that?

MR. MATHESON: Yes.

MR. BUSBY: Okay. Do you understand your testimony may be used later in this proceeding at -- at the trial, for example, as evidence?

MR. MATHESON: Yes.

MR. BUSBY: Okay. If at any time during the deposition if you don't understand one of my questions in whole or part, just let me know. And I'll be glad to rephrase the question. But if you answer one of my questions without asking me to repeat it, I'll take it to mean that you understood what I meant; fair enough?

MR. MATHESON: Fair enough.

MR. BUSBY: Okay. And there will be times in the deposition where I'll be in the middle of one of my questions, and you want to jump in and provide an answer. I just ask that you let me finish my question before you start responding for clarity of the record. And I'll do my best to do the same for you; sound fair?

MR. MATHESON: Fair enough.

**Q: Okay. Where do you currently live, sir?**

A: I live in Fallon, Nevada.

**Q: Okay. And how long have you lived in Fallon?**

A: Since 1993.

**Q: Okay. And what do you do for a living, sir?**

A: I work at Renown Regional Health in the security department.

**Q: Oh, okay. And how long have you been at Renown?**

A: I have been there since March of 2018.

**Q: Okay. And what did you do before you worked at**

**Renown?**

A: I was a captain with the Churchill County Sheriff's Office.

**Q: Okay. And how long were you with Churchill County?**

A: I began there in April of 2013, and I left there in January of 2017.

**Q: Okay. And what did you do before you worked at Churchill County?**

A: I was a trooper with the Nevada Highway Patrol.

**Q: Oh, okay. And so you -- you quit that in 2013. When did you start?**

A: When did I start with the highway patrol?

**Q: Yes.**

A: 1991.

**Q: Okay. Okay. Did you attend college, sir?**

A: Uh, some college.

**Q: Okay. Do you have a degree?**

A: I do not.

**Q: Okay. What college did you attend?**

A: I had one quarter at what was then Southern Utah State College. I had, uh, some time at the University of Nevada in Reno. I -- I had a -- a course at Western Nevada community college and a course at Truckee Meadows Community College.

MR. BUSBY: Okay. I'm just trying to get you to pop up on my video. What I'm getting is the screen. If you'd

just give me a moment so I could see you. All right. That's better.

**Q: Okay. Do you have any specialized certifications or qualifications as a police officer?**

A: I was POST certified in the state of Nevada.

**Q: Okay. When did you receive that certification?**

A: I received the initial certification in 1988.

**Q: Okay. All right. Can you tell me essentially what your duties were at the Churchill County Sheriff's Office when you worked there?**

A: I was the support bureau captain. My responsibilities included that I had to have the dispatch center, the detention center of the jail, and the civil, uh, section under my command.

**Q: Okay. And when you mean "the jail," what did you mean? That was -- you're captain, so you -- did you supervise the sergeants who actually conducted the day-to-day operations at the jail?**

A: Yes, sir.

**Q: Okay. And do you remember my client, Mr. Erwine?**

A: I do.

**Q: Okay. Do you remember the approximate time period that he worked at the Churchill County Sheriff's Office?**

A: Uh, I don't know he -- the -- the start date. Uh --

Page 9

**Q: Okay.**
A: --- but yes, during my tenure there, he was -- he was an employee there.
**Q: Okay. And you were there the entire time he was there, right?**
A: Yes.
**Q: Okay. Do you remember my client?**
A: Yes.
**Q: Okay. What do you remember about him?**
A: Um, I remember that I sat on his interview for hiring.
**Q: Okay.**
A: I remember having a -- a meeting with him in my office at some point. And I remember him turning his, uh, department-issued equipment into me.
**Q: Okay. And that was after he was terminated by Sheriff Trotter?**
A: That's correct.
**Q: Okay. All right. So you were part of the team that interviewed Mr. Erwine; is that right?**
A: Yes.
**Q: Okay. Do you recall the specifics of that interview, what was discussed, et cetera?**
A: I do not.
**Q: Okay. But at the end of the day -- oh, I am sorry,**

**back in. Who else was on the committee that interviewed Mr. Erwine?**

A: I -- I recall myself and Sheriff Trotter.

**Q: Sheriff Trotter? Okay. Just the two of you?**

A: To the best of my memory, yes, sir.

**Q: Okay. And at the end of the day, you obviously determined he was qualified, and he was offered a job?**

A: That's correct.

**Q: Okay. Did you conduct background investigations for Churchill County when you worked there?**

A: I did not do background investigations for the deputies who were hired, uh, in detention.

**Q: Do you recall who did?**

A: I do not.

**Q: Okay. Do you think Sheriff Trotter may have conducted those investigations?**

A: I -- I don't know who -- who did the background investigation for -- for Mike.

**Q: Oh, okay. But did you do background investigations otherwise?**

A: I did background investigations for dispatchers.

**Q: Okay. Did you do background investigations when you were at the highway patrol?**

A: I did.

**Q: Oh, okay. Can you understand or can you explain to**

Page 11

**me the basic process you go through when conducting the background investigation on an applicant for a law enforcement job?**

A: Uh, when --

MS. PARKS: Obj- -- objection. Vague and ambiguous. I don't know whether you mean at Nevada Highway Patrol or while he was with Churchill County Sheriff's Office?

MR. BUSBY: Either one.

A: When I conducted background investigations at the highway patrol, I would receive a packet on a --

MS. PARKS: You might slow -- slow down just a bit.

MR. MATHESON: Okay. I'm sorry.

A: I would, uh, receive a packet on a prospective, uh, candidate. Um, I would -- most of the, uh, background investigation consisted of contacting, uh, individuals, uh, businesses, who they've listed on their personal history statement to try and --

**Q: Okay.**

A: -- determine the, uh -- whether the candidate was a -- a -- a -- would be a good match for the Nevada Highway Patrol.

**Q: Okay. There are certain moral eth- -- ethical standards they have to meet in order to be hired as a peace officer, right?**

A: Yes.

Page 12

**Q: Okay. And do you contact previous employers as part of that --**

A: Yes.

**Q: -- process?**

A: Yes, sir.

**Q: Would that include previous law enforcement employers for an individual applicant?**

A: Yes.

**Q: Okay. Did you request employee files or other documentation from other agencies for applicants who had previously worked in law enforcement?**

A: Yes.

**Q: Okay. And I assume the contents of those employee files probably -- I mean, can you describe how much weight they would carry in your decision about whether or not to hire somebody in a law enforcement position?**

A: I'm sorry, could you repeat the question, sir?

**Q: I'm just asking how much weight you would assign to the contents of someone's employee file from a previous law enforcement job in considering them for another law enforcement job, say, in Churchill County?**

MS. PARKS: Objection. Improper hypothetical for this witness. Go ahead.

MR. BUSBY: And Captain Matheson, just from time to time your counsel may object to my questions. And unless she

directs you not to answer, just go ahead. And just one more ground rule before we proceed. I'm not asking you for -- for guesses as to my questions, but I will ask you for estimates. And the example that lawyers always use in this context is, you know, if I asked you how long my kitchen table was, you'd be guessing because I've never seen my kitchen table. But if I ask you, you know, how long the kitchen table -- or the table you're sitting at is, you'd be able to approximate that answer; is that fair?

MR. MATHESON: Okay.

**Q: Okay. So -- but the question that I asked was: How much weight you would assign to the contents of a personnel file from the previous law enforcement agency when evaluating a prospect for a current law enforcement position?**

A: I -- I would -- it -- it would be -- it would be weighted. I would not be the final, uh, decision-maker on what the -- what the weight of that information would be. I got my -- my job as a background investigator just to collect the available information.

MS. PARKS: Okay.

**Q: Oh, okay.**

MS. PARKS: Just one second. The court reporter is taking down everything that you say, Mike. And you're just -- at least for me, you're talking at the speed of light. So I'm sure she would jump in, but let's make sure that you speak slowly

enough that we get a good transcript.

MR. MATHESON: Okay. Okay.

MS. FLETCHER: And also just if you could speak a little bit louder, too, that would help. Thank you.

**Q: Okay. So as a background investigator, you're gathering facts. You're not so making decisions. Is that what you're saying? Okay. And now, I can't hear you at all.**

MR. BUSBY: Sally, I think we lost the audio feed.

MS. FLETCHER: The audio? Okay. Let me check.

MR. BUSBY: Mike, we can see you wave, but we can't hear you.

MS. FLETCHER: Yeah. It shows us connected, but I think -- I think we lost it. Maybe if you just do --

MR. BUSBY: I think the phone hung up.

MS. FLETCHER: Oh.

MR. BUSBY: Because it doesn't appear to be --

MS. FLETCHER: It shows it is still connected.

MR. BUSBY: Does it? Okay.

MS. FLETCHER: Yeah. I'm going to just remove it. Maybe they can connect just with the volume of their computer like they did last time.

MR. BUSBY: Why don't we go off the record for a second 'til we get this --

MS. FLETCHER: Okay.

MR. BUSBY: -- fixed? Yeah.

MS. FLETCHER: We're going off the record. The time is 2:41 p.m.

MS. FLETCHER: We are back on the record, and the time is 2:44 p.m.

**Q: All right. Captain Matheson, can you hear me now?**

A: Yes, sir.

**Q: Okay. Great. So where we left off, you know, we were talking about background investigations. You're experienced with that. And I asked you how much weight would be assigned to the contents of the -- of the file of the previous job. And you said the background investigation guy just gathers the information and turns it over to the decision-maker, who then decides what -- what should happen next, right?**

A: That's correct.

**Q: Okay. So in your experience, when someone's applying for a law enforcement job when they -- when they previously worked in law enforcement, would you request copies of the files from the places they previously worked?**

MS. PARKS: Objection. Improper hypothetical. This is a fact witness. He did not do Mr. Erwine's background, so objection. Improper hypothetical. Go ahead.

**Q: Go ahead and answer.**

A: I -- I would request to look at -- look at their background -- of their, uh, employee file, yes.

**Q: Okay. Because, I mean, common sense, right? You**

**want to know what -- what happened at the previous job, right?**
A: Yes, sir.
**Q: Okay. Right.**
MS. PARKS: Same objection.
**Q: Okay. So how many background investigations have you conducted overall? Can you estimate?**
A: I -- I don't have a hard number.
**Q: Okay.**
A: Uh, several.
**Q: Okay. Under 10? More than 10?**
A: Probably at least 10.
**Q: Okay. Under 50?**
A: Yes.
**Q: Do you know how many you did at Churchill County Sheriff's Office?**
A: I think I recall doing less than five.
**Q: Okay. All right. So -- what -- do you recall what your day-to-day interactions were with Mr. Erwine, if any, that you had after you interviewed him when he was hired at the sheriff's office?**
A: I don't recall any particular interaction other than what I had, uh, mentioned before.
**Q: Okay. So you mentioned an interview, a meeting, and then receiving his equipment after he was terminated, right?**
A: Yes, sir.

**Q: Okay. Let's just briefly discuss those three incidences [sic]. So the interview, what do you remember about that?**

A: I don't remember anything.

**Q: Okay. How many people did you interview on a typical year when you worked at Churchill County Sheriff's Office?**

A: We conducted several interviews. Uh --

**Q: Okay. And --**

A: -- I don't have an exact number.

**Q: Okay. But these are competitive jobs. Do you think that's a fair statement?**

A: Yes, I believe it is a fair statement.

**Q: Okay. So they pay well, they have good benefits, so you get a lot of applicants for -- for positions you have, right?**

MS. PARKS: Objection. Vague and ambiguous with respect to "a lot of applicants."

**Q: Go ahead.**

A: We -- we -- we did get a number of applicants.

**Q: Okay. Can you estimate how many applicants you would get for a typical open position?**

A: I can't.

**Q: Okay. Ballpark?**

A: 10 --

**Q: Okay.**

A: -- 15, perhaps.

**Q: All right. And how many of th- -- those applicants would you actually interview for a job?**

A: Uh, al- -- all of the ones who qualified up to that point, whatever that was -- whoever was asked to go to that stage of, uh, the employment process.

**Q: Okay. All right. But at the end of the day, do you -- you don't recall anything specifically about that meeting with Mr. Erwine, right?**

A: I do not.

**Q: Okay. Do you recall discussing whether or not to hire Mr. Erwine with Sheriff Trotter, for example?**

A: I do not.

**Q: Okay. But it was ultimately Sheriff Trotter's decision as to who to hire and who not to hire at the Churchill County Sheriff's Office; is that right?**

A: He -- he was the final say, yes.

**Q: Okay. All right. You mentioned you also had a meeting with Mr. Erwine at some point in time during his employment with Churchill County?**

A: Yes.

**Q: Okay. Do you recall when that was?**

A: Uh, uh, it was in August of 2016 is what I believe.

**Q: Okay. And what was the substance of that meeting?**

A: Uh, Deputy Erwine had requested the meeting in regard to some, uh, discipline that he had received the previous day from his sergeant.

**Q: Okay. Do you recall which sergeant it was?**

A: Sergeant Summers, I believe.

**Q: Okay. Do you recall what the discipline was?**

A: I believe it was, uh, like, a verbal -- a document of verbal, uh, counsel in regard to, uh, failure to conduct, uh, facility-wide detention checks.

**Q: Okay. And do you recall the substance of the conversation you had with Mr. Erwine about it?**

A: Uh, the -- the -- I believe the substance was that he was -- he was concerned that, uh -- that he had received the -- the discipline, and that, uh, documentation had -- had started. He was concerned for his employment there because the discipline had been received, and, uh, he was concerned for his employment there.

**Q: Okay. So he was concerned about the -- the discipline he'd received from Sergeant Summers as and how it affects his ability to maintain his employment in Churchill County?**

A: Yes.

**Q: Okay. Did he ever -- did you ever delve into whether the discipline was justified or not?**

A: I -- the discipline had been administered by his

sergeant. Uh, the -- as I recall, Deputy Irwine did not deny the -- the, uh -- the substance of the -- of the discipline.

**Q: Okay. Okay. Did you make a record of this meeting?**

A: I did.

**Q: Okay. What -- what sort of record did you produce?**

A: I did a supervisor's note within the -- the Spillman program that the sheriff's office utilized.

**Q: Okay. What's the Spillman program?**

A: Uh, it's a program that they use on the computers.

**Q: Okay. Okay. Do you recall any -- any restrictive measures that were taken by Sergeant Summers against Mr. Erwine as a result of the discipline in 2016, or August 2016?**

A: He had recommended that, uh, Deputy Erwine not to be allowed to, uh, participate in ride-along, uh, or accompany patrol officers until he had completed his one-year, uh, completion of probation.

**Q: Okay. So -- so Mr. Erwine was doing ride-alongs with other officers?**

A: That's what I gathered from the information at that time, yes.

**Q: Okay. Was he doing those ride-alongs on his shift?**

A: I do not know the circumstances of the ride-alongs.

**Q: Okay. So, it seems unlikely that he'd be doing those on his shift because he's working as a detention deputy,**

**right?**

A: Uh, very unlikely, yes.

**Q: Okay. So did you consider whether this was an appropriate action against Mr. Erwine that Mr. -- Sergeant Summers was taking in response to Mr. Erwine's concerns that he voiced to you?**

A: I -- I did consider it appropriate, yes.

**Q: Okay. Why would it be appropriate to prevent him from doing ride-along after shift for --**

A: I --

**Q: -- failure to complete a check in?**

A: Well, I consider it appropriate because he was a probationary employee. He was new to his position in the jail, and, uh, I agreed that it was necessary that he learned that position before maybe setting his sights on a -- a different division or a different function.

**Q: Okay. Why would a deputy off shift on their own time go on ride-along with people who are out doing patrols?**

A: Uh, out of an interest in law enforcement, uh, interest in pursuing that avenue of his career.

**Q: Okay. Would that in any way interfere with his ability to conduct his regular duties as a detention deputy in the jail?**

A: Uh, I -- I guess that would depend on the individual, how -- how distracting that was to them.

Page 22

**Q: Okay. Are you aware of any allegations of misconduct against Sergeant Summers that were leveled by any detention deputy at Churchill County Sheriff's Office at any time?**

A: I'm sorry. Can you repeat the question, sir?

**Q: Are you aware of any allegations of misconduct on Sergeant Summers' part by any deputy, detention deputy who worked at Churchill County Sheriff's Office at any time?**

MS. PARKS: Do you understand the question? On Sergeant Summers' part? I'm not sure I understand the question either, Luke. If you're asking about complaints about Sergeant Summers, I -- it's confusing to me.

**Q: I'm asking: Did any detention deputy ever complain about Sergeant Summers when you worked at the Churchill County Sheriff's Office?**

MS. PARKS: Okay.

A: I -- I know that deputy Erwine complained about him.

**Q: Okay. When?**

A: Well, I am only aware of it as a result of these proceedings.

**Q: Okay. So were you aware in August 2016? Did Deputy Erwine complain about Sergeant Summers' conduct at that time?**

A: At that meeting that was in my office, Deputy

Page 23

Erwine may not have been happy with Sergeant Summers as his supervisor.

**Q: Okay. Was he transferred to -- to another supervisor at any point, to your knowledge?**

A: I believe he was transferred --

**Q: Okay.**

A: -- afterwards.

**Q: To who?**

A: To Sergeant Jesse Nuckolls, I believe.

**Q: And do you know when that occurred?**

A: I do not.

**Q: Okay. But was it after your meeting with Mr. Erwine in August of 2016?**

A: Yes.

**Q: Okay. All right. So I'd like to show you an exhibit which has been marked as Exhibit No. 1 to the deposition.**

MS. PARKS: It's right here.

**Q: If you can just look this over briefly. And when you finish, let me know. And then I'm going to ask you some questions about it.**

A: I have reviewed the document, sir.

**Q: Okay. Have you seen this document before?**

A: I have.

**Q: Okay. When?**

A: I initialed it on "March 10th, 2016."

**Q: Okay. And what is this document?**

A: It is the Churchill County Sheriff's Office employee evaluation report for Deputy Mike Erwine.

**Q: Okay. When is it dated?**

A: Uh, the rating period for this was "December 9th, 2015 to March 9th, 2016."

**Q: Okay. So this is his three-month initial evaluation, right?**

A: Yes.

**Q: Okay.**

A: Yes.

**Q: Did you meet -- did you meet with Mr. Erwine regarding this evaluation report?**

A: Not that I recall.

**Q: Okay. Okay. Do you see on page 3 there, right above the signature line where it says, "I certify this report has been discussed with me. I understand my signature does not necessarily indicate agreements."?**

A: Yes.

**Q: Okay. So I -- just to be clear, you never discussed this report with Mr. Erwine. You just read it and signed it?**

A: I don't recall discussing it with him, no.

**Q: Okay. Fair enough. Okay. And he's rated -- he's rated fair. Is that the --**

A: Yeah.

**Q: -- overall rating? Okay. Okay. All right. Are you familiar with the evaluation schedule for probationary employees that got jobs at Churchill County?**

A: I don't recall that now, no.

**Q: Okay. Let's take a look at what's marked as Exhibit No. 7. And just to speed things up a little bit, I'll represent to you that this is excerpts from the Churchill County Sheriff's Office administration policy. Its pages is 1 and 9, and I just would like to focus your attention on policy at 1.2 on page 9, "performance evaluations." Do you see that?**

A: Yes, sir.

**Q: Okay. Do you see where it says, "Probationary employees shall be evaluated in the 3rd and 9th month of their probation?**

A: Yes.

**Q: Okay. So do you know who would have conducted the evaluation of Mr. Erwine after nine months of employment in Churchill County Sheriff's Office?**

A: I don't.

**Q: Okay. Would it have been one of the sergeants working in the detention center?**

MS. PARKS: Objection. Asked and answered.

A: I don't know.

**Q: Okay. Did you rec- -- do you recall ever seeing**

**and a nine-month evaluation of Mr. Erwine?**

A: I do not.

**Q: Okay. Can you tell me everything you did to get ready for this deposition today?**

A: I spoke with Ms. Parks, uh --

**Q: Okay.**

A: -- on the telephone.

**Q: Just -- just to be clear, I don't want to -- I don't want to know anything that you and Ms. Parks talked about. Did you --**

A: Okay.

**Q: Okay. But did you speak to anybody else about your deposition?**

A: No, sir.

**Q: Okay. Have you spoken with Sheriff Trotter?**

A: I have not.

**Q: Okay. You never called him?**

A: I have not spoken to Sheriff Trotter since I left the sheriff's office.

**Q: Oh, okay. Okay. That was some time ago, a couple years.You're aware that he's become a Justice of Peace now, right?**

A: I am aware, yes.

**Q: Okay. All right. So as part of your duties as a captain with the Churchill County Sheriff's Office, were you in**

Page 27

**charge of internal investigations?**

A: I -- I conducted internal investigations, yes, sir.

**Q: Okay. Was that exclusively your -- your job at the sheriff's office, or was there anybody else who did that same kind of work?**

A: No, sir. It was not my exclusive job.

**Q: Okay. Who else did it at the sheriff's office?**

A: Uh, the -- the captain -- I was the captain of the -- of the support division, so I would have done them for my division.

**Q: Okay. Would you conduct internal investigations, these things that happened at the jail?**

A: Yes.

**Q: Okay. I'm going to ask you about a couple of things we alleged in our complaint. So do you know who Lacy Haberstat (phoentic) is?**

A: I believe she was an inmate at the jail at one point.

**Q: Okay. Did you ever conduct an investigation in the allegations of misconduct against a deputy involving Ms. Haberstat?**

A: Yes.

**Q: Okay. Well, do you recall what those allegations were?**

A: I believe the allegation was that, uh, she claimed

that a deputy had observed her while she was in the bathroom at
Banner Community Hospital in Fallon.

**Q: Okay. Did you create a file for that investigation?**

A: I believe I did, yes.

**Q: Okay. And where at the Churchill County Sheriff's Office would that file be located?**

A: I do not know.

**Q: Okay. Where -- where was it when you worked there?**

A: I don't know how I -- how I completed the document if I completed the document. Whether it was, uh -- I couldn't -- I couldn't -- I could make a -- an assumption of where I did it.

**Q: Okay. To the best of your recollection, you know, where -- where -- where was that file the last time you saw it at Churchill County Sheriff's Office?**

A: I -- I don't -- I don't have a recollection of where I saw it, sir.

**Q: Okay. But you know a file existed at some point --**

A: To the best --

**Q: [INAUDIBLE].**

A: -- of my memory, I -- I -- I documented the -- the allegation, yes.

**Q: Okay. Would it -- would it have been in your files in your office, or -- ?**

A: My -- my -- I believe it was probably a Spillman

document much the same as that I completed for Deputy Erwine's meeting with me.
**Q: Okay. Would it have been in the Spillman program?**
A: I -- I would believe so if I -- if I completed it there, yes.
**Q: Okay. And what did you do with the investigatory file when you completed your investigation?**
A: It would just remain in the system. I -- I -- I didn't do anything with it.
**Q: Okay. Would you refer the investigatory documents to anybody to review them? Any- -- anything like that?**
A: Um, more than likely, I would refer it to the sheriff.
**Q: Okay.**
A: She was my direct --
**Q: Because you're doing the investigation so somebody could see it, right? Presumably?**
A: For document- -- to -- so -- so that it would be documented, yes, sir.
**Q: Okay. All right. So do you remember what the outcome of your investigation of the Habertat incident was?**
A: I don't recall any -- I don't recall finding substantial evidence to corroborate her claim.
**Q: Okay. Was there any disciplinary action that was taken against any deputy at the department as a result of your**

**investigation?**

A: I don't recall -- I don't recall any disciplinary action.

**Q: So you don't recall whether any disciplinary action was taken against Deputy Keller as a result of what happened with Lacy Haberstat?**

A: I do not recall. No, sir.

**Q: Okay. You don't -- you don't recall, or -- I mean -- I just want to make sure I'm clear. You don't remember, or you're saying it didn't happen?**

A: I don't believe there was any disciplinary action, but I -- I don't recall.

**Q: Okay. Fair enough.**

A: For sure.

**Q: All right. Do you remember an incident at the facility involving Andrew Beaulieu?**

A: I -- I'm sorry, the name, sir?

**Q: Andrew Beaulieu.**

A: The -- the name doesn't sound familiar to me, no.

**Q: Okay. Can you take a look at what's been marked as Exhibit No. 4? Okay. This one is pretty long, but I'm going to -- please take a moment to review it. And when you're ready to answer some questions about it, let me know. Please let me know, thanks.**

MS. PARKS: I'm going to step out just for a

second for some Kleenex while this is being reviewed.

MR. BUSBY: Okay.

A: I have reviewed that document, sir.

**Q: Okay. Before today, have you -- have you seen that document?**

A: I don't recall seeing this document, no.

**Q: Okay. It's dated "October 10, 2016." Is it not?**

A: It's dated "October 10th, 2016."

**Q: Okay. Did you review the allegations or the facts and circumstances described in Exhibit 4 regarding Mr. Beaulieu?**

A: I did not.

**Q: Okay. Did you see on page 2 the description of what happened with Mr. Beaulieu?**

A: Yes.

**Q: Okay. Do you see the bullet points under "items of concern" on page 2?**

A: Yes, sir.

**Q: Okay. Sorry. I'm not trying to be opaque, but I'm -- it indicates in that last bullet point that an investigation would be conducted into what happened to Mr. Beaulieu, right?**

A: The final bullet point?

**Q: Yes.**

A: Referring to Deputy Erwine's investigation?

**Q: No. Do -- did you -- the last sentence, it says, "This will be investigated further and separately from this**

Page 32

**topic." right?**

A: Yes, sir. I see that.

**Q: Okay. And then that -- this is authored by Sheriff Trotter, at least appears to be ush- -- authored by Sheriff Trotter; is that correct?**

A: Yes, sir.

**Q: Okay. So did you ever conduct an investigation of what happened to Mr. Beaulieu at the jail?**

A: I -- I did not.

**Q: Okay. All right. Did you have a -- a -- anormal bookkeeping system for lack of a better term for what you would do with internal investigation files when they were, you know, being worked on or completed?**

A: I'm -- I'm sorry. I don't -- I don't understand the question.

**Q: Okay. When you were working at the Churchill County Sheriff's Office, where did you keep your internal investigatory files?**

A: The personnel files were located in the -- in the sheriff's -- in a locked, uh, cabinet in the sheriff's -- in the sheriff's office.

**Q: Okay. Would internal investigation files be kept in that same place?**

A: As part of the personnel file, yes.

**Q: Okay. All right. Did you review the statements in**

**Exhibit 4 regarding an incident involving Matthew Maes and Mr. Erwine?**

A: I -- I have read them in this document, yes.

**Q: Okay. Did you investigate the Maes incident?**

A: I did not.

**Q: Okay. All right. So I want to talk for a minute about the circumstances surrounding Mr. Erwine's leaving Churchill County. Can you take a look at what's marked as Exhibit 3?**

A: Yes, sir.

**Q: Okay. Do you recognize this document?**

A: Uh, it's identified as a letter of separation.

**Q: Okay. Is that your signature on this document?**

A: It is.

**Q: Okay. Do you recall signing this?**

A: I do not.

**Q: Oh, okay.**

A: I -- but I --

**Q: I know realize just as a practical matter, I'm asking you things about -- about things that happened four years ago.**

A: Yes.

**Q: So, you know, I understand that you're not going to remember everything. But were you there when Mr. Erwine was fired?**

A: This is absolutely my signature on this document.

**Q: Okay. Do you remember -- so do you remember being in the room when that happened?**

A: I -- I do not.

**Q: Okay. You said you remembered Mr. Erwine picking up his equipment from the jail, is that right?**

A: Delivering it to me, yes.

**Q: Okay. Do you recall -- well, did you guys talk about anything at that time?**

A: I -- not that I recall, no. I don't recall any particular conversation.

**Q: With him?**

A: With him, yes.

**Q: Mr. Erwine? Okay. Do you recall any conversations about Mr. Erwine when you worked at the Churchill County Sheriff's Office?**

A: I -- I don't.

**Q: Did you ever hear anyone at the Churchill County Sheriff's Office refer to Mr. Erwine as a rat?**

A: I'm sorry, refer to him as a what, sir?

**Q: As a rat?**

A: No.

**Q: Okay. All right. I'd like you to take a look at what's been marked as Exhibit 8. And when you're finished reviewing, let me know.**

A: I have read the document, sir.

**Q: Okay. Do you know who Jimmy Thomas is?**

A: I do not.

**Q: Okay. Have you ever heard of these allegations made by Mr. Thomas against Mr. Summers before today?**

A: Uh, prior to these proceedings, no.

**Q: Okay. Do you know who Sammy Davis is?**

A: Sammy Davis?

**Q: Yeah.**

A: Not the performer?

**Q: Oh, no.**

A: No, I do not.

**Q: Okay. Do you know who Jessica Zamora is?**

A: Yes, I do.

**Q: Okay. Who is Jessica Zamora?**

A: Uh, she was a police officer with the Fallon Police Department, I believe.

**Q: Okay. Do you have any knowledge of a complaint made by Officer Zamora about how Sergeant Summers treated Mr. Davis?**

A: I -- could you -- could you elaborate more on the complaint, sir?

**Q: That she was -- well, I can ask you what you're aware of. I can't tell you --**

A: Uh --

Page 36

**Q: -- anything --**

A: -- I -- I -- I do --

**Q: -- but --**

A: -- I do --

**Q: Basically, what I need to know is whether you ever conducted an investigation of Sergeant Summers' treatment of Mr. Davis as a result of a complaint that was made by Ms. Zamora against Mr. Summers?**

A: I -- I don't recall Mr. Davis, but I do recall a -- a complaint that, uh, came to my attention that involved Officer Zamora.

**Q: Okay.**

A: And -- and Sergeant Summers.

**Q: Okay. Okay. Do -- what do you recall about the substance of that complaint?**

A: I recall that, uh, I was requested to go to speak with Captain, uh, Ronald Wenger at the Fallon Police Department. Uh, it had come to his attention that Officer Zamora had had, uh, an issue with a prisoner that she had transported. And I recalled it had something to do, uh, with a loud noise, as I recall. Uh, at -- at the time of the -- the transfer from her patrol unit to the detention facility, there was a loud noise. That's what --

**Q: Okay.**

A: -- that's what --

Page 37

**Q: Do you --**

A: -- that's what --

**Q: -- know what -- okay. Do you know what caused the loud noise?**

A: I do not recall what caused the loud noise.

**Q: Do you recall whether there was an allegation that the noise was a result of Sergeant Summers striking Mr. Davis?**

A: I -- I recall that I conducted an investigation. I don't -- I don't recall what the -- what the -- what the alle- -- the -- the precise allegation was.

**Q: Okay. All right. So did you -- you conducted an investigation of this incident; is that right?**

A: Yes.

**Q: Okay. Did you create a -- a file where you documented what you were finding in your investigation?**

A: Yes. I believe that I would have.

**Q: Okay. Did you interview Mr. Erwine about that incident?**

A: Not that I recall.

**Q: Okay. But if you had interviewed him, would you have created a -- some notation or documentation of that interview?**

A: I believe I would've documented the -- the interview, yes, sir.

**Q: Okay. Were you ever made aware of any complaint**

**made against surrounding the incident involving Mr. Beaulieu by Zachary White, an inmate, at the jail?**

A: No.

**Q: Okay. And so you wouldn't be in a position to be reviewing kites from inmates --**

A: No, sir.

**Q: -- that were submitted? Oh, okay. That was -- that was the sergeant at the -- at the jail facility who deals with those on day-to-day basis, right?**

A: Yes, sir.

**Q: Okay. Okay. So what's your understanding of why Mr. Erwine got fired?**

A: I recall that he was a probationary employee, and he was not performing to standard. That's what I recall.

**Q: Okay. Do you recall him ever receiving notice of a hearing where he could explain, you know, his actions or provide a defense as to what he was being accused of?**

A: I do not recall that. No, sir.

**Q: Okay. So I showed you Exhibit 4, the memorandum, and you indicated that that is the first time you'd seen that document, right?**

A: Yes.

**Q: Okay. All right. So you don't recall whether this document was presented to Mr. Erwine at the meeting or at the time the letter of separation was fired -- was executed to Mr.**

**Erwine, right?**

MS. PARKS: Luke, you're -- you're fading in and out, and can't hear you.

MR. BUSBY: Oh, I'm sorry.

**Q: Captain Matheson, did you hear the question?**

A: The question was whether if I had knowledge that Deputy Erwine had seen this prior to termination; is that correct?

**Q: Yeah.**

A: I -- I don't know. I don't recall.

**Q: Okay. All right. And so do you recall when Mr. Erwine turned in his equipment to you at the Churchill County Sheriff's Office whether he tried to ask, you know, "What happened, why am I being fired?"**

A: I don't -- I don't recall.

**Q: Okay. Do you recall saying to him something to the effect of, you know, "I think you are just trying too hard to be a cop, Mike."?**

A: I don't recall saying that. That -- that -- that doesn't sound like something I would say. Oh, I don't recall it, no.

MR. BUSBY: Okay. You know what? I want to take a very quick break and come back, but I think we're getting close to the end here. So do you mind if we take five minutes for a bathroom break?

MS. PARKS: Sure.
MR. BUSBY: Okay. Thank you.
MR. MATHESON: Thank you.
MS. FLETCHER: We are going off the record, and the time is 3:24 p.m.
MS. FLETCHER: We are back on the record in the matter of Michael Erwine v. Churchill County, et al. And the time is 3:28 p.m.
**Q: Captain Matheson, I just have a few more questions. Do you recall ever conducting any other internal investigation into allegations of misconduct against Sergeant Summers?**
A: I don't -- I don't recall.
MR. BUSBY: Okay. All right. I think that's -- that's all I got. So Ms. Parks, do you have any questions?
MS. PARKS: I have -- I have -- I have a question --
MR. BUSBY: Okay. Go ahead.
MS. PARKS: -- for -- I have a couple of questions.
CROSS EXAMINATION
BY: Ms. Parks
**Q: Mr. Matheson, when you were asked questions by Mr. Busby about the Jessica Zamora, Samuel Davis incident, you gave testimony about potential report writing. What I would like to know is whether or not you do actually remember having prepared a**

**written report relative to that incident?**

A: I don't -- I don't remember.

MR. BUSBY: Object -- I'm going to object to the form. Go ahead.

**Q: Finish your answer.**

A: I do not remember actually completing a report.

MS. PARKS: All right. That's all I have.

MR. BUSBY: Okay. I'll go ahead and give the closing admonishment. I think we're finished unless you want to do the honors, Kathy.

MS. PARKS: Oh, no. That's okay.

MR. BUSBY: Okay. Captain Matheson, thank you for your time today. I appreciate you showing up. What happens next is the court reporter is going to prepare a transcription of your deposition. You'll have a chance to review it and make any changes to your answers, substantive or otherwise. But keep in mind that if you do make any changes, I'll be able to comment on those if you do testify at trial. And other than that, thank you for your time and thank you for your service.

MR. MATHESON: Thank you.

MS. FLETCHER: This concludes --

MS. PARKS: Thanks, Luke.

MS. FLETCHER: Thank you.

MR. BUSBY: [INAUDIBLE].

MS. FLETCHER: This --

MS. PARKS: I'll take a copy.

MS. FLETCHER: You want a copy? Okay. This concludes --

MS. PARKS: Yes.

MS. FLETCHER: -- the recorded deposition of Captain Michael Matheson. We are now going off the record. The time is 3:31 p.m.

(Deposition adjourned at 3:31 p.m.)

Page 43

CERTIFICATE OF RECORDER

STATE OF NEVADA )
)
COUNTY OF WASHOE )

NAME OF CASE: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY ET.AL. DEFENDANTS

I, Sally Fletcher, a duly commissioned Notary Public, authorized to administer oaths or affirmations in the State of Nevada, do hereby certify: That I recorded the foregoing deposition of the witness, Cap. Michael Matheson, on 01/07/2021.

That prior to being examined, the witness was duly sworn to testify to the truth. That deposition was recorded via audio and video pursuant to NRCP30(b)(3) and said deposition recording is a complete, true, and accurate recording of deposition testimony. A transcript was created by E-Depositions LLC to aid the audio video recording. A review of the deposition [ ] was [X] was not requested by the deponent and [ ] was [X] was not requested by a party of the action. If a review was requested, any changes communicated to me by the deponent during the period allowed are appended hereto.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor

Page 44

a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Las Vegas.

Sally Fletcher
Notary Public
Appointment No. 16-1551-1

Page 45

STATE OF NEVADA )
)SS
COUNTY OF WASHOE )

Case Name: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY ET.AL. DEFENDANTS

Case Number: 3:18-cv-00461-RCJ-WGC

Deposition Date: 01/07/2021

Deponent: CAP. Michael Matheson

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the State of Nevada, that I have reviewed the entire recording of my deposition taken in the above-captioned matter or the same has been played or read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the ERRATA SHEET attached hereto and made part hereof, with the understanding that I offer these changes as if still under oath.

Executed on this_________ day of______________, 2021, at ____________________,

______________________________
CAP. Michael Matheson

Page 46

ERRATA SHEET

Case Name: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY ET.AL. DEFENDANTS

Deposition Date: 01/07/2021

Deponent: CAP. Michael Matheson

REASON CODES: 1. To clarify the record.

2. To conform the facts.

3. To correct transcription errors if reviewed with the official audio video recording. Understanding the transcript reviewed is not the official record and is an aide to the audio video recording. Transcription errors will be corrected to match the audio video recording.

Page____________Line_________Reason_____________________________

From______________________________to____________________________

Page____________Line_________Reason_____________________________

From______________________________to____________________________

Page____________Line_________Reason_____________________________

From______________________________to____________________________

Page____________Line_________Reason_____________________________

From______________________________to____________________________

Page____________Line_________Reason_____________________________

From______________________________to____________________________

Page____________Line_________Reason_____________________________

From______________________________to____________________________

CAP. Michael Matheson

Page 47

Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
Page____________Line_________Reason______________________________
From______________________________to____________________________
CAP. Michael Matheson

**Exhibits**

**Exhibit 1** 3:8 23:16
**Exhibit 3** 3:9 33:9
**Exhibit 4** 3:10 30:21 31:10 33:1 38:19
**Exhibit 7** 3:11 25:7
**Exhibit 8** 3:12 34:24

**1**

**1** 23:16 25:9
**1.2** 25:10
**10** 16:10,11 17:25 31:7
**105** 4:5
**10th** 23:25 31:8
**15** 18:2
**1988** 8:7
**1991** 7:14
**1993** 6:19

**2**

**2** 31:12,16
**2013** 7:5,10
**2015** 24:6
**2016** 18:24 20:13 22:22 23:13,25 24:6 31:7,8
**2017** 7:6
**2018** 6:24
**2021** 4:5
**2:28** 4:6
**2:41** 15:2
**2:44** 15:4

**3**

**3** 24:15 33:9
**30** 5:16
**3:24** 40:5
**3:28** 40:8
**3rd** 25:14

**4**

**4** 30:21 31:10 33:1 38:19

**5**

**50** 16:12

**7**

**7** 4:5 25:7
**730** 4:4

**8**

**8** 34:24
**89521** 4:5

**9**

**9** 25:9,11
**9th** 24:5,6 25:14

**A**

**ability** 19:20 21:22
**absolutely** 34:1
**accompany** 20:15
**accused** 38:17
**action** 21:4 29:24 30:3,4,11
**actions** 38:16
**administered** 19:25
**administration** 25:9
**admonishment** 41:9
**affects** 19:20
**affirm** 4:9
**afternoon** 5:6,7
**agencies** 12:10
**agency** 13:13
**agreed** 21:14
**agreements** 24:18
**ahead** 12:23 13:1 15:21,22 17:19 40:17 41:4,8
**aid** 4:19
**al-** 18:5
**alle-** 37:9
**allegation** 27:25 28:22 37:6,10
**allegations** 22:1,6 27:20,23 31:9 35:4 40:11
**alleged** 27:15
**allowed** 20:15
**ambiguous** 11:6 17:17
**Andrew** 30:16,18
**anormal** 32:10
**answers** 5:19 41:16
**Any-** 29:11
**appearing** 4:24
**appears** 32:4
**applicant** 11:2 12:7
**applicants** 12:10 17:15,18,20,21 18:3
**applying** 15:16
**approximate** 8:22 13:8
**approximately** 5:15
**April** 7:5
**assign** 12:18 13:12
**assigned** 15:9
**assume** 12:13
**assumption** 28:12
**attend** 7:15,19
**attention** 25:10 36:10,18
**attorney** 5:11
**attorneys** 4:20
**audio** 4:17 14:8,9
**audio-video** 4:20
**August** 18:24 20:13 22:22 23:13
**authored** 32:3,4

**avenue** 21:20

**aware** 22:1,6,20,22 26:21,23 35:24 37:25

B

**back** 10:1 15:3 39:23 40:6

**background** 10:9,11,17,19,21, 22 11:2,9,15 13:18 14:5 15:8,11, 20,24 16:5

**Ballpark** 17:24

**Banner** 28:2

**basic** 5:18 11:1

**Basically** 36:5

**basis** 38:9

**bathroom** 28:1 39:25

**Beaulieu** 30:16,18 31:10,13,20 32:8 38:1

**began** 7:5

**beginning** 4:22

**behalf** 5:1

**benefits** 17:14

**bit** 11:12 14:4 25:7

**bookkeeping** 32:11

**break** 39:23,25

**briefly** 17:1 23:18

**bullet** 31:15,19,21

**bureau** 8:11

**Busby** 4:24 5:5,10,17,23 6:2,9 7:24 11:8 12:24 14:8,10,14,16,18, 22,25 31:2 39:4,22 40:2,13,17,23 41:3,8,12,24

**businesses** 11:17

C

**cabinet** 32:20

**called** 26:17

**candidate** 11:15,20

**captain** 4:7,8 5:6 7:2 8:11,16 12:24 15:5 26:25 27:8 36:17 39:5 40:9 41:12

**career** 21:20

**carry** 12:15

**caused** 37:3,5

**center** 8:12,13 25:22

**certification** 8:6,7

**certifications** 8:3

**certified** 8:5

**certify** 24:16

**cetera** 9:23

**chance** 41:15

**charge** 27:1

**Charles** 4:15

**check** 14:9 21:11

**checks** 19:9

**Churchill** 4:2 7:2,4,8 8:9,23 10:10 11:7 12:21 16:14 17:6 18:16,21 19:20 22:3,8,14 24:2 25:4,8,19 26:25 28:6,15 32:16 33:8 34:15,18 39:12 40:7

**circumstances** 20:23 31:10 33:7

**civil** 8:13

**claim** 29:23

**claimed** 27:25

**clarity** 6:13

**clear** 24:20 26:8 30:9

**client** 8:20 9:7

**close** 5:16 39:23

**closing** 41:9

**collect** 13:18

**college** 7:15,16,19,21,23

**command** 8:14

**comment** 41:18

**committee** 10:1

**common** 15:25

**community** 7:22,23 28:2

**competitive** 17:11

**complain** 22:13,23

**complained** 22:17

**complaint** 27:15 35:18,22 36:7, 10,15 37:25

**complaints** 22:11

**complete** 21:11

**completed** 20:16 28:10,11 29:1, 4,7 32:13

**completing** 41:6

**completion** 20:17

**computer** 14:20

**computers** 20:10

**concern** 31:16

**concerned** 19:13,15,16,18

**concerns** 21:5

**concludes** 41:21

**conduct** 10:9 19:8 21:22 22:23 27:11,19 32:7

**conducted** 8:17 10:16 11:9 16:6 17:8 25:17 27:2 31:20 36:6 37:8, 11

**conducting** 11:1 40:10

**conference** 4:8

**confusing** 22:12

**connect** 14:20

**connected** 14:12,17

**consisted** 11:16

**contact** 12:1

**contacting** 11:16

**contents** 12:13,19 13:12 15:10

**context** 13:4

**conversation** 19:11 34:11

**conversations** 34:14

**cop** 39:18

**copies** 15:17

**correct** 9:18 10:8 15:14 32:5 39:8

**corroborate** 29:23

**counsel** 12:25 19:8

**County** 4:2 7:2,4,8 8:9,23 10:10

11:7 12:21 16:14 17:6 18:17,21 19:21 22:3,8,14 24:2 25:4,8,19 26:25 28:6,15 32:17 33:8 34:15, 18 39:12 40:7

**couple** 26:20 27:14 40:18

**court** 5:18 13:22 41:14

**courtroom** 5:21

**create** 28:3 37:14

**created** 4:19 37:21

**CROSS** 40:20

**current** 13:14

D

**date** 4:5 8:24

**dated** 24:4 31:7,8

**Davis** 35:7,8,20 36:7,9 37:7 40:23

**day** 9:25 10:6 18:8 19:3

**day-to-day** 8:17 16:18 38:9

**deals** 38:8

**December** 24:5

**decides** 15:13

**decision** 12:15 18:16

**decision-maker** 13:16 15:12

**decisions** 14:6

**defendants** 5:2

**defense** 38:17

**degree** 7:17

**Delivering** 34:7

**delve** 19:23

**deny** 20:1

**department** 6:22 29:25 35:17 36:17

**department-issued** 9:15

**depend** 21:24

**deposed** 5:13

**deposition** 4:3,6,18 5:11,12 6:3, 10 23:16 26:4,13 41:15

**deputies** 10:12

**deputy** 19:1 20:1,14,25 21:17,22 22:3,7,13,17,23,25 24:3 27:20 28:1 29:1,25 30:5 31:23 39:7

**describe** 12:14

**description** 31:12

**detention** 8:13 10:12 19:9 20:25 21:22 22:3,7,13 25:22 36:22

**determine** 11:20

**determined** 10:7

**direct** 5:4 29:15

**directs** 13:1

**disciplinary** 29:24 30:2,4,11

**discipline** 19:2,6,14,16,19,24,25 20:2,13

**discuss** 17:1

**discussed** 9:23 24:17,21

**discussing** 18:12 24:23

**dispatch** 8:12

**dispatchers** 10:21

**distracting** 21:25

**division** 21:16 27:9,10

**document** 19:7 23:21,22 24:1 28:10,11 29:1 31:3,5,6 33:3,11,13 34:1 35:1 38:21,24

**document-** 29:18

**documentation** 12:10 19:14 37:21

**documented** 28:21 29:19 37:15, 23

**documents** 29:10

**duties** 8:9 21:22 26:24

E

**E-DEPOSITIONS** 4:4,20

**effect** 39:17

**elaborate** 35:21

**electronic** 4:17

**employee** 9:3 12:9,13,19 15:24 21:13 24:3 38:13

**employees** 25:4,14

**employers** 12:1,7

**employment** 18:7,21 19:15,17, 20 25:18

**end** 9:25 10:6 18:8 39:24

**enforcement** 11:2 12:6,11,16,20 13:13,14 15:16,17 21:19

**entire** 9:4

**equipment** 9:15 16:24 34:6 39:12

**Erwine** 4:2,25 8:20 9:20 10:2 16:18 18:10,13,20 19:1,11 20:12, 14,18 21:4 22:17,23 23:1,13 24:3, 12,21 25:18 26:1 33:2,24 34:5,14, 15,19 37:17 38:12,24 39:1,7,12 40:7

**Erwine's** 5:11 15:20 21:5 29:1 31:23 33:7

**essentially** 8:8

**estimate** 16:6 17:21

**estimates** 13:3

**et al** 4:2 40:7

**eth-** 11:22

**ethical** 11:22

**evaluated** 25:14

**evaluating** 13:13

**evaluation** 24:3,8,13 25:3,18 26:1

**evaluations** 25:11

**evidence** 5:25 29:23

**exact** 17:10

**EXAMINATION** 5:4 40:20

**excerpts** 25:8

**exclusive** 27:6

**exclusively** 27:3

**executed** 38:25

**exhibit** 23:16 25:7 30:21 31:10 33:1,9 34:24 38:19

**existed** 28:18

**experience** 15:15

**experienced** 15:8

**explain** 5:18 10:25 38:16

**explaining** 5:12

F

**facility** 30:16 36:22 38:8

**facility-wide** 19:9

**fact** 15:20

**facts** 14:6 31:9

**fading** 39:2

**failure** 19:8 21:11

**fair** 6:7,8,14,15 13:9 17:12,13 24:24,25 30:13

**Fallon** 6:17,18 28:2 35:16 36:17

**familiar** 25:3 30:19

**feed** 14:8

**file** 12:19 13:12 15:10,24 28:3,7, 14,18 29:7 32:24 37:14

**files** 12:9,14 15:18 28:23 32:12, 18,19,22

**final** 13:16 18:18 31:21

**finding** 29:22 37:15

**finish** 6:12 23:19 41:5

**finished** 34:24 41:9

**fired** 33:25 38:12,25 39:14

**firm** 4:21

**fixed** 14:25

**Fletcher** 4:1,3,13,17 5:3 14:3,9, 12,15,17,19,24 15:1,3 40:4,6 41:21,23,25

**focus** 25:10

**form** 41:4

**full** 4:14

**function** 21:16

G

**gathered** 20:20

**gathering** 14:6

**gathers** 15:11

**gave** 40:23

**give** 4:10 8:1 41:8

**glad** 6:4

**good** 5:6,7 11:21 14:1 17:14

**Great** 15:7

**ground** 5:18 13:2

**guess** 21:24

**guesses** 13:3

**guessing** 13:6

**guy** 15:11

**guys** 34:8

H

**Haberstat** 27:16,21 30:6

**Habertat** 29:21

**hand** 4:9

**happen** 15:13 30:10

**happened** 16:1 27:12 30:5 31:13,20 32:8 33:20 34:3 39:14

**happy** 23:1

**hard** 16:7 39:17

**Health** 6:21

**hear** 14:7,11 15:5 34:18 39:3,5

**heard** 35:4

**hearing** 38:16

**highway** 7:9,12 10:23 11:6,10,21

**hire** 12:15 18:13,16

**hired** 10:12 11:23 16:19

**hiring** 9:11

**history** 11:17

**honors** 41:10

**Hospital** 28:2

**hung** 14:14

**hypothetical** 12:22 15:19,21

I

**identified** 33:12

**identify** 4:21

**Improper** 12:22 15:19,21

**INAUDIBLE** 28:20 41:24

**incidences** 17:2

**incident** 29:21 30:15 33:1,4 37:12,18 38:1 40:23 41:1

**include** 12:6

**included** 8:12

**individual** 12:7 21:25

**individuals** 11:16

**information** 13:17,19 15:12 20:20

**initial** 8:7 24:7

**initialed** 23:25

**inmate** 27:17 38:2

**inmates** 38:5

**interaction** 16:21

**interactions** 16:18

**interest** 21:19,20

**interfere** 21:21

**internal** 27:1,2,11 32:12,17,22 40:10

**interview** 9:10,23 16:23 17:2,5 18:4 37:17,22,24

**interviewed** 9:20 10:1 16:19 37:20

**interviews** 17:8

**investigate** 33:4

**investigated** 31:25

**investigation** 10:18 11:2,16 15:11 27:19 28:4 29:7,16,21 30:1 31:19,23 32:7,12,22 36:6 37:8,12, 15 40:10

**investigations** 10:9,11,16,19, 21,22 11:9 15:8 16:5 27:1,2,11

**investigator** 13:18 14:5

**investigatory** 29:6,10 32:18

**involved** 36:10

**involving** 27:20 30:16 33:1 38:1

**Irwine** 20:1

**issue** 36:19

**items** 31:15

J

**jail** 8:13,15,18 21:13,23 27:12,17 32:8 34:6 38:2,8

**January** 4:5 7:6

**Jesse** 23:9

**Jessica** 35:13,15 40:23

**Jimmy** 35:2

**job** 10:7 11:3 12:20,21 13:18 15:10,16 16:1 18:4 27:3,6

**jobs** 17:11 25:4

**joining** 4:25

**jump** 6:11 13:25

**Justice** 26:21

**justified** 19:24

K

**Katherine** 5:1

**Kathy** 41:10

**Keller** 30:5

**kind** 27:5

**kitchen** 13:5,6,7

**kites** 38:5

**Kleenex** 31:1

**knowledge** 23:4 35:18 39:6

L

**lack** 32:11

**Lacy** 27:15 30:6

**law** 11:2 12:6,11,16,19,20 13:13, 14 15:16,17 21:19

**lawyers** 13:4

**learned** 21:14

**leaving** 33:7

**left** 7:5 15:7 26:18

**letter** 33:12 38:25

**leveled** 22:2

**light** 13:24

**listed** 11:17

**live** 6:16,17

**lived** 6:18

**living** 6:20

**LLC** 4:4,20

**located** 4:4 28:7 32:19

**locked** 32:20

**long** 6:18,23 7:4 13:5,7 30:21

**lost** 14:8,13

**lot** 17:15,18

**loud** 36:20,22 37:4,5

**louder** 14:4

**Luke** 4:24 5:10 22:11 39:2 41:22

M

**M-A-T-H-E-S-O-N** 4:16

**made** 35:5,19 36:7 37:25 38:1

**Maes** 33:1,4

**maintain** 19:20

**make** 13:25 20:3 28:12 30:9 41:15,17

**making** 14:6

**March** 6:24 23:25 24:6

**marked** 23:16 25:6 30:20 33:8 34:24

**match** 11:21

**Matheson** 4:7,8,12,15 5:6,22 6:1,8,15 11:13 12:24 13:10 14:2 15:5 39:5 40:3,9,22 41:12,20

**matter** 4:2 33:19 40:7

**Matthew** 33:1

**Meadows** 7:23

**meant** 6:7

**measures** 20:12

**meet** 5:8 11:23 24:12

**meeting** 9:13 16:23 18:9,20,25 19:1 20:4 22:25 23:12 29:2 38:24

**memorandum** 38:19

**memory** 10:5 28:21

**mentioned** 16:22,23 18:19

**Michael** 4:2,7,15,25 40:7

**middle** 6:10

**Mike** 5:10 10:18 13:23 14:10 24:3 39:18

**mind** 39:24 41:17

**minute** 33:6

**minutes** 39:24

**misconduct** 22:2,6 27:20 40:11

**moment** 8:1 30:22

**month** 25:14

**months** 25:18

**moral** 11:22

N

**necessarily** 24:18

**Nevada** 4:5 6:17 7:9,21,22 8:5 11:6,21

**nine-month** 26:1

**noise** 36:20,22 37:4,5,7

**notation** 37:21

**note** 20:7

**notice** 38:15

**noticing** 4:23

**Nuckolls** 23:9

**number** 16:7 17:10,20

O

**oath** 5:20

**Obj-** 11:5

**object** 12:25 41:3

**objection** 11:5 12:22 15:19,21 16:4 17:17 25:23

**observed** 28:1

**occurred** 23:10

**October** 31:7,8

**offered** 10:7

**office** 5:2 7:3 8:9,23 9:14 11:7 16:15,20 17:7 18:17 20:8 22:3,8, 15,25 24:2 25:9,19 26:19,25 27:4, 7 28:7,15,24 32:17,21 34:16,19 39:13

**officer** 4:3 8:4 11:24 35:16,19 36:10,18

**officers** 20:16,19

**official** 4:18

**one-year** 20:16

**opaque** 31:18

**open** 17:22

**operations** 8:17

**order** 11:23

**outcome** 29:21

**P**

**p.m.** 4:6 15:2,4 40:5,8

**packet** 11:10,14

**pages** 25:9

**Parks** 5:1 11:5,11 12:22 13:20,22 15:19 16:4 17:17 22:9,16 23:17 25:23 26:5,9 30:25 39:2 40:1,14, 15,18,21 41:7,11,22

**part** 6:4 9:19 12:2 22:7,10 26:24 32:24

**participate** 20:15

**parties** 4:8

**party** 4:22

**patrol** 7:9,12 10:23 11:7,10,21 20:16 36:22

**patrols** 21:18

**pay** 17:14

**peace** 11:23 26:21

**penalty** 5:20

**people** 17:5 21:18

**performance** 25:11

**performer** 35:10

**performing** 38:14

**period** 8:22 24:5

**perjury** 5:20

**personal** 11:17

**personnel** 13:12 32:19,24

**phoentic** 27:16

**phone** 14:14

**picking** 34:5

**place** 32:23

**places** 15:18

**plaintiff** 4:24

**Pleasure** 5:8

**point** 9:14 18:6,20 23:4 27:18 28:18 31:19,21

**points** 31:15

**police** 8:4 35:16 36:17

**policy** 25:9,10

**pop** 7:25

**position** 12:16 13:14 17:22 21:13,15 38:4

**positions** 17:15

**POST** 8:5

**potential** 40:24

**practical** 33:19

**precise** 37:10

**prepare** 41:14

**prepared** 40:25

**present** 4:21

**presented** 38:24

**pretty** 30:21

**prevent** 21:8

**previous** 12:1,6,19 13:13 15:10 16:1 19:2

**previously** 12:11 15:17,18

**prior** 35:6 39:7

**prisoner** 36:19

**probation** 20:17 25:15

**probationary** 21:13 25:3,13 38:13

**proceed** 5:3 13:2

**proceeding** 4:23 5:24

**proceedings** 22:21 35:6

**process** 5:12 11:1 12:4 18:7

**produce** 20:6

**program** 20:8,9,10 29:3

**prospect** 13:14

**prospective** 11:14

**provide** 6:11 38:16

**pursuing** 21:20

**Q**

**qualifications** 8:4

**qualified** 10:7 18:5

**quarter** 7:20

**question** 6:5,12 12:17 13:11 22:5,9,10 32:15 39:5,6 40:15

**questions** 5:19 6:3,5,10 12:25 13:3 23:20 30:23 40:9,14,19,22

**quick** 39:23

**quit** 7:10

**R**

**raise** 4:9

**rat** 34:19,21

**rated** 24:24,25

**rating** 24:5 25:2

**read** 24:21 33:3 35:1

**ready** 26:4 30:22

**realize** 33:19

**rec-** 25:25

**recall** 9:22 10:3,13 16:16,17,21 18:9,12,23 19:4,6,10 20:1,11 24:14,23 25:5,25 27:23 29:22 30:2,4,7,8,12 31:6 33:15 34:8,10, 14 36:9,14,16,21 37:5,6,8,9,19 38:13,14,15,18,23 39:10,11,15, 16,19,20 40:10,12

**recalled** 36:20

**receive** 8:6 11:10,14

**received** 8:7 19:2,13,16,19

**receiving** 16:24 38:15

**recognize** 33:11

**recollection** 28:13,16

**recommended** 20:14

**record** 4:1,19 5:19 6:13 14:22 15:1,3 20:3,6 40:4,6

**recorded** 4:6,7

**recording** 4:18,20

**refer** 29:10,12 34:19,20

**Referring** 31:23

**regard** 19:2,8

**Regional** 6:21

**regular** 21:22

**relative** 41:1

**remain** 29:8

**remember** 8:20,22 9:7,9,10,13, 14 17:2,4 29:20 30:9,15 33:24 34:2 40:25 41:2,6

**remembered** 34:5

**remove** 14:19

**Reno** 4:5 7:22

**Renown** 6:21,23 7:1

**repeat** 6:6 12:17 22:5

**rephrase** 6:4

**report** 24:3,13,16,21 40:24 41:1, 6

**reporter** 5:18 13:22 41:14

**represent** 4:22 25:8

**request** 12:9 15:17,23

**requested** 19:1 36:16

**respect** 17:18

**responding** 6:12

**response** 21:5

**responsibilities** 8:12

**restrictive** 20:11

**result** 20:13 22:20 29:25 30:5 36:7 37:7

**review** 29:11 30:22 31:9 32:25 41:15

**reviewed** 23:21 31:1,3

**reviewing** 34:25 38:5

**ride-along** 20:15 21:9,18

**ride-alongs** 20:18,22,23

**Road** 4:4

**Ronald** 36:17

**room** 34:3

**rule** 13:2

**rules** 5:18

**S**

**Sally** 4:3 14:8

**Sammy** 35:7,8

**Samuel** 40:23

**Sandhill** 4:4

**sat** 9:10

**schedule** 25:3

**screen** 7:25

**section** 8:13

**security** 6:21

**sense** 15:25

**sentence** 31:24

**separately** 31:25

**separation** 33:12 38:25

**sergeant** 19:3,4,5,19 20:1,12 21:4 22:2,7,10,11,14,23 23:1,9 35:19 36:6,13 37:7 38:8 40:11

**sergeants** 8:17 25:21

**service** 41:19

**setting** 21:15

**sheriff** 9:17 10:3,4,15 18:13,15 26:15,18 29:13 32:3,4

**sheriff's** 7:2 8:9,23 11:7 16:15, 20 17:6 18:17 20:8 22:3,8,15 24:2 25:9,19 26:19,25 27:4,7 28:6,15 32:17,20,21 34:16,19 39:13

**shift** 20:22,25 21:9,17

**show** 23:15

**showed** 38:19

**showing** 41:13

**shows** 14:12,17

**sic** 17:2

**sights** 21:15

**signature** 24:16,17 33:13 34:1

**signed** 24:22

**signing** 33:15

**sir** 5:9,14 6:16,20 7:15 8:19 10:5 12:5,17 15:6 16:2,25 22:5 23:21 25:12 26:14 27:2,6 28:17 29:19 30:7,17 31:3,17 32:2,6 33:10 34:20 35:1,22 37:24 38:6,10,18

**sitting** 13:8

**slow** 11:11

**slowly** 13:25

**solemnly** 4:9

**someone's** 12:19 15:15

**sort** 20:6

**sound** 6:14 30:19 39:20

**Southern** 7:20

**speak** 13:25 14:3 26:12 36:16

**specialized** 8:3

**specifically** 18:9

**specifics** 9:22

**speed** 13:24 25:7

**spelling** 4:14

**Spillman** 20:8,9 28:25 29:3

**spoke** 26:5

**spoken** 26:15,18

**stage** 18:6

**standard** 38:14

**standards** 11:23

**start** 5:12 6:12 7:11,12 8:24

**started** 19:15

**state** 4:13 7:21 8:5

**statement** 11:18 17:12,13
**statements** 32:25
**step** 30:25
**stipulation** 4:8
**striking** 37:7
**subject** 5:20
**submitted** 38:7
**substance** 18:25 19:10,12 20:2 36:15
**substantial** 29:23
**substantive** 41:16
**Suite** 4:4
**Summers** 19:5,19 20:12 21:5 22:2,12,14 23:1 35:5,19 36:8,13 37:7 40:11
**Summers'** 22:7,10,23 36:6
**supervise** 8:16
**supervisor** 23:2,4
**supervisor's** 20:7
**support** 8:11 27:9
**surrounding** 33:7 38:1
**system** 29:8 32:11

T

**table** 13:5,6,7
**taking** 5:11 13:23 21:5
**talk** 33:6 34:8
**talked** 26:9
**talking** 13:24 15:8
**team** 9:19
**telephone** 26:7
**tenure** 9:2
**term** 32:11
**terminated** 9:16 16:24
**termination** 39:7
**testify** 41:18
**testifying** 5:21
**testimony** 4:10 5:24 40:24
**th-** 18:3
**things** 25:7 27:12,15 33:20
**Thomas** 35:2,5
**three-month** 24:7
**til** 14:23
**time** 4:6 6:2 7:21 8:22 9:4 12:24,25 14:21 15:2,4 18:20 20:21 21:18 22:4,8,24 26:20 28:14 34:9 36:21 38:20,25 40:5,8 41:13,19
**times** 6:9
**today** 5:11,19 26:4 31:4 35:5 41:13
**Today's** 4:5
**topic** 32:1
**transcript** 4:19 14:1
**transcription** 41:14
**transfer** 36:21
**transferred** 23:3,5
**transported** 36:19
**treated** 35:19
**treatment** 36:6
**trial** 5:25 41:18
**trooper** 7:9
**Trotter** 9:17 10:3,4,15 18:13 26:15,18 32:4,5
**Trotter's** 18:15
**Truckee** 7:23
**truth** 4:10,11
**turned** 39:12
**turning** 9:14
**turns** 15:12
**typical** 17:6,22

U

**ultimately** 18:15
**understand** 5:21,23 6:3 10:25 22:9,10 24:17 32:14 33:23
**understanding** 38:11
**understood** 6:6
**unit** 36:22
**University** 7:21
**ush-** 32:4
**Utah** 7:20
**utilized** 20:8

V

**Vague** 11:5 17:17
**verbal** 19:7,8
**video** 4:6,7,25 7:25
**visual** 4:18
**voiced** 21:6
**volume** 14:20

W

**wave** 14:10
**weight** 12:14,18 13:12,17 15:9
**weighted** 13:16
**Wenger** 36:17
**Western** 7:22
**White** 38:2
**work** 4:4 6:21 27:5
**worked** 6:25 7:7 8:10,23 10:10 12:11 15:17,18 17:6 22:7,14 28:9 32:13 34:15
**working** 20:25 25:22 32:16
**would've** 37:23
**wow** 5:17
**writing** 40:24
**written** 41:1

Y

**year** 17:6
**years** 5:14,15,16 33:20
**years.you're** 26:21

**Z**

**Zachary** 38:2

**Zamora** 35:13,15,19 36:7,11,18 40:23